IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| CALVIN NEYLAND, JR., | ) | |
| | ) | CASE NO. 3:16 CV 1064 |
| Petitioner, | ) | |
| | ) | |
| v. | ) | JUDGE JOHN R. ADAMS |
| | ) | |
| CHARLOTTE JENKINS, Warden, | ) | |
| | ) | **MEMORANDUM OF OPINION** |
| Respondent. | ) | **AND ORDER** |
| | ) | |

**INTRODUCTION**

Petitioner Calvin Neyland, Jr., was convicted and sentenced to death in an Ohio state court for the aggravated murder of Douglas Smith and Thomas Lazar. Neyland has filed a petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254, challenging the constitutionality of his convictions and sentence. (Doc. 17.) Respondent Warden Charlotte Jenkins has filed a return of

writ to the petition. (Doc. 43.)[1] And Neyland has filed a traverse and supplement to the traverse. (Docs. 50, 59.) For the reasons stated below, Neyland's petition is DENIED.

## FACTUAL HISTORY

The Ohio Supreme Court set forth the following facts underlying Neyland's convictions:

> A. *State's case*
>
> {¶ 2} Evidence introduced at trial showed that Neyland began working as a truck driver for Liberty Transportation Company in Perrysburg, Ohio, in July 2006.
>
> {¶ 3} Beginning in March 2007, Neyland was cited several times for falsifying his driver's logs and for committing other driving violations. On July 24, 2007, Liberty notified Neyland in writing of these infractions and informed him that any further violations for completing a false document would result in his termination from the company.
>
> {¶ 4} Doug Smith was the branch manager for Liberty Transportation in Perrysburg. During the spring of 2007, Smith noticed a change in Neyland's attitude and performance. Smith was receiving complaints from Liberty's customers about Neyland, and some of them did not want Neyland to return to their businesses. Neyland and Smith had a meeting about one of the complaints. The meeting resulted in a bizarre ending with Neyland seated in a lawn chair outside Smith's office, repeatedly phoning him, while Smith remained in his office with the doors locked.
>
> {¶ 5} During late July or early August 2007, Anthony Arent, the shipping manager at nearby Great Lakes Windows, overheard Neyland on the phone with Smith. Arent testified that Neyland was "very uncooperative" during the conversation and that he resorted to profanity, calling Smith "a bitch." William Lynch Jr., a truck driver for Liberty, talked to Neyland about a week before the murders. Neyland, who was upset with Smith, warned, "If they mess with me, I'll just shoot them."
>
> {¶ 6} On August 1, 2007, Neyland was involved in a vehicle accident and was determined to be at fault. Following this incident,

[1] According to the Ohio Department of Rehabilitation & Correction's Offender Search service, Neyland is currently incarcerated at the Ross Correctional Institution, where Tim Shoop is the warden. For consistency with the docket, however, the Court continues to list Charlotte Jenkins as the respondent.

officials at Liberty decided to terminate Neyland's employment.

{¶ 7} Smith scheduled a meeting with Neyland at Smith's office at 8:00 a.m. on August 8, 2007, to terminate Neyland's employment. Thomas Lazar, the safety director for Liberty, planned to attend this meeting because Smith did not want to be alone with Neyland when he terminated him. Lazar also planned to remove the Department of Transportation ("DOT") sticker that was attached to the door of Neyland's tractor-trailer.

{¶ 8} On August 8, Neyland delayed the meeting three times before he finally agreed to meet with Smith and Lazar at 3:00 p.m. During one conversation to reschedule the meeting, Neyland told Smith that if Smith was going to have somebody at the meeting, then he was going to bring somebody, too.

{¶ 9} At approximately 3:00 p.m., Neyland arrived outside Liberty's warehouse in his tractor. Neyland was wearing a dark Hawaiian shirt. It is unclear whether Neyland met with either Lazar or Smith when he first arrived. In any event, Neyland shot Lazar four times in the back and once in the arm in the yard outside the building. Neyland then entered Liberty's warehouse with a gun in his hand and walked up the stairway to Smith's office.

{¶ 10} Smith called 9–1–1 and reported that he heard shots being fired. He told the 9–1–1 operator that he needed to get downstairs to see what was going on. On the recording of the call, two gunshots can be heard and a voice says, "crawl bitch." There is then the sound of a struggle, and Smith repeatedly calls for help. A final shot was then fired. Neyland had killed Smith in his office with a single gunshot to the head.

{¶ 11} Afterwards, Neyland left the warehouse with the gun in his hand. He walked to his tractor and drove away.

{¶ 12} Police officers arriving at the scene found Lazar lying on the lawn in front of Liberty's warehouse. He died at the scene shortly thereafter. Officers also went upstairs and found Smith's dead body lying on the floor near his desk. A description of Neyland's tractor, along with a partial license-plate number, was broadcast to law-enforcement agencies.

{¶ 13} Investigators collected shell casings outside the warehouse and around Smith's office. They found one bullet hole that went through Smith's chair and into the wall and another bullet hole in the wall behind the chair. Investigators also found paperwork about

Neyland's performance, including a driver's vehicle-inspection report, in the middle of the desk.

{¶ 14} After the shooting, Neyland drove to the Silver Blue Motel in Monroe County, Michigan, where he was staying. During the late afternoon of August 8, 2007, police officers spotted Neyland's tractor parked outside the motel. Officers watched the tractor until the Monroe County Special Weapons and Tactics ("SWAT") team arrived.

{¶ 15} Around 6:00 p.m., Neyland came out of his motel room, got into the tractor, and drove the short distance to the motel office. The SWAT team then approached the vehicle and arrested Neyland. As he was being placed on the ground, Neyland said, "I was going to turn myself in." Neyland also said, "I want the letter. There's a letter in my truck. It's to my brother. It's my last will." When asked if he had any weapons before being handcuffed, Neyland said, "No, the gun is in the truck by the door."

{¶ 16} Neyland was placed in a police cruiser following his arrest. Sgt. Keith Williamson of the Ohio Bureau of Criminal Identification and Investigation ("BCI & I") Crime Scene Unit, obtained a gunshot-residue sample from Neyland's hands.

{¶ 17} After obtaining a search warrant, the police seized evidence from Neyland's tractor. A Ruger 9 mm handgun and magazine inside a holster, another weapon magazine, and a dark Hawaiian shirt were found between the driver's and the passenger's seats. Sgt. Williamson also obtained a gunshot-residue sample from the steering wheel.

{¶ 18} During the search of the tractor, the police collected an envelope addressed to Phyllis Gregory with Neyland's return address. Inside the envelope were three default-payment notices that had been sent to Neyland for four storage units. On each of the notices, Neyland had handwritten some variation of the following statement: "This may be my last will and testament. You may have these items. I will no longer be able to pay; these are paid til 8/1/07." Two of the statements were signed by Neyland. On the reverse side of one notice, Neyland wrote that additional items were located at the Silver Blue Motel. Beneath this last statement, Neyland wrote an address next to his brother's name.

{¶ 19} Dr. Cynthia Beisser, M.D., deputy coroner for Lucas County, conducted the autopsies on Smith and Lazar. Dr. Beisser testified that Smith died from one gunshot wound to the head. The gunshot

entered Smith's right cheek and exited just above his left ear.

{¶ 20} Dr. Beisser testified that Lazar was shot four times in the back and once in the right arm. Three of the shots in the back were in close proximity and displayed a triangular pattern. Gunpowder stippling around one of the gunshot wounds in the back indicated "an intermediate range of fire." Dr. Beisser concluded that Lazar's death resulted from multiple gunshot wounds.

{¶ 21} After obtaining a search warrant, the police searched Neyland's storage units. In one of the units, the police found two spotting scopes set up in the middle of the unit with pieces of paper underneath. The top piece of paper stated, "If your big dumb retard ass wasn't in here!!! You wouldn't be reading this would you?" A paper underneath that one stated, "OOOO, I'm so scared. Three Round Shot Group." On the same paper, three pennies were arranged in a triangular pattern with circles drawn around them. Below the pennies, there was the statement, "You think I'm playing[.] You're gonna come up missing!!!" Numerous firearms and ammunition were also found in the storage unit.

{¶ 22} Daniel Davison, a forensic scientist at BCI & I, performed a gunshot-residue analysis on samples from Neyland's hands and from the steering wheel of the tractor. Davison testified that test results were "highly indicative of gunshot residue" on one of the samples from Neyland's hands and on a sample from the steering wheel.

{¶ 23} Todd Wharton, a forensic scientist at BCI & I, compared Neyland's fingerprints with a fingerprint lifted from a weapons magazine found in Neyland's tractor. Wharton testified that his comparison identified the print of Neyland's left little finger on the magazine.

{¶ 24} Wharton also examined the Ruger 9 mm semiautomatic pistol found in Neyland's tractor. Testing established that the empty cartridge cases collected at the murder scene were fired from this firearm. Testing also confirmed that bullets recovered from the scene and from the Lazar autopsy had been fired by this firearm.

B. *Defense case*

{¶ 25} The defense presented no witnesses during the trial phase. The defense did present four sales receipts showing that two rifles, a shotgun, and a pistol found in Neyland's storage unit had been purchased on November 3, 2006. Defense counsel offered this evidence to show that these weapons were purchased almost ten

months before the homicides.

*State v. Neyland*, 139 Ohio St. 3d 353, 353-56 (Ohio 2014).

## PROCEDURAL BACKGROUND

### A. State-Court Proceedings

#### 1. Trial

A Wood County, Ohio, Grand Jury indicted Neyland on August 29, 2007, for the aggravated murders of Douglas Smith and Thomas Lazar. (Doc. 20-2 at 20-22.)[2] Count One charged him with the aggravated murder of Lazar with prior calculation and design under Ohio Rev. Code § 2903.01(A)(1). (*Id*. at 20.) Count Two charged him with the aggravated murder of Smith with prior calculation and design under Ohio Rev. Code § 2903.01(A)(1). (*Id*.) Both counts contained a death-penalty specification for a course of conduct involving multiple murders or attempted murders under Ohio Rev. Code § 2929.04(A)(5), and a firearm specification. (*Id*.) Count Two also included a capital specification for murder to escape accounting for a crime under Ohio Rev. Code § 2929.04(A)(3). (*Id*. at 21.) The court assigned attorneys Adrian Cimerman and J. Scott Hicks to represent him. (*Id*. at 18.)

Neyland was arraigned on September 12, 2007. (*Id*. at 50.) He entered a plea of not guilty to all charges. (*Id*. at 51.)

On October 29, 2007, Neyland, through counsel, filed a motion requesting that the court determine his competency to stand trial. (*Id*. at 58.) The court ultimately ordered three competency evaluations of Neyland at Neyland's request. (*See id*. at 68, 78, 113.) The court conducted a hearing on Neyland's competency to stand trial on March 21, 2007. (Doc. 21-1 (Trial

[2] For ease of reference, all citations to page numbers of documents filed in the Court's electronic court filing system ("ECF") are to the ECF-assigned page numbers of the individual documents, not to the documents' original page numbers or the ECF "PageID" numbers.

Tr.) at 101-214.) Based on Ohio's competency statute, the testimony of two psychiatrists and two clinical psychologists, and three expert reports, the court concluded that Neyland was competent to stand trial, as "the presumption of competency was not overcome by a preponderance of the evidence and [Neyland's] mental condition [was] not a mental illness that prevent[ed] him from (a) understanding the nature of the proceedings against him, or (b) . . . assisting in his defense in a meaningful manner." (*See* Doc. 20-3 at 24.)

Neyland's trial began on October 20, 2008. (*See* Doc. 20-9 at 142.) On October 30, 2008, the jury reached a verdict of guilty on all charges except the murder-to-escape-detection specification. (*Id*. at 143-44.) The mitigation phase of Neyland's trial began on November 4, 2008. (*Id*. at 144.) On November 6, 2008, the jury recommended a sentence of death on each count of aggravated murder. (*Id*. at 144-45.)

On that same day, the court imposed the death sentence on both counts of aggravated murder and the attached specifications. (*Id*. at 145.) It further imposed a three-year prison term as to the firearm specifications of each count. (*Id*.)

**2. Direct appeal**

Neyland, now represented by attorneys Spiros Cocoves and Ann Baronas, filed a timely appeal of his convictions and sentences directly to the Ohio Supreme Court. (Doc. 20-11 at 4-5.) In his merit brief, he presented nineteen propositions of law, stated as follows:

1. It is a violation of due process, right to a fair trial, and cruel and unusual punishment to try a capital defendant who is incompetent and unable to assist in his own defense.

2. A trial court commits error and violates a criminal defendant's due process rights under the Fifth, Sixth and Fourteenth Amendments to the United States Constitution and the applicable portions of the Ohio Constitution when it orders, without a valid reason, a criminal defendant to wear a leg brace restraint while in trial.

3. Trial counsel commit error and violate a criminal defendant's due process rights under the Fifth, Sixth and Fourteenth Amendments to the United States Constitution and the applicable portions of the Ohio Constitution when it fails to object to a trial court's order that a criminal defendant wear a leg brace restraint while in trial.

4. A trial court errs where it concludes that the aggravating circumstances outweighed the mitigating factors beyond a reasonable doubt where the evidence clearly establishes that the mitigating factors outweigh the aggravating factors.

5. A criminal defendant is denied due process and the right to effective assistance of counsel where the actions of his trial counsel fall below any accepted standard of competence in violation of the Fifth, Sixth, Eighth, Ninth and Fourteenth Amendments to the United States Constitution and the Ohio Constitution.

6. Prosecutorial misconduct during opening and closing arguments at the mitigation phase of the trial deprives a criminal defendant of a fair sentencing determination.

7. A criminal defendant's trial counsel are ineffective when they fail to file motions to suppress statements made by the defendant and fail to seek suppression of search warrants in violation of his right to counsel and right to due process of law under the Fourth, Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution and the Ohio Constitution.

8. Lethal injection as administered in Ohio constitutes cruel and unusual punishment and violates Mr. Neyland's rights under the Fourth, Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution and the Ohio Constitution.

9. Errors in the mitigation phase jury instructions of a capital trial violate a defendant's constitutional rights under the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution and the Ohio Constitution and require resentencing.

10. In order to comport with due process, the right to meaningful appeal, and avoid cruel and unusual punishment, the universe of cases to be examined for review of proportionality must include all those in which a capital specification has been charged.

11. Jurors who do not unequivocally state that they could not impose the death penalty and can follow the court's instructions may not be dismissed for cause juror [sic] under R.C. 2945.25(C) and *Witherspoon v. Illinois*.

12. A prosecutor may not conjecture about inflammatory subjects not supported by the evidence or elicit improper testimony during the culpability determination phase of a capital trial.

13. A trial court errs in admitting, at a penalty phase hearing, the transcript of testimony of a rebuttal witness for the state where the testimony was generated at a competency hearing and is not proper rebuttal testimony, in violation of a criminal defendant's right to confrontation and due process guaranteed under the Fifth, Sixth, Eighth, Ninth, and Fourteenth Amendments to the United States Constitution and the corresponding provisions of the Ohio Constitution.

14. A trial court must accept a capital defendant's waiver of his right to counsel upon a finding that the defendant is competent to represent himself.

15. A trial court commits error and violates the rights of a capital defendant to due process and to fair trial when it permits evidence of defendant's numerous additional weapons and ammunition that are not related to the crime charged.

16. A death sentence under the facts of this case is neither appropriate nor in proportion to the death sentence[s] in other cases.

17. Ohio's death penalty law is unconstitutional both in the abstract and as applied.

18. Cumulative errors may deprive a criminal defendant and criminal appellant of a fair trial in violation of his rights under the Fifth, Sixth, Eighth, Ninth, and Fourteenth Amendments to the United States Constitution and the corresponding provisions of the Ohio Constitution.

19. When counsel in a capital case do not adequately preserve the record for appellate purposes, they provide constitutionally ineffective assistance of counsel.

(Doc. 20-12 at 2-5 (capitalization altered).) Respondent filed a responsive brief. (*Id*. at 110-88.)

On May 8, 2014, the Ohio Supreme Court affirmed the trial court's judgment. *Neyland*, 139 Ohio St. 3d at 353. Neyland moved for reconsideration (*id.* at 299-307), which the court denied (*id*. at 312).

Neyland filed a timely petition for writ of certiorari with the United States Supreme Court. (*Id.* at 325.) The Court denied the petition on March 9, 2015. (*Id*. at 337.)

**3. Reopening application**

Meanwhile, on December 2, 2014, Neyland, represented by Tyson Fleming and Pam Prude-Smithers of the Ohio Public Defender's Office, filed an application for reopening his direct

appeal pursuant to Ohio Supreme Court Practice Rule 11.06. (*Id*. at 313-24.) That rule permits defendants to request to reopen the direct appeal from a judgment to present claims of ineffective assistance of appellate counsel within ninety days from issuance of the court's direct-appeal mandate, or later for "good cause." Ohio S. Ct. Prac. R. 11.06(A); *see also State v. Murnahan,* 63 Ohio St. 3d 60 (Ohio 1992).

Neyland asserted in the application that appellate counsel were ineffective for failing to raise the following two claims on direct appeal, stated as:

1. A capital defendant is denied the right to the effective assistance of trial counsel when trial counsel prejudicially fails to have his client's competency revisited during his capital trial and sentencing.

2. When the trial court is confronted with indicia that the defendant is incompetent to stand trial, the trial court's failure to order a competency evaluation and conduct a hearing violates the defendant's procedural due process rights.

(Doc. 20-12 at 315, 318.) Respondent filed a memorandum of law in response to the reopening application. (*Id.* at 326-36.)

The court summarily denied Neyland's reopening application on February 24, 2016. (*Id.* at 346.)

**4. Post-Conviction proceedings**

Meanwhile, on April 16, 2010, Neyland, represented by Tyson Fleming and Benjamin Zober of the Ohio Public Defender's Office, filed a petition for post-conviction relief in the state trial court. (Doc. 20-14.) He raised the following grounds for relief, stated as:

1. Neyland's sentence is void or voidable because he was incompetent at the time of his trial. Allowing him to stand trial while incompetent violated Neyland's rights as guaranteed by the Sixth, Eighth, and Fourteenth Amendments to the United States Constitution.

2. Neyland's convictions and sentence are void or voidable because he was denied the effective assistance of counsel during the competency hearing of his capital trial as guaranteed by the Sixth and Fourteenth Amendments of the United States

Constitution. Trial counsel failed to investigate and use available documents from the time Neyland was at Twin Valley Behavioral Healthcare that would have completely discredited Dr. Delaney Smith's testimony that Neyland did not have a mental illness.

3. Neyland's convictions and sentence are void or voidable because he was denied the effective assistance of counsel during the competency hearing of his capital trial as guaranteed by the Sixth and Fourteenth Amendments of the United States Constitution. Trial counsel were ineffective when they failed to impeach Dr. Kristen Haskins during Neyland's competency hearing.

4. Neyland's convictions and sentence are void or voidable because he was denied the effective assistance of counsel during the competency hearing of his capital trial as guaranteed by the Sixth and Fourteenth Amendments of the United States Constitution. Trial counsel were ineffective when they failed to impeach Dr. Barbara Bergman during Neyland's competency hearing.

5. Neyland's convictions and sentence are void or voidable because he was denied the effective assistance of counsel during the competency hearing of his capital trial as guaranteed by the Sixth and Fourteenth Amendments of the United States Constitution. Trial counsel were ineffective when they failed to provide their mental health expert with relevant documents and failed to use the expert to assist them in identifying the fallacies in Dr. Smith's, Dr. Haskins', and Dr. Bergman's testimonies concerning Neyland's competency to stand trial.

6. Neyland's convictions and sentence are void or voidable because he was denied the effective assistance of counsel during the competency hearing of his capital trial as guaranteed by the Sixth and Fourteenth Amendments of the United States Constitution. Trial counsel were ineffective when they failed to use their mental health expert to assist them in identify[ing] the signs of Neyland's mental illness and present them to the trial court.

7. Neyland's convictions and sentence are void or voidable because he was denied the effective assistance of counsel during the competency hearing of his capital trial as guaranteed by the Sixth and Fourteenth Amendments of the United States Constitution. Trial counsel were ineffective when they failed to use their mental health expert to demonstrate the fallacies of Dr. Kristen Haskins' conclusions from the psychological testing she performed on Neyland.

8. Neyland's convictions and sentence are void or voidable because the trial court's decision on Neyland's competency to stand trial was not based on reliable, credible evidence. Neyland's convictions and sentence are void or voidable because Neyland's rights were denied under the Fifth, Sixth, Eighth, and Fourteenth Amendments of the United States Constitution and Sections 1, 2, 5, 9, 10, 16, and 20 of Article I of the Ohio Constitution. The testimony supplied by Dr. Haskins and Dr. Bergman concerning Neyland's competency was not reliable nor credible.

9. Neyland's convictions and sentence are void or voidable because he was denied the effective assistance of counsel during the competency hearing of his capital trial as guaranteed by the Sixth and Fourteenth Amendments of the United States Constitution. Trial counsel were ineffective when they failed to impeach Dr. Kristen Haskins' testimony during Neyland's competency hearing.

10. Neyland's convictions and sentence are void or voidable because he was denied the effective assistance of counsel during the competency hearing of his capital trial as guaranteed by the Sixth and Fourteenth Amendments of the United States Constitution. Trial counsel were ineffective when they failed to impeach Dr. Bergman during Neyland's competency hearing.

11. Neyland's convictions and sentence are void or voidable because he was denied the effective assistance of counsel during his capital trial as guaranteed by the Sixth and Fourteenth Amendments of the United States Constitution. Trial counsel were ineffective when they failed to have Neyland's competency revisited at the time of his trial.

12. Neyland's convictions and sentence are void or voidable because he was denied the effective assistance of counsel during the mitigation hearing of his capital trial as guaranteed by the Sixth and Fourteenth Amendments of the United States Constitution. Ohio recognizes mental disease or defect affecting "substantial capacity to appreciate the criminality of the offender's conduct or to conform the offender's conduct to the requirements of the law" as a statutory mitigating factor. O.R.C. § 2929.04(B)(3). Trial counsel were ineffective when they failed [to] present evidence of Neyland's mental illness to the jury during his mitigation hearing.

13. Neyland's convictions and sentence are void or voidable because he was denied the effective assistance of counsel during the mitigation hearing of his capital trial as guaranteed by the Sixth and Fourteenth Amendments of the United States Constitution. Trial counsel were ineffective in developing and presenting mitigating evidence of his family history of mental illness for the penalty phase of his trial.

14. Neyland's convictions and sentence are void or voidable because he was denied the effective assistance of counsel during the mitigation hearing of his capital trial as guaranteed by the Sixth and Fourteenth Amendments of the United States Constitution. Trial counsel failed to reasonably investigate, prepare, and present compelling evidence of Neyland's history of abuse and neglect to mitigate the sentence of death.

15. Neyland's convictions and sentences are void or voidable due to excessive security measures used during trial, violating his right to a fair and impartial trial, due process, the presumption of innocence, and the right to counsel. U.S. Const. amends. V, VI, VIII, and XIV; Ohio Const. art. I, §§ 1, 2, 5, 9, 10, 16, and 20; *Holbrook v. Flynn*, 4 75 U.S. 560 (1986).

> 16. Neyland's conviction[s] and death sentence are void or voidable because he did not receive effective assistance of counsel during the pretrial phase of his capital proceedings as guaranteed by the Sixth and Fourteenth Amendments of the United States Constitution. Defense counsel was ineffective for failing to request a change of venue.
>
> 17. Neyland's judgment and sentence are void or voidable because, assuming *arguendo* that none of the grounds for relief in his post-conviction petition individually warrant the relief sought from this court, the cumulative effects of the errors and omissions presented in the petition's foregoing paragraphs have been prejudicial and have denied Neyland his rights secured by the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution, and Article I, Sections 1, 2, 5, 9, 10, 16, and 20 of the Ohio Constitution.
>
> 18. Neyland's convictions and sentence are void or voidable because Neyland will be unable to rationally understand the connection between his acts and the punishment to be inflicted. This will deny Neyland's rights under [the] Eighth and Fourteenth Amendment[s] to the United States Constitution.

(*Id*. at 12, 15, 18, 21, 24, 27, 30, 33, 36, 39, 42, 45, 48, 51, 54, 57, 60, 61.) The State filed an answer to the petition. (Doc. 20-15 at 35-48.)

Neyland moved for leave to conduct discovery. (Doc. 20-14 at 63.) The State opposed some of the requests and agreed to others. (Doc. 20-15 at 13-15.) The trial court granted Neyland's motion in part and denied it in part. (*Id*. at 59-60.) The State also moved for discovery (*id*. at 11-12), which Neyland did not oppose (*id*. at 32-33). The State later moved to compel additional discovery (*id*. at 75-76), which the court granted (*id*. at 77).

Nyland further requested a competency evaluation and expert funds (*see id*. at 6), which the State opposed (*id*. at 17-19). The trial court denied the motion. (*Id*. at 61-63.)

On July 25, 2011, the State moved for summary judgment. (*Id*. at 141-386; Doc. 20-16 at 1-142; Doc. 20-17 at 1-212.) Neyland opposed the State's motion. (Doc. 20-16 at 268-307.) The court granted the motion on February 29, 2012. (Doc. 20-18 at 172-223.)

Neyland's counsel, still from the Ohio Public Defender's Office, filed a timely notice of appeal of the trial court's judgment, but expressed reservations regarding Neyland's consent to the

appeal and his competency to proceed. (Doc. 20-19 at 29-30.) Counsel also filed a contemporaneous request for a competency evaluation on Neyland's behalf. (*Id*. at 86-91.) The appellate court denied the request. (*Id*. at 107-09.)

In his merit brief, Neyland asserted the following three assignments of error, stated as:

1. The trial court erred by applying the doctrine of res judicata to bar Neyland's grounds for relief.

2. The trial court erred when in dismissing Neyland's post-conviction [petition] when he presented sufficient operative facts to merit relief or, at a minimum, an evidentiary hearing.

3. The trial court erred in dismissing Neyland's motion for a competency hearing when he had a right to be competent for his post-conviction proceedings and he presented sufficient evidence he was incompetent.

(*Id*. at 136 (capitalization altered).) The State filed a responsive brief. (Doc. 20-20 at 141-87.)

The court of appeals affirmed the trial court's judgment on July 12, 2013. (*Id.* at 200-20.)

Neyland, still represented by the Ohio Public Defender's Office, filed a timely appeal to the Ohio Supreme Court. (Doc. 20-21 at 2-4.) In his memorandum in support of jurisdiction, he asserted the following propositions of law, stated as:

1. A person whose mental condition is such that he lacks the capacity to understand the nature and object of the proceedings against him, to consult with counsel, and to assist in preparing his defense may not be subjected to trial.

2. Effective assistance of counsel requires that counsel conduct a reasonable investigation, and use appropriate evidence readily at hand to counter the State's evidence. U.S. Const. amend. VI, VIII, XIV.

3. A defendant's rights to a fair and impartial trial, due process, and the presumption of innocence are violated when he is forced to wear a leg brace during his trial.

4. The Eighth Amendment prohibits a State from carrying out a sentence of death upon a prisoner who is insane.

(*Id*. at 6.) The State filed a brief in opposition. (*Id*. at 115-45.)

The Ohio Supreme Court declined jurisdiction over the appeal on June 24, 2015. (*Id*. at

153.) Neyland then filed a petition for a writ of certiorari in the United States Supreme Court, which it declined to grant on November 30, 2015. *Neyland v. Ohio*, 577 U.S. 1013 (2015) (Table).

**B. Federal Habeas Proceedings**

Neyland filed a notice of intent to initiate this habeas action on May 3, 2016. (Doc. 1.) He requested appointment of counsel and permission to proceed in forma pauperis on that same date. (Docs. 2, 3.) The Court granted the motion to appoint counsel in a marginal judgment entry on May 10, 2016, appointing counsel Joseph Wilhelm and Alan Rossman of the Office of the Federal Public Defender for the Northern District of Ohio. (Doc. 7.) It granted the motion to proceed in forma pauperis on May 16, 2016. (Doc. 8.)

Neyland filed his petition for a writ of habeas corpus on February 23, 2017. (Doc. 17.) Respondent filed an answer to the petition on April 20, 2023. (Doc. 43.) Neyland filed a traverse on September 8, 2023. (Doc. 50.)

Neyland filed a motion for discovery on November 10, 2023. (Doc. 53.) Respondent opposed the motion the next day. (Doc. 54.) The Court will address Neyland's motion for discovery in this memorandum of opinion and order.

On January 24, 2025, Neyland filed a supplement to his traverse. (Doc. 59.)

**PETITIONER'S GROUNDS FOR RELIEF**

Neyland asserts seventeen grounds for relief in his petition, stated as:

1. Petitioner's due process right to a fair trial was violated because he was tried while mentally incompetent.

2. Petitioner's right to the effective assistance of counsel was violated by trial counsel's failure to impeach Dr. Delaney Smith during the competency hearing.

3. Petitioner's right to the effective assistance of counsel was violated by trial counsel's failure to impeach Dr. Kristen Haskins during the competency hearing.

4. Petitioner's right to the effective assistance of counsel was violated by trial

counsel's failure to impeach Dr. Barbara Bergman during the competency hearing.

5. Petitioner's right to the effective assistance of counsel was violated because trial counsel failed to employ the services of a mental health expert for the purpose of assessing Petitioner's competence to stand trial.

6. Petitioner was denied the effective assistance of counsel because his trial counsel did not revisit the matter of Petitioner's competency to stand trial during the culpability phase.

7. Petitioner was denied the effective assistance of counsel during the mitigation phase.

8. Petitioner's due process right to a fair trial, right of confrontation, and right to a reliable capital sentencing hearing were infringed when the trial court permitted the State to present Dr. Delaney Smith's testimony for rebuttal in the penalty phase.

9. Petitioner's due process right to a fair trial, his right to the presumption of innocence, and his right to a reliable capital sentencing hearing were violated because the Petitioner was forced to wear restraints throughout his trial.

10. Petitioner's trial counsel rendered ineffective assistance by failing to object to unnecessary court room security measures.

11. Petitioner was denied a fair trial and a fair and impartial jury due to excessive pretrial publicity.

12. Appellate counsel violated Petitioner's due process right to the effective assistance of counsel on his first appeal of right.

13. Petitioner's right to a fair and impartial jury was violated when death scrupled but otherwise qualified jurors were removed from the venire.

14. Petitioner was denied the right to represent himself at trial.

15. Petitioner's due process right to a fair trial was violated by the admission into evidence and display of prejudicial and irrelevant evidence.

16. Petitioner's serious mental illness renders him ineligible for execution.

17. Petitioner's death sentences must be vacated because Ohio's capital sentencing laws are unconstitutional.

(Doc. 17 at 109, 120, 124, 129, 134, 141, 144, 152, 154, 157, 158, 161, 166, 168, 169, 172, 173.)

## Standard of Review

### A. AEDPA Review

Habeas corpus is essentially "an attack by a person in custody upon the legality of that custody, and . . . the traditional function of the writ is to secure release from illegal custody." *Preiser v. Rodriguez*, 411 U.S. 475, 484 (1973). Neyland's petition for a writ of habeas corpus is governed by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"). *See Lindh v. Murphy*, 521 U.S. 320, 336 (1997) (AEDPA governs federal habeas petitions filed after Act's effective date). The Act, which amended 28 U.S.C. § 2254, authorizes federal courts to issue writs of habeas corpus to state prisoners who are "in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a).

At the same time, however, AEDPA was intended "to reduce delays in the execution of state and federal criminal sentences, particularly in capital cases, and 'to further the principles of comity, finality, and federalism.'" *Woodford v. Garceau*, 538 U.S. 202, 206 (2003) (quoting *(Michael) Williams v. Taylor*, 529 U.S. 420, 436 (2000)). The Act "recognizes a foundational principle of our federal system: State courts are adequate forums for the vindication of federal rights." *Burt v. Titlow*, 571 U.S. 12, 18 (2013). It therefore "erects a formidable barrier to federal habeas relief for prisoners whose claims have been adjudicated in state court." *Id*. at 19.

Most significantly, § 2254(d) forbids a federal court from granting habeas relief with respect to a "claim that was adjudicated on the merits in State court proceedings" unless the state-court decision either:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the

State court proceeding.

28 U.S.C. § 2254(d).

Habeas courts review the "last *explained* state-court judgment" on the federal claim at issue. *Ylst v. Nunnemaker*, 501 U.S. 797, 805 (1991) (emphasis original). A state court has adjudicated a federal claim "on the merits," and AEDPA deference applies, regardless of whether the state court provided little or no reasoning at all for its decision. "When a federal claim has been presented to a state court and the state court has denied relief, it may be presumed that the state court adjudicated the claim on the merits in the absence of any indication or state-law procedural principles to the contrary." *Harrington v. Richter*, 562 U.S. 86, 99 (2011) (applying presumption to state-court summary dispositions); *see also Johnson v. Williams*, 568 U.S. 289, 292-93 (2013) (applying *Richter* presumption to state-court decisions that rule against a defendant and address some issues, but not expressly the federal claim in question).

"[C]learly established Federal law" for purposes of § 2254(d)(1) "is the governing legal principle or principles set forth by the Supreme Court at the time the state court renders its decision." *Lockyer v. Andrade*, 538 U.S. 63, 71-72 (2003). It includes "only the holdings, as opposed to the dicta, of [the Supreme] Court's decisions." *White v. Woodall*, 572 U.S. 415, 419 (2014) (internal quotation marks and citations omitted). When identifying what a Supreme Court decision actually holds, courts should not frame the decision "at too high a level of generality." *Woods v. Donald*, 575 U.S. 312, 318 (2015). Clearly established law under § 2254(d)(1) "squarely addresses" the issue presented or "clearly establishes" a legal rule developed in a different context applied to the facts of that case. *Wright v. Van Patten*, 552 U.S. 120, 125 (2008).

A state-court decision is "contrary to" clearly established federal law under § 2254(d)(1) only "if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on

a question of law or if the state court decides a case differently than [the Supreme] Court has on a set of materially indistinguishable facts." (*Michael*) *Williams v. Taylor*, 529 U.S. 362, 412-13 (2000). Under § 2254(d)(1)'s "unreasonable application" clause, "a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." *Andrade*, 538 U.S. at 75 (citations omitted). "The unreasonable application clause requires the state court decision to be more than incorrect or erroneous"; it must be "objectively unreasonable." *Id*. (citations omitted). "[R]eview under § 2254(d)(1) is limited to the record that was before the state court that adjudicated the claim on the merits." *Cullen v. Pinholster*, 563 U.S. 170, 181 (2011).

A state-court decision is an "unreasonable determination of the facts" under § 2254(d)(2) if the court made a "clear factual error." *Wiggins v. Smith,* 539 U.S. 510, 528-29 (2003). The petitioner bears the burden of rebutting the state court's factual findings "by clear and convincing evidence." *Burt*, 571 U.S. at 18; *see also Rice v. White*, 660 F.3d 242, 250 (6th Cir. 2011). This requirement mirrors the "presumption of correctness" AEDPA affords state-court factual determinations, which only can be overcome by clear and convincing evidence. 28 U.S.C. § 2254(e)(1).[3] The Supreme Court has cautioned, however, that "'a state-court factual determination is not unreasonable merely because the federal habeas court would have reached a different conclusion in the first instance.'" *Burt*, 571 U.S. at 18 (quoting *Wood v. Allen,* 558 U.S. 290, 301 (2010)).

[3] Section 2254(e)(1) provides: "In a proceeding instituted by an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court, a determination of a factual issue made by a State court shall be presumed to be correct. The applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence." 28 U.S.C. § 2254(e)(1).

In deciding whether a state court's decision "involved" an unreasonable application of federal law or "was based on" an unreasonable determination of fact under § 2254(d), a habeas court must "'train its attention on the particular reasons – both legal and factual – why state courts rejected a state prisoner's federal claims . . . .'" *Wilson v. Sellers,* 584 U.S. 122, 125 (2018) (quoting *Hittson v. Chatman*, 576 U.S. –, 135 S. Ct. 2126, 2126 (2015) (Ginsburg, J., concurring in denial of certiorari)). In cases in which the last state court to decide a prisoner's federal claim explains its decision on the merits in a reasoned opinion, a habeas court "simply reviews the specific reasons given by the state court and defers to those reasons if they are reasonable." *Id*. But when the last state court to adjudicate a federal claim on the merits issues an *unexplained* order upholding a lower court's *explained* judgment on a federal claim, the federal court "should 'look through' the unexplained decision to the last related state-court decision that does provide a relevant rationale" and "then presume that the unexplained decision adopted the same reasoning." *Id.* (adopting the "look through" presumption in determining procedural default of federal habeas claims established in *Ylst*, 501 U.S. at 803). The state may then rebut this presumption "by showing that the unexplained affirmance relied or most likely did rely on different grounds than the lower state court's decision, such as alternative grounds for affirmance that were briefed or argued for the state supreme court or obvious in the record it reviewed." *Id*. [4]

[4] The Sixth Circuit generally has adhered to *Wilson*'s directive. *See, e.g., Cassano v. Shoop*, 1 F.4th 458, 472 (6th Cir. 2021) ("this Court reviews only the Ohio Supreme Court's reasons for denying Cassano's claim") (citing *Wilson*, 138 S. Ct. at 1192); *Coleman v. Bradshaw*, 974 F.3d 710, 719 (6th Cir. 2020) ("AEDPA requires this court to review the actual grounds on which the state court relied") (citing *Wilson*, 138 S. Ct. at 1192); *Thompson v. Skipper*, 981 F.3d 476, 480 (6th Cir. 2020) (following and quoting *Coleman*). But the circuit court also has acknowledged that "[i]n the wake of *Wilson*, courts have grappled with whether AEDPA deference extends only to the reasons given by a state court (when they exist), or instead applies to other reasons that support a state court's decision." *Thompson*, 981 F.3d at 480 n.1 (listing cases); *see also id*. at 483-85 (Nalbandian, J., concurring in result but emphasizing that "[f]ederal courts have never been required to confine their habeas analysis to the exact reasoning that the state court wrote, and neither [*Wilson* nor *Coleman*] compels us to change our analysis"); *Davis v. Jenkins,* 115 F.4th 545, 557 (6th Cir. 2024) ("AEDPA deference applies to 'decision[s],' not opinions or reasoning.") (citing 28 U.S.C. § 2254(d)(1)–(2); *Holland v. Rivard*, 800 F.3d 224, 235 (6th Cir. 2015)).

The Supreme Court repeatedly has emphasized that § 2254(d), as amended by AEDPA, is an intentionally demanding standard, affording great deference to state-court adjudications of federal claims. The Court has admonished that a reviewing court may not "treat[] the reasonableness question as a test of its confidence in the result it would reach under *de novo* review," and that "even a strong case for relief does not mean the state court's contrary conclusion was unreasonable." *Richter*, 562 U.S. at 102; *see also Schriro v. Landrigan*, 550 U.S. 465, 473 (2007) ("The question under AEDPA is not whether a federal court believes the state court's determination was incorrect but whether that determination was unreasonable – a substantially higher threshold."). Rather, § 2254(d) "reflects the view that habeas corpus is a guard against extreme malfunctions in the state criminal justice systems" and does not function as a "substitute for ordinary error correction through appeal." *Richter,* 562 U.S. at 102-03 (internal quotation marks and citation omitted). A petitioner, therefore, "must show that the state court's ruling . . . was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Id*. at 103. This is a very high standard, which the Court readily acknowledges: "If this standard is difficult to meet, that is because it is meant to be." *Id.* at 102.

But AEDPA "stops short of imposing a complete bar on federal court relitigation of claims already rejected in state proceedings." *Id*. "[E]ven in the context of federal habeas, deference does not imply abandonment or abdication of judicial review. Deference does not by definition preclude relief." *Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003). Federal habeas courts may, for example, review *de novo* an exhausted federal claim where a state court misapplied a procedural bar and did not review the claim on the merits. *See, e.g., Hill v. Mitchell*, 400 F.3d 308, 313 (6th Cir. 2005). They likewise may review *de novo* claims adjudicated on the merits in state court if

the petitioner meets the criteria for one of § 2254(d)'s exceptions. *See, e.g., Wiggins,* 539 U.S. at 534 (performing *de novo* review under *Strickland*'s second prong because the state court unreasonably applied the law in resolving *Strickland*'s first prong).

**B. Exhaustion and Procedural Default**

Under AEDPA, state prisoners must exhaust all possible state remedies, or have no remaining state remedies, before a federal court will review a petition for a writ of habeas corpus. 28 U.S.C. § 2254(b) and (c); *see also Rose v. Lundy*, 455 U.S. 509 (1982). This entails giving the state courts "one full opportunity to resolve any constitutional issues by invoking one complete round of the State's established appellate review process." *O'Sullivan v. Boerckel*, 526 U.S. 838, 845 (1999). In other words, "the highest court in the state in which the petitioner was convicted [must have] been given a full and fair opportunity to rule on the petitioner's claims." *Manning v. Alexander*, 912 F.2d 878, 881 (6th Cir. 1990). The exhaustion requirement, however, "refers only to remedies still available at the time of the federal petition." *Engle v. Isaac*, 456 U.S. 107, 125 n.28 (1982). It "does not require pursuit of a state remedy where such a pursuit is clearly futile." *Wiley v. Sowders*, 647 F.2d 642, 647 (6th Cir. 1981).

Procedural default is an "important corollary" to the exhaustion requirement. *Davila v. Davis,* 582 U.S. 521, 527 (2017) (internal quotation marks and citation omitted). The doctrine generally prevents federal courts from hearing federal constitutional claims that were not presented to the state courts "consistent with [the state's] own procedural rules." *Edwards v. Carpenter*, 529 U.S. 446, 453 (2000). It occurs when a habeas petitioner failed to either: (1) comply with a state procedural rule that prevented the state courts from reaching the merits of the petitioner's claim; or (2) fairly raise that claim before the state courts while state remedies were still available. *See, e.g., Wainwright v. Sykes*, 433 U.S. 72, 80, 84-87 (1977); *Engle*, 456 U.S. at 125 n.28.

Where a state court declines a prisoner's federal claim because the prisoner failed to meet a state procedural requirement, federal habeas review is barred as long as the state judgment rested on "independent and adequate" state procedural grounds. *Coleman v. Thompson*, 501 U.S. 722, 729 (1991). To be independent, a state procedural rule and the state courts' application of it must not rely in any part on federal law. *Id.* at 732-33. To be adequate, a state procedural rule must be "'firmly established' and 'regularly followed'" by the state courts at the time it was applied. *Beard v. Kindler*, 558 U.S. 53, 60-61 (2009).[5]

A petitioner also may procedurally default a claim by failing to raise the claim in state court and pursue it through the state's "ordinary appellate review procedures," if, at the time of the federal habeas petition, state law no longer allows the petitioner to raise the claim. *Williams v. Anderson*, 460 F.3d 789, 806 (6th Cir. 2006) (quoting *O'Sullivan*, 526 U.S. at 848); *see also Baston v. Bagley*, 282 F. Supp. 2d 655, 661 (N.D. Ohio 2003) ("Issues not presented at each and every level [of the state courts] cannot be considered in a federal habeas corpus petition."). Under these circumstances, while the exhaustion requirement is technically satisfied because there are no longer any state-court remedies available to the petitioner, the petitioner's failure to have the

[5] In *Maupin v. Smith*, 785 F.2d 135 (6th Cir. 1986), the Sixth Circuit established the now-familiar test to be followed when the state argues that a habeas claim is defaulted because of a prisoner's failure to observe a state procedural rule. It is:

> First, the federal court must determine whether there is a state procedural rule that is applicable to the petitioner's claim and whether the petitioner failed to comply with that rule. Second, the federal court must determine whether the state courts actually enforced the state procedural sanction – that is, whether the state courts actually based their decisions on the procedural rule. Third, the federal court must decide whether the state procedural rule is an adequate and independent state ground on which the state can rely to foreclose federal review of a federal constitutional claim. Fourth, if the federal court answers the first three questions in the affirmative, it will not review the petitioner's procedurally defaulted claim unless the petitioner can show cause for not following the procedural rule and that failure to review the claim would result in prejudice or a miscarriage of justice.

*Williams v. Coyle*, 260 F.3d 684, 693 (6th Cir. 2001) (citing *Maupin*, 785 F.2d at 138) (further citations omitted).

federal claims fully considered in the state courts constitutes a procedural default of those claims, barring federal habeas review. *Williams*, 460 F.3d at 806 ("Where state court remedies are no longer available to a petitioner because he or she failed to use them within the required time period, procedural default and not exhaustion bars federal court review."); *see also Gray v. Netherland*, 518 U.S. 152, 161-62 (1996) ("Because the exhaustion requirement 'refers only to remedies still available at the time of the federal petition,' . . . it is satisfied 'if it is clear that [the petitioner's] claims are now procedurally barred under [state] law'" (internal citations omitted)).

Furthermore, to "fairly present" a claim to a state court, a petitioner must assert both its legal and factual basis. *Williams*, 460 F.3d at 806 (citing *McMeans v. Brigano*, 228 F.3d 674, 681 (6th Cir. 2000)). Most importantly, a "'petitioner must present his claim to the state courts as a federal constitutional issue – not merely as an issue arising under state law.'" *Id*. (quoting *Koontz v. Glossa*, 731 F.2d 365, 368 (6th Cir. 1984)).

In determining whether a claim is procedurally defaulted and barred from consideration on federal habeas review, habeas courts again employ a "look through" presumption and review the "last *explained* state-court judgment" on the federal claim at issue. *Ylst,* 501 U.S. at 805 (emphasis in original). If the last state court "explicitly imposes a procedural default," then the claim is presumed defaulted. *Id.* at 803; *see also Harris v. Reed*, 489 U.S. 255, 263 (1989) (state court must "clearly and expressly state[] that its judgment rests on a state procedural bar" to result in procedural default). Conversely, if the last state court presented with the claim reaches its merits in a decision that "'fairly appear[s] to rest primarily upon federal law,'" then any procedural bar is presumed removed, and the federal habeas court may consider the merits of the claim in its review.

*Ylst*, 501 U.S. at 803 (citation omitted).[6]

A petitioner may overcome procedural default by demonstrating cause for the default and actual prejudice that resulted from the alleged violation of federal law, or that there will be a "fundamental miscarriage of justice" if the claim is not considered. *Coleman*, 501 U.S. at 750. "'[C]ause' under the cause and prejudice test must be something external to the petitioner, something that cannot be fairly attributed to him." *Id*. To establish prejudice, a petitioner must demonstrate "not merely that the errors at his trial created a *possibility* of prejudice, but that they worked to his *actual* and substantial disadvantage, infecting his entire trial with error of constitutional dimensions." *United States v. Frady*, 456 U.S. 152, 170 (1982) (emphasis in original). "A fundamental miscarriage of justice results from the conviction of one who is 'actually innocent.'" *Lundgren v. Mitchell*, 440 F.3d 754, 764 (6th Cir. 2006) (citing *Murray v. Carrier*, 477 U.S. 478, 496 (1986)).

A fundamental miscarriage of justice in capital cases also means actually innocent of the death penalty. *See Sawyer v. Whitley*, 505 U.S. 333, 347 (1992). In this sense, "[t]o show 'actual innocence' one must show by clear and convincing evidence that, but for a constitutional error, no reasonable jury would have found the petitioner eligible for the death penalty under the applicable state law." *Id*. at 336. This "actual innocence" standard "must focus on the elements that render a defendant eligible for the death penalty." *Hutton v. Mitchell*, 839 F.3d 486, 498 (6th Cir. 2016) (citing *Sawyer*, 505 U.S. at 347).

**C. Cognizability**

Federal habeas courts also must consider whether the petitioner's claims are cognizable.

---

[6] Also, where a later state-court decision rests upon a prohibition against further state review, the decision "neither rests upon procedural default nor lifts a pre-existing procedural default, [and] its effect upon the availability of federal habeas is nil . . . ." *Ylst*, 501 U.S. at 804 n.3.

To the extent a claim alleges state-law violations, it is not reviewable by a federal habeas court and must be dismissed on that basis. "It is not the province of a federal habeas court to reexamine state-court determinations on state-law questions. In conducting habeas review, a federal court is limited to deciding whether a conviction violated the Constitution, laws, or treaties of the United States." *Estelle v. McGuire*, 502 U.S. 62, 68 (1991) (citing 28 U.S.C. § 2241); *see also Lewis v. Jeffers*, 497 U.S. 764, 780 (1990) ("[F]ederal habeas corpus relief does not lie for errors of state law."); *Engle v. Isaac*, 456 U.S. 107, 121 n.21 (1982) ("We have long recognized that a 'mere error of state law' is not a denial of due process.") (citation omitted)).

Moreover, "a state court's interpretation of state law, including one announced on direct appeal of the challenged conviction, binds a federal court sitting in habeas corpus." *Bradshaw v. Richey*, 546 U.S. 74, 76 (2005) (citing *Estelle*, 502 U.S. at 67-68). A federal habeas court does not function as an additional state appellate court reviewing state courts' decisions on state law or procedure. *Allen v. Morris*, 845 F.2d 610, 614 (6th Cir. 1988).

State-court rulings on issues of state law may, however, "rise to the level of due process violations [if] they 'offend[] some principle of justice so rooted in the traditions and conscience of our people as to be ranked as fundamental.'" *Seymour v. Walker*, 224 F.3d 542, 552 (6th Cir. 2000) (quoting *Montana v. Egelhoff*, 518 U.S. 37, 43 (1996)). But they must be "so egregious that [they] result in a denial of fundamental fairness." *Bugh v. Mitchell*, 329 F.3d 496, 512 (6th Cir. 2003). Courts, therefore, "'have defined the category of infractions that violate 'fundamental fairness' very narrowly.'" *Id.* (quoting *Wright v. Dallman*, 999 F.2d 174, 178 (6th Cir. 1993)).

## Discussion

### I. First Ground for Relief: *Competency to Stand Trial*

For his first ground for relief, Neyland claims that the trial court erred by finding him

competent to stand trial. Neyland raised this claim in state court on both direct appeal and post-conviction review.

**A. Procedural Posture**

Neyland first asserted a competency claim on direct appeal to the Ohio Supreme Court, on December 11, 2008. (*See* Doc. 20-11 at 4.) He later presented a competency claim to the state trial court in a petition for post-conviction relief, on April 16, 2010. (Doc. 20-14 at 1-64.) The trial court found the post-conviction claim barred from review under Ohio's res judicata doctrine, which the state appellate court affirmed on July 12, 2013. *Neyland,* 2013 WL 3776602, at *7-8. *See State v. Perry,* 10 Ohio St. 2d 175 (Ohio 1967) (res judicata bars a criminal defendant from raising in post-conviction proceedings claims that were or could have been litigated at trial or raised on direct appeal). The Ohio Supreme Court adjudicated Neyland's competency claim on the merits in its decision denying Nyland's direct appeal on May 8, 2014. *Neyland*, 139 Ohio St. 3d 353 (2014). Ohio's high court summarily declined jurisdiction over the post-conviction appeal on June 24, 2015. (Doc. 20-21 at 153.)

Respondent does not assert a procedural-default defense to this claim. (*See* Doc. 43 at 8-10.) The Ohio Supreme Court adjudicated the merits of the claim, and it is therefore preserved for federal habeas review. *See O'Sullivan v. Boerckel*, 526 U.S. 838, 845 (1999).

**B. Merits Analysis**

**1. Standard of Review**

Respondent contends that the Ohio Supreme Court's decision on direct appeal rejecting Neyland's competency claim on the merits is entitled to AEDPA deference. (Doc. 43 at 8-9.) *See also* 28 U.S.C. § 2254(d); *Wilson v. Sellers*, 584 U.S. 122, 125 (2018). Neyland counters that AEDPA deference should not apply to this claim, and the Court should review it *de novo*—

including a consideration of supporting evidence he submitted on post-conviction review—because the state court's earlier post-conviction decision misapplied Ohio's res judicata rule to bar its review of the claim. (Doc. 50 at 112-15.) *See Wogenstahl v. Mitchell*, 668 F.3d 307, 341 (6th Cir. 2012) ("an incorrect application of a state res judicata rule does not constitute reliance on an adequate and independent state ground" to bar review of federal habeas court). Respondent does not address this argument.[7]

Neyland argued to the state post-conviction courts that, although he had litigated his competency claim at trial and on direct appeal, the claim fell within the exception to the res judicata doctrine because he presented evidence dehors the record to support it. *Id*. at *3 (¶ 17); *see also State v. Smith*, 17 Ohio St. 3d 98, 101 n.1 (Ohio 1985) (noting an exception to Ohio's *res judicata* doctrine where a petitioner presents evidence dehors the record to support a claim on post-conviction). Neyland submitted multiple exhibits in support of the claim, including: an additional expert report, along with his deposition testimony; deposition testimony of defense counsel and the other experts who testified at trial; medical and prison records; and his handwritten letters and phone call transcripts. (*See* Doc. 20-14 at 68-301.)

The trial court and appellate court, however, found the claim barred by res judicata. The court of appeals explained that it was a claim "typically reserved for direct appeal," and the additional, extra-record evidence Neyland proffered was insufficient to overcome res judicata

[7] Respondent argues that this Court should deny Neyland relief in this case because he did not properly plead his grounds for relief one through six in his petition as required under Rule 2(c) of the Rules Governing Habeas Corpus Cases Under Section 2254. (Doc. 43 at 6-8.) She contends that Neyland's petition fails to meet this requirement because it does not address the reasonableness of the state-court decisions at issue under § 2254(d). (Doc. 43 at 6-8.) Consequently, in her return of writ, Respondent presented little argument contesting the merits of those claims, and, the Court notes, did not file a sur-reply to Neyland's traverse, which did address the state-court decisions at issue. Rule 2(c) requires only that a habeas petition "shall specify all the grounds for relief which are available to the petitioner"; "state the facts supporting each ground"; and "state the relief requested." Habeas Rule 2(c)(1)-(3). And the Sixth Circuit has held that even a "bare-bones petition [meets] these requirements." *Flood v. Phillips*, 90 Fed. Appx. 108, 113-14 (6th Cir. 2004) (citing *O'Neal v. McAninch*, 513 U.S. 432, 444-45 (1995); *Jones v. Jerrison*, 20 F.3d 849, 853 (8th Cir. 1994) (en banc)). Neyland's petition, therefore, meets Habeas Rule 2(c)'s requirements.

because it was either available to him at the time of trial or merely cumulative in nature. *Neyland,* 2013 WL 3776602, at *3-4, 8 (¶¶ 18-20, 42)); *see State v. Jones*, 2002 WL 31812945, at *3 (Ohio Ct. App. Dec. 13, 2002) (To fall within the res judicata exception, "it is not sufficient for the petitioner to simply present evidence outside the record, he must also demonstrate that the evidence was not available at the time of his trial, or at the time of his direct appeal."); *State v. Lawson*, 103 Ohio App. 3d 307, 315 (Ohio Ct. App. 1995) (extra-record evidence must "demonstrate that the petitioner could not have appealed the constitutional claim based upon information in the original record" and be "competent, relevant and material"); *State v. Combs*, 100 Ohio App. 3d 90, 98 (Ohio Ct. App. 1995) (evidence dehors the record must be other than cumulative of or alternative to evidence presented at trial). Specifically, it noted that, with the exception of the new competency expert's affidavit, the extra-record evidence he submitted was available at trial, and the affidavit was cumulative to the expert testimony introduced at the competency hearing. *Neyland,* 2013 WL 3776602, at *3-4, 8 (¶¶ 18-20, 42)). This Court agrees with the state court's analysis.

Neyland alternatively argues that, because his post-conviction petition was adjudicated before his direct appeal, "the post-conviction proceeding was a part of the direct appeal of his conviction for the purposes of habeas review." (Doc. 50 at 115.) He cites as support for this proposition *Pudelski v. Wilson*, 576 F.3d 595 (6th Cir. 2009). In that case, the Sixth Circuit held that a motion for new trial is part of the original criminal proceeding and is not considered a collateral proceeding "when a state defendant files a motion for new trial before filing a direct appeal, and when the denial of that motion is then consolidated with and reviewed during the direct appeal." *Id*. at 610. But this case is distinguishable from *Pudelski.* Neyland filed a post-conviction petition in state court asserting this claim, not a motion for new trial; he filed the petition more

than a year after the direct appeal of his conviction commenced, not before it; and the state court did not consolidate the two actions. *Pudelski* does not apply here.

Accordingly, the Ohio Supreme Court's decision is the state-court decision at issue here and is entitled to AEDPA deferential review. And this Court's review under both § 2254(d)(1) and (d)(2) is therefore limited to the record that was before the state court. *See Cullen v. Pinholster*, 563 U.S. 170, 181 (2011) (limiting review under § 2254(d)(1) to state-court record); 28 U.S.C. § 2254(d)(2). The Court, therefore, will consider only the evidence that was before that state court at the time of its decision.

**2. Ohio Supreme Court opinion**

In addressing Neyland's competency claim, the Ohio Supreme Court opined:

> {¶ 31} Neyland argues that the trial court abused its discretion in finding that he was competent to stand trial, because this ruling is not supported by the evidence.
>
> {¶ 32} The test for determining whether a defendant is competent to stand trial is """whether [the defendant] has sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding—and whether he has a rational as well as factual understanding of the proceedings against him.""" *State v. Berry*, 72 Ohio St.3d 354, 359, 650 N.E.2d 433 (1995), quoting *Dusky v. United States,* 362 U.S. 402, 80 S.Ct. 788, 4 L.Ed.2d 824 (1960), quoting the argument of then Solicitor General J. Lee Rankin. Moreover, a defendant is presumed to be competent to stand trial, and the burden is on the defendant to prove by a preponderance of the evidence that he is not competent. *State v. Jordan*, 101 Ohio St.3d 216, 2004-Ohio-783, 804 N.E.2d 1, ¶ 28; R.C. 2945.37(G).
>
> {¶ 33} A trial court's finding that a defendant is competent to stand trial will not be disturbed when there is some reliable and credible evidence supporting that finding. *State v. Were,* 118 Ohio St.3d 448, 2008-Ohio-2762, 890 N.E.2d 263, ¶ 46*; State v. Vrabel*, 99 Ohio St.3d 184, 2003-Ohio-3193, 790 N.E.2d 303, ¶ 33.
>
> a. The competency proceedings
>
> {¶ 34} Defense counsel submitted a pretrial motion requesting that

Neyland be examined to determine whether he was competent to stand trial. Dr. Thomas G. Sherman, a psychiatrist at the Court Diagnostic and Treatment Center, met with Neyland and concluded that he was not competent to stand trial.

{¶ 35} The trial court granted the state's request for a second evaluation of Neyland's competency to be conducted on an in-patient basis at Twin Valley Behavioral Healthcare. Dr. Delaney Smith, a psychiatrist at Twin Valley, and Dr. Kristen E. Haskins, a clinical psychologist at Twin Valley, evaluated Neyland. They found that Neyland was competent to stand trial. The trial court then granted a defense request for a third evaluation. Dr. Barbra A. Bergman, a clinical/forensic psychologist, conducted this evaluation and concluded that Neyland was competent.

{¶ 36} Thereafter, the trial court conducted a competency hearing. Dr. Sherman testified that he spent a little over an hour talking with Neyland and determined that he had a mental illness, most likely schizophrenia. Dr. Sherman mentioned that Neyland had been evaluated in the late 1990s, and it was determined that he had a mental illness then. Dr. Sherman provided examples of Neyland's paranoid thinking. Neyland believed that people were placing prophylactics in his laundry and that people were entering his apartment and listening to his answering machine

.

{¶ 37} Dr. Sherman stated that as a result of his mental illness, Neyland was "not able to understand the nature or the gravity of the charges against him, but more importantly it impacted upon his ability to cooperate with his own defense." Dr. Sherman concluded that Neyland was not competent to stand trial. He stated, "This was not even a close call." During cross-examination, Dr. Sherman acknowledged that he did not speak with Neyland's attorneys, did not administer any tests, and did not review the reports completed by the other psychologists who had examined Neyland.

{¶ 38} Dr. Smith testified that Neyland was "under my care" during his 30–day in-patient stay at Twin Valley. Dr. Smith was responsible for doing "intake on him, a psychiatric assessment, and prescribing any medications." Dr. Smith detected no signs of mental illness, but determined that Neyland had a paranoid personality disorder. She stated that Neyland discussed his plans to work with his attorneys and mentioned that if things did not work out at trial he could file an appeal. Dr. Smith also testified that "he was able to be cooperative when he chose to be so; and that when he chose not to be cooperative it was just that, it was a choice that he was making and not the product of some mental illness, such as being grossly delusional * *

* or hearing voices telling him not to cooperate." Dr. Smith concluded, "It is my opinion within a reasonable medical certainty that he is both able to understand the nature and objectives of the proceedings as well as to assist counsel in his defense should he choose to do so." Yet Dr. Smith did not complete a written report and acknowledged that it was not her purpose to conduct a competency evaluation.

{¶ 39} Dr. Haskins also evaluated Neyland during his stay at Twin Valley. She administered a test called the MacArthur Competence Assessment Tool–Criminal Adjudication ("MacCAT–CA") to help determine Neyland's competency. Neyland had a low score of 4 out of a possible 16 on the reasoning section, suggesting serious difficulty in distinguishing relevant from irrelevant information and difficulty in reasoning about the options of pleading guilty or not guilty. Dr. Haskins attributed this low score to Neyland's refusal to cooperate with the assessment procedures.

{¶ 40} But Dr. Haskins's clinical evaluation showed that Neyland was aware of the charges against him, knew the possible pleas and the potential sentences, and understood the different roles of the parties. Neyland also stated that he would allow his attorneys to defend him. Dr. Haskins testified that Neyland is "at least of average intelligence" and that he does not have a serious mental illness. She concluded that Neyland is "capable of understanding the nature and objective of the proceedings against him and of assisting in his own defense." Yet Dr. Haskins said that "it's going to be very difficult for his attorneys to represent him. He is not stupid. * * * He has certain thoughts about how he wants things to go."

{¶ 41} Dr. Bergman evaluated Neyland during a one-hour interview at the Wood County Jail. She testified that Neyland did not want her to conduct this evaluation, because a competency evaluation had already found that he was competent. She stated that Neyland was "very controlling" and would not allow her to ask questions about pertinent topics. Dr. Bergman believed that Neyland had a personality disorder with predominant features that are paranoid, narcissistic, schizoid, and obsessive-compulsive. Dr. Bergman concluded that Neyland understood the nature and significance of the charges and the objectives of the court proceedings and that he was capable of assisting his counsel and meaningfully participating in the proceedings.

{¶ 42} The trial court found Neyland competent to stand trial. The trial court stated that Dr. Smith and Dr. Haskins were more persuasive than Dr. Sherman, because the doctors at Twin Valley

had the opportunity to observe Neyland's behavior for approximately 30 days. The trial court discounted Neyland's low score on the reasoning section of the MacCAT–CA because all the doctors who evaluated Neyland indicated that he was very guarded and that Neyland exercised his right against self-incrimination, which made it difficult to administer the test.

b. Analysis

{¶ 43} Neyland argues that the trial court abused its discretion in finding that he was competent to stand trial. He asserts that Dr. Sherman's report, along with his experience, deserved as much weight, if not more, than the other expert opinions. Neyland also attacks the findings of the three experts who found him to be competent and argues that the trial court erred in relying on their testimony in finding him competent.

{¶ 44} First, Neyland argues that Dr. Haskins's opinion that he was competent was not supported by her own underlying findings about Neyland, including (1) his inability to disclose personal information, (2) his rigid neurotic adjustment, (3) his clinically significant impairment and serious difficulty in distinguishing relevant from less relevant factual information and in reasoning about legal options of pleading guilty or not guilty, and (4) the likelihood that he would be a very difficult defendant with whom to reason.

{¶ 45} Neyland's claims take Dr. Haskins's statements out of context. Dr. Haskins acknowledged that the validity of Neyland's test results on the Minnesota Multiphasic Personality Inventory–2 (“MMPI–2”) might have been compromised by his unwillingness or inability to disclose personal information. Dr. Haskins also discussed the possibility that Neyland's pattern of uncooperativeness may be due to a “rigid neurotic adjustment.”

{¶ 46} Dr. Haskins did report that Neyland scored low on the reasoning section of the MacCAT–CA. But Dr. Haskins attributed Neyland's low score to his refusal to cooperate with the assessment procedures. Dr. Haskins's comment that Neyland will be a “very difficult defendant with whom to reason” came after her discussion about Neyland's refusal to cooperate and refusal to answer certain questions on the MacCAT–CA. Dr. Haskins's observations do not conflict with her finding that Neyland is competent to stand trial. As noted in *Berry*, 72 Ohio St.3d at 360–361, 650 N.E.2d 433, a defendant's failure to cooperate with counsel does not constitute sufficient indicia of incompetence to raise doubt about a defendant's competence to stand trial. Thus, Dr. Haskins's findings do not

undermine her competency findings.

{¶ 47} Second, Neyland argues that Dr. Bergman's opinion that he was competent to stand trial is undermined by her observations of Neyland's (1) poor judgment, (2) inflexible, rigid views, (3) limited insight, (4) severe personality disorder, and (5) failure to assist his counsel to prepare for his defense.

{¶ 48} Dr. Bergman discussed Neyland's mental status in her written evaluation. Neyland's poor judgment, inflexible, rigid views, and limited insight into his own behavior were some of the factors that led to Dr. Bergman's conclusion that Neyland had a severe personality disorder. These findings do not undermine Dr. Bergman's conclusion that Neyland was competent to stand trial. Indeed, "[i]ncompetency must not be equated with mere mental or emotional instability or even with outright insanity. A defendant may be emotionally disturbed or even psychotic and still be capable of understanding the charges against him and of assisting his counsel." *State v. Bock*, 28 Ohio St.3d 108, 110, 502 N.E.2d 1016 (1986).

{¶ 49} Dr. Bergman's evaluation included her discussion with J. Scott Hicks, Neyland's defense counsel. Hicks reported that Neyland is "no help at all in preparing the case for [the] defense." Dr. Bergman stated that Neyland had his own ideas about his defense and expressed his unhappiness with counsel's direction in managing his case. Yet Neyland clearly understood his legal rights and stated several times, "I have a right to remain silent." Neyland's lack of cooperation with defense counsel at various times did not establish that he was not competent to stand trial. *See Vrabel*, 99 Ohio St.3d 184, 2003-Ohio-3193, 790 N.E.2d 303, at ¶ 30. Thus, Dr. Bergman's comments about Neyland's lack of cooperation with counsel did not invalidate her findings.

{¶ 50} Neyland also argues that Dr. Bergman's finding of competency was based on the wrong standard, i.e., she believed that he must be suffering from mental illness or mental retardation to be found incompetent. We also reject this claim. In finding Neyland competent, Dr. Bergman testified, "In my opinion he does understand the nature and significance of the charges. He does understand the nature and objectives of the Court proceedings. He is capable of assisting his attorney and he is capable of participating in a meaningful manner in the Court proceedings." Thus, Dr. Bergman used the correct standard in finding that Neyland was competent to stand trial.

{¶ 51} Finally, Neyland argues that the trial court's factual findings underlying its determination that he was competent to stand trial were clearly erroneous.

{¶ 52} First, Neyland argues that Dr. Smith's testimony could not form the basis for the trial court's findings, because Dr. Smith testified that it was not her job to perform a competency evaluation and she did not prepare a written report. Thus, Neyland argues that Dr. Smith's testimony did not meet the exacting standards of R.C. 2945.371. However, Neyland failed to object to Dr. Smith's opinion about his competency at the hearing and thus waived all but plain error. *See State v. Mink,* 101 Ohio St.3d 350, 2004-Ohio-1580, 805 N.E.2d 1064, ¶ 29. No plain error occurred.

{¶ 53} R.C. 2945.371 provides procedures for a trial court to follow in conducting competency evaluations. R.C. 2945.371(G)(1) and (2) provide that an examiner shall file a written report that includes the examiner's findings and the facts in reasonable detail on which the findings are based.

{¶ 54} R.C. 2945.37 provides procedures for conducting a competency hearing. R.C. 2945.37(E) states: "The prosecutor and defense counsel *may* submit evidence on the issue of the defendant's competence to stand trial. A written report of the evaluation of the defendant may be admitted into evidence at the hearing * * *." (Emphasis added.) Nothing in R.C. 2945.37 limits expert testimony that may be presented during such hearings.

{¶ 55} Evid.R. 702(B) provides that "a witness may testify as an expert" by reason of his or her "specialized knowledge, skill, experience, training, or education." Dr. Smith was qualified to testify as an expert under Evid.R. 702 because of her specialized knowledge and experience as a psychiatrist. She testified that she had previously conducted between 30 and 40 competency evaluations. Neyland was under Dr. Smith's care during the 30 days that he was at Twin Valley, and she met with him throughout his stay. She also testified that she talked to other staff members who interacted with Neyland on a daily basis.

{¶ 56} We conclude that a sufficient foundation was established for Dr. Smith to render an opinion about Neyland's competency to stand trial. Neyland's complaint that it was not Dr. Smith's job to conduct a competency evaluation goes to the weight to be given to her opinion and not her ability to render such an opinion. *See State v. Luoma,* 2d Dist. Montgomery No. 10719, 1990 WL 197944, *10 (Dec. 7, 1990) (psychiatrist permitted to testify concerning

defendant's sanity although his sole purpose for evaluating the defendant was to determine competency).

{¶ 57} Second, Neyland argues that the trial court should not have relied on Dr. Haskins's evaluation, because she spent only four hours with him. Neyland's claim overlooks the fact that Dr. Haskins reported that she received treatment-team updates during Neyland's in-patient stay, talked to defense counsel about him, reviewed treatment charts, reviewed Dr. Sherman's report, consulted with Dr. Smith, and reviewed other information involving his case. Moreover, Dr. Haskins was unable to meet with Neyland for a longer period, because he refused to meet with her.

{¶ 58} Third, Neyland argues that the trial court erred in finding that because Dr. Smith and Dr. Haskins observed him for approximately 30 days, this gave them a better opportunity to observe his behavior than Dr. Sherman. Neyland emphasizes that Dr. Smith and Dr. Haskins testified that the length of an examination is not the crucial factor in conducting a competency evaluation. Neyland also points out that Dr. Bergman met with him for only an hour.

{¶ 59} As with other witnesses, the trial judge heard all of the expert testimony, and it was his job to judge their credibility and weigh all the evidence in making his findings. Deference on these issues should be given to those "who see and hear what goes on in the courtroom." *State v. Cowans*, 87 Ohio St.3d 68, 84, 717 N.E.2d 298 (1999).

{¶ 60} The trial court's findings about the length of the evaluations were not unreasonable. Indeed, Dr. Smith compared her examination with Dr. Sherman's shorter examination. She noted, "I had more time to observe and interact with Mr. Neyland and see him in various different settings and see his interactions with different people." Thus, we also reject this claim.

c. Conclusion

{¶ 61} We hold that the trial court did not abuse its discretion in finding that Neyland was competent to stand trial. Three of the four witnesses who testified concluded that he was competent. The trial court also reasonably determined that greater weight should be given to testimony of a psychiatrist and a psychologist who examined Neyland during a 30–day observational period rather than a psychiatrist who spent only a little more than an hour with him. Thus, reliable and credible evidence supports the trial court's decision. We reject proposition I.

*Neyland*, 139 Ohio St. 3d at 357-63.[8]

### 3. Analysis

Neyland first argues that the Ohio Supreme Court misapplied or contravened clearly established Supreme Court precedent in this decision under § 2254(d)(1) by applying a "more onerous" standard for determining competency to stand trial than the federal constitutional standard. (Doc. 50 at 116-21.)

It is well-established that "the criminal trial of an incompetent defendant violates due process." *Cooper v. Oklahoma*, 517 U.S. 348, 354 (1996) (quoting *Medina v. California*, 505 U.S. 437, 453 (1992)); *see also Drope v. Missouri*, 420 U.S. 162, 171 (1975). It is equally well-established that one who lacks either a "sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding" or "a rational as well as factual understanding of the proceedings against him" is not competent to stand trial. *Dusky v. United States*, 362 U.S. 402, 402 (1960) (per curiam). Neyland concedes that Ohio's high court set forth the proper federal constitutional test for competency in the opinion, established in *Dusky*. (*Id*. at 117.) *See Neyland*, 139 Ohio St. 3d at 357 (¶ 32).

Neyland contends, however, that the *trial court* erred by imposing an additional requirement at the competency hearing that he prove he was mentally ill or intellectually disabled, pointing to the testimony of expert Dr. Barbara Bergman and the court's judgment. (Doc. 50 at 118-21.) The Ohio Supreme Court's error, according to Neyland, is that it "gave deference" to the trial court, finding "reliable and credible evidence" supporting its decision. (*Id*. at 120 (citing *Neyland*, 139

[8] In his dissenting opinion, Justice William M. O'Neill characterized the majority's conclusion regarding Neyland's competence as "baffling," noting that every expert at Neyland's trial agreed that he was suffering "from significant mental problems that affected his behavior," and opining that Neyland's refusal to participate in mitigation and his statements rebutting his own defense expert demonstrated his resistance to treatment. *Neyland*, 139 Ohio St. 3d at 410 (¶ 311-12) (J. O'Neill, dissenting).

Ohio St. 3d at 357 (¶ 33)).) He claims the court should have used the "clear error" standard of review required by the Sixth Circuit in reviewing federal habeas claims under § 2254(d)(2), which he argues is a "less onerous burden on appeal." (*Id*. at 120-21 (citing *Harries v. Bell*, 417 F.3d 631, 635 (6th Cir. 2005)).) Respondent does not address this issue.

Neyland's argument is misplaced. The only state-court case at issue here is the Ohio Supreme Court's, and, as Neyland acknowledges, that court correctly articulated the competency test established by the Supreme Court. *See Drope*, 420 U.S. at 172. Indeed, the court explicitly *rejected* Neyland's argument that Dr. Bergman employed the wrong standard at the hearing, stating:

> {¶ 50} Neyland also argues that Dr. Bergman's finding of competency was based on the wrong standard, i.e., she believed that he must be suffering from mental illness or mental retardation to be found incompetent. We also reject this claim. In finding Neyland competent, Dr. Bergman testified, "In my opinion he does understand the nature and significance of the charges. He does understand the nature and objectives of the Court proceedings. He is capable of assisting his attorney and he is capable of participating in a meaningful manner in the Court proceedings." Thus, Dr. Bergman used the correct standard in finding that Neyland was competent to stand trial.

*Neyland*, 139 Ohio St. 3d at 361 (¶ 50).

Furthermore, Neyland's argument that the Ohio Supreme Court misapplied clearly established federal law under § 2254(d)(1) by applying a "reliable and credible evidence" standard rather than one of "clear error" also fails. The state court explained that a trial-court finding that a defendant is competent to stand trial "will not be disturbed when there is some reliable and credible evidence supporting that finding." *Id*. at 357 (¶ 33) (citing *State v. Were*, 118 Ohio St. 3d 448, ¶ 46 (Ohio 2008); *State v. Vrabel*, 99 Ohio St. 3d 184, ¶ 33 (Ohio 2003)). In the cited *Were* case, the court added that "[d]eference on these issues should be given 'to those who see and hear what goes on in the courtroom.'" *Were*, 118 Ohio St. 3d at 276 (quoting *State v. Cowans*, 87 Ohio St.3d 68,

84 (Ohio 1999)). This standard does not conflict with, or misapply, Supreme Court precedent. In *Thompson v. Keohane*, 516 U.S. 99 (1995), the Supreme Court noted that competence to stand trial is a question of fact. *Id*. at 111 (citing *Maggio v. Fulford*, 462 U.S. 111, 117 (1983) (per curiam)). It explained: "While these issues encompass more than 'basic, primary, or historical facts,' their resolution depends heavily on the trial court's appraisal of witness credibility and demeanor." *Id*. (quoting *Wainwright v. Witt*, 469 U.S. 412, 429 (1985). "[A] trial court is better positioned to make decisions of this genre, and has therefore accorded the judgment of the jurist-observer 'presumptive weight.'" *Id*. (quoting *Miller v. Fenton*, 474 U.S. 104, 114 (1985) (when an "issue involves the credibility of witnesses and therefore turns largely on an evaluation of demeanor, there are compelling and familiar justifications for leaving the process of applying law to fact to the trial court"). Thus, the Ohio court's deference toward a trial court's factual findings regarding a defendant's competency to stand trial is not contrary to, or an unreasonable application of, Supreme Court precedent.

Neyland next challenges the Ohio Supreme Court's determination that Neyland was competent to stand trial under § 2254(d)(2).[9] (Doc. 50 at 103-07.) The Ohio Supreme Court thoroughly evaluated the testimony and evidence adduced at Neyland's competency hearing. Neyland does not identify any factual finding that was unreasonable in light of the evidence presented to the state court. *See Filiaggi v. Bagley,* 445 F.3d 851, 858–59 (6th Cir. 2006) ("A determination of competence is a factual finding, to which deference must be paid.").

His only specific complaints are that the court overlooked its own findings in its independent

[9] The Sixth Circuit has recognized that "the Supreme Court has yet to clarify the relationship between 28 U.S.C. §§ 2254(d)(2) and 2254(e)(1), *see* [*Burt v.*] *Titlow*, 571 U.S. [12,] 18 [2013], . . . and, thus, [a] competency challenge may also be subject to the strictures of 28 U.S.C. § 2254(e)(1), *see Black* [*v. Bell*], 664 F.3d [81,] 102 [(6th Cir. 2011)]. However, [if a petitioner] fails to show that the [state court's] determination was unreasonable in light of the evidence presented in the state court proceedings, [the habeas court] need not analyze his claim under 28 U.S.C. § 2254(e)(1)." *Carter v. Bogan*, 900 F.3d 754, 770, n.7 (6th Cir. 2018).

sentencing evaluation regarding his apparent paranoia, "bizarre" comments," and "odd behavior" during trial, and that it failed to mention the "bizarre engagements" between him and the trial court and the irrational statements he made to the jury at trial. (Doc. 50 at 123-25.) *See Wilson v. Sellers,* 584 U.S. 122, 125 (2018) (quoting *Hittson v. Chatman*, 576 U.S. –, 135 S. Ct. 2126, 2126 (2015) (Ginsburg, J., concurring in denial of certiorari)) (a habeas court must "'train its attention on the particular reasons – both legal and factual – why state courts rejected a state prisoner's federal claims'").

This Court has carefully examined the record and finds the state court reasonably found Neyland was competent to stand trial. *See O'Neal v. Bagley*, 743 F.3d 1010, 1022 (6th Cir. 2013) ("For better or worse, as a habeas court, we are not in a position to pick and choose which evidence we think is best so long as the presumption of correctness remains unrebutted."). Three mental health experts testified at the competency hearing that Neyland was competent, while one testified he was incompetent, and trial counsel had ample opportunity to cross-examine the State's experts. *Id.* at 1022-23 ("With expert testimony split, as it often is, the state court chose to credit [the State's experts] over [the petitioner's expert], and we cannot say from this vantage that it was unreasonable to do so."); *see also Carter v. Bradshaw*, No. 3:02CV524, at *21 (N.D. Ohio Sept. 30, 2015), *aff'd sub nom. Carter v. Bogan*, 900 F.3d 754 (6th Cir. 2018) (rejecting the habeas petitioner's competency claim, noting two experts found the petitioner competent to stand trial and trial counsel "had every opportunity to expose weaknesses in their investigation, evaluations, and opinions through cross-examination"). In light of the evidence presented at the competency hearing, Neyland has failed to show "the trial court was *clearly* wrong in believing the State's expert[s]," nor that the trial court's finding was an unreasonable determination of the facts. *Franklin v. Bradshaw*, 695 F.3d 439, 449 (6th Cir. 2012).

### I. Second through Seventh, Tenth Grounds for Relief: *Ineffective Assistance of Trial Counsel*

For his second through seventh and tenth grounds for relief, Neyland claims his trial counsel provided constitutionally ineffective assistance of counsel. Specifically, he alleges his counsel failed to: (1) establish his incompetency to stand trial by (a) impeaching the State's expert witnesses at the competency hearing (Grounds Two through Four), (b) employing a mental health expert for the competency hearing (Ground Five), and (c) reasserting the issue of his competency to stand trial during his trial (Ground Six); (2) investigate and present sufficient mitigation evidence (Ground Seven); and (3) object to unnecessary courtroom security measures (Ground Ten). (Doc. 17 at 120-52; 157-58.)

#### A. Procedural Posture

Neyland raised sub-claim (1), as listed above, on post-conviction review. *See Neyland*, 2013 WL 3776602, at *5-6 (¶¶ 29-31). Respondent asserts that the claim is procedurally defaulted. (Doc. 43 at 10-13.) But the only support she provides for this defense is a citation to a portion of the post-conviction appellate court's decision that addresses an entirely different claim, challenging the trial court's competency determination. (*Id*. (citing *Neyland*, 2013 WL 3776602, at *6 (¶¶ 40-42).) In fact, the state appellate court addressed the merits of Neyland's ineffective-assistance incompetency claim, and it is preserved for habeas review. *Neyland*, 2013 WL 3776602, at *5-6 (¶¶ 29-31).

Neyland raised sub-claim (2), as listed above, generally on direct appeal and again on post-conviction review, with supporting documents. Both the Ohio Supreme Court on direct review and the appellate court on post-conviction review addressed the merits of the claim. *See Neyland*, 139 Ohio St. 3d at 395-99; *Neyland*, 2013 WL 3776602, at *6. This claim, therefore, also is ripe for habeas review.

Respondent argues that sub-claim (3), as listed above, is procedurally defaulted because the state appellate court in post-conviction proceedings found it barred from review based on res judicata. (Doc. 43 at 31 (citing *Neyland*, 2013 WL 3776602, at *8 (¶ 43).) As Neyland replies, however, Respondent is mistaken. Neyland raised this claim on direct review, and it was adjudicated on the merits. *See Neyland*, 139 Ohio St. 3d at 372. The claim to which Respondent cites relates to the trial court's order that Neyland wear leg restraints, not counsel's failure to object to that order. Accordingly, this claim is also preserved for habeas review.

**B. Merits Analysis**

Even if all of Neyland's ineffective-assistance claims were properly preserved for review, they would fail. The Supreme Court has long recognized the Sixth Amendment right to effective assistance of counsel at trial as a "bedrock principle in our justice system." *Martinez v. Ryan*, 566 U.S. 1, 12 (2012); *see also Gideon v. Wainwright*, 372 U.S. 335, 342-44 (1963). The Court announced a two-prong test for claims of ineffective assistance of counsel in *Strickland v. Washington,* 466 U.S. 668 (1984). First, the petitioner must demonstrate that counsel's errors were so egregious that "counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Id*. at 687. An attorney's performance is "deficient" if his or her representation falls "below an objective standard of reasonableness." *Id*. at 688. The court must "reconstruct the circumstances of counsel's challenged conduct" and "evaluate the conduct from counsel's perspective at the time." *Id*. at 689. Second, the petitioner must show that he was prejudiced by counsel's errors, demonstrating a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694. A reasonable probability is "a probability sufficient to undermine confidence in the outcome." *Id*. Counsel's errors must be "so serious as to deprive the defendant of a fair trial, a trial whose result

is reliable." *Id*. at 687.

If a petitioner fails to prove either deficiency or prejudice, his ineffective-assistance claim will fail. *Id.* Whether a petitioner has been deprived of the effective assistance of counsel, however, is a mixed question of law and fact to which the unreasonable-application prong of § 2254(d)(1) applies. *See, e.g., Mitchell v. Mason*, 325 F.3d 732, 738 (6th Cir. 2003).

The Supreme Court has emphasized that "'[s]urmounting *Strickland*'s high bar is never an easy task.'" *Harrington v. Richter,* 562 U.S. 86, 105 (2011) (quoting *Padilla v. Kentucky*, 559 U.S. 356, 371 (2010)). It has explained,

> An ineffective-assistance claim can function as a way to escape rules of waiver and forfeiture and raise issues not presented at trial, and so the *Strickland* standard must be applied with scrupulous care, lest intrusive post-trial inquiry threaten the integrity of the very adversary process the right to counsel is meant to serve.

*Id*. (internal quotation marks and citations omitted). Thus, "[j]udicial scrutiny of a counsel's performance must be highly deferential" and "every effort [must] be made to eliminate the distorting effects of hindsight . . . ." *Strickland,* 466 U.S. at 689. "*Strickland* specifically commands that a court 'must indulge [the] strong presumption' that counsel 'made all significant decisions in the exercise of reasonable professional judgment,'" recognizing "'the constitutionally protected independence of counsel and . . . the wide latitude counsel must have in making tactical decisions.'" *Cullen v. Pinholster*, 563 U.S. 170, 195 (2011) (quoting *Strickland,* 466 U.S. at 689).

The Court further has observed that the standards imposed by *Strickland* and § 2254(d) are both "highly deferential," so that in applying them together, "review is 'doubly' so." *Richter,* 562 U.S. at 105 (internal quotation marks and citations omitted). It has cautioned:

> Federal habeas courts must guard against the danger of equating unreasonableness under *Strickland* with unreasonableness under § 2254(d). When § 2254(d) applies, the question is not whether counsel's actions were reasonable. The question is whether there is

> any reasonable argument that counsel satisfied *Strickland's* deferential standard.

*Id.*; *see also Stermer v. Warren*, 959 F.3d 704, 736 (6th Cir. 2020) ("On the cause prong in particular, the Supreme Court has described this review as "doubly deferential," because AEDPA provides deference to the state court, which in turn is expected to give considerable deference to trial counsel's decisions.").

**1. Competency**

Neyland asserts that his trial counsel were ineffective for failing to establish his incompetency to stand trial by: (a) impeaching the State's expert witnesses at the competency hearing (Grounds Two through Four), (b) employing a mental health expert for the competency hearing (Ground Five), and (c) reasserting the issue of his competency to stand trial during his trial (Ground Six). The last state court to address this claim was the court of appeals on post-conviction review, which reasoned:

> {¶ 29} With regard to Neyland's arguments that counsel was ineffective for failing to establish his incompetency, the record is clear that counsel thoroughly evaluated the medical reports issued by each of the experts. Further, counsel delivered those reports, in addition to other evidence that counsel deemed relevant to the competency determination, to their own expert in order to ferret out any inconsistencies in the opinions held by the state's experts.
>
> {¶ 30} Neyland argues that counsel should have further investigated the Twin Valley records and the jail records. He asserts that Stinson's review of those records uncovered numerous inconsistencies that demanded further investigation. However, as we already noted, Stinson's review of the records did not take place until long after the initial competency determination. Given the information available to them at the time of the hearing, we find that counsel's efforts to establish Neyland's incompetency did not fall below an objective standard of reasonableness. Any other conclusion would require us to apply the benefit of hindsight to the analysis, which we are not permitted to do. *See State v. Carver*, 2d Dist. No. 21328, 2008–Ohio–4631, ¶ 112, citing *Strickland*, 466 U.S. at 689, 104 S.Ct. 2052, 80 L.E.2d 674 ("Hindsight is not

> permitted to distort the assessment of what was reasonable in light of counsel's perspective at the time, and a debatable decision concerning trial strategy cannot form the basis of a finding of ineffective assistance of counsel.").
>
> {¶ 31} Even assuming counsel's performance was deficient, we can only speculate as to the effect that further investigation and cross-examination of the state's experts would have had on the trial court's decision following the competency hearing. As noted by the court in its decision:
>
> > [This court] recognized the existence of inconsistent opinions as to whether Neyland was competent to stand trial. It accorded more weight to the opinions of Dr. Smith and Dr. Haskins because they had more opportunity to observe and record Neyland's behavior. It is doubtful that the Twin Valley and jail records would have altered the Court's view of the evidence.
>
> Thus, Neyland has failed to establish that counsel's investigation into his competency to stand trial fell below an objective standard of reasonableness or prejudiced him in any way. *See Baze v. Parker*, 371 F.3d 310, 322 (6th Cir.2004) (concluding that speculation on the issue of whether the outcome of the trial or penalty phase would have been different is insufficient to establish prejudice in a claim for ineffective assistance of counsel). Further, Neyland's allegation that counsel was ineffective for failing to request his reevaluation for competency at trial lacks factual support in the record. In actuality, Neyland's counsel attempted to readdress the issue of Neyland's competency, but the trial court denied his motion.

*Neyland*, 2013 WL 3776602, at *5-6.

According to Neyland, the records from Twin Valley Behavioral Healthcare and the Wood County Jail contained ample evidence he was experiencing psychosis and/or delusions, and, if properly investigated and utilized by counsel, they would have thoroughly undermined the State's experts' testimony that he was not mentally ill.[10] (Doc. 50 at 111-13.) Neyland

[10] The Twin Valley records included an aftercare plan in which Dr. Smith indicated Neyland was suffering from a psychotic disorder not otherwise specified, notes by Dr. Soehner—who filled in for Dr. Smith during a leave of absence—listing Neyland's condition as schizophrenia, and the notes of other treatment providers at Twin Valley concluding that Neyland required "reality reorientation," which, according to Neyland, showed he was experiencing

maintains trial counsel were aware of the inconsistent opinions regarding his competence and, therefore, had a duty to properly investigate the records and use them to impeach the State's witnesses. (Doc. 50 at 114.) Neyland asserts the court of appeals' conclusion that counsel's failure to impeach the State's experts would not have altered the trial court's competency finding was unreasonable under § 2254(d) due to the volume and strength of the impeachment evidence available to counsel at the time of the hearing and the fact that his mental health was the critical issue at hand. (Doc. 50 at 114-15.) Neyland takes particular issue with the court of appeals' rationale that he was not prejudiced because Dr. Stinson's review of the Twin Valley and jail records took place long after the competency hearing, explaining that those records were accessible to counsel prior to and apart from Dr. Stinson's report, which served only to highlight counsel's error in failing to utilize the records. (Doc. 50 at 115). Neyland argues the court of appeals' prejudice finding was an unreasonable determination of the facts under § 2254(d)(2) where counsel had a duty to investigate impeachment evidence, and it was undisputed trial counsel had access to the records at the time of the hearing. (Doc. 50 at 115).

This Court finds Neyland has failed to overcome the doubly deferential standards of *Strickland* and § 2254(d) to demonstrate there was no reasonable argument counsel provided adequate representation with respect to impeaching the State's experts. *See Richter*, 562 U.S. at 105 ("Federal habeas courts must guard against the danger of equating unreasonableness under *Strickland* with unreasonableness under § 2254(d). When § 2254(d) applies, the question is not whether counsel's actions were reasonable. The question is whether there is

---

psychosis. The jail records reflected that Neyland experienced olfactory hallucinations such as smelling gunpowder, as well as disorganized thoughts and behavior, poor hygiene and grooming, inappropriate masturbatory behavior, and other bizarre behavior. Neyland contends the foregoing evidence would have showed that he likely was experiencing schizophrenia or a psychotic disorder and would have directly contradicted the State's experts' diagnoses and their characterization of Neyland's mental health records.

any reasonable argument that counsel satisfied *Strickland*'s deferential standard."). The court of appeals acknowledged trial counsel had access to the Twin Valley and jail records at the time of the competency hearing and found counsel thoroughly investigated them. *Neyland,* 2013 WL 3776602, at *5. Moreover, the court of appeals' conclusion that Neyland failed to establish he was prejudiced by trial counsel's alleged error is supported by the record; even if trial counsel had more thoroughly cross-examined the State's experts using Neyland's mental health records, the State's experts spent more time with Neyland in their evaluations, which the trial court took into consideration in its decision. There is no evidence, beyond mere speculation, that the trial court's decision on Neyland's competency would have been altered by trial counsel's utilization of the Twin Valley and jail records. *See Richter*, 562 U.S. at 111-12 ("In many instances cross-examination will be sufficient to expose defects in an expert's presentation. . . . The likelihood of a different result must be substantial, not just conceivable.");

Neyland further argues the result of the competency hearing would have been altered if counsel had engaged a mental health expert, or properly utilized their expert, to review the aforementioned records, along with Neyland's phone calls to family members and his voluminous writings, and testify they showed he suffered from schizophrenia and was unable to rationally understand the proceedings or assist in his defense. (Doc. 50 at 111.) Neyland maintains trial counsel also should have had a mental health expert testify that the State's experts based their competency findings on a misunderstanding of the legal standard for competence, noting that the State's experts erroneously believed that a personality disorder could not qualify as a "mental condition" for purposes of Ohio's competency standard. (Doc. 50 at 112.); *see* Ohio Rev. Code Ann. § 2945.37(G) (a defendant is incompetent to stand trial if, because of his present mental

condition, he "is incapable of understanding the nature and objective of the proceedings against [him] or of assisting in [his] defense"); § 2945.371(G)(3)(b) (defining "mental condition" as "mentally ill or mentally retarded"). Thus, even if Neyland were not suffering from schizophrenia, his personality disorder diagnosis would not have precluded a finding of incompetence under the correct legal standard. According to Neyland, counsel were unable to effectively cross-examine the State's experts because they failed to make themselves aware of the correct standards for competency by employing their own mental health expert for the competency hearing. (Doc. 50 at 113.)

This Court finds Neyland has failed to demonstrate that counsel's representation fell below an objective standard of reasonableness in this regard, in light of the deferential standard we must apply. *See Stermer* 959 F.3d at 736 ("On the cause prong in particular, the Supreme Court has described this review as "doubly deferential," because AEDPA provides deference to the state court, which in turn is expected to give considerable deference to trial counsel's decisions."); *Fields v. Jordan*, 86 F.4th 218, 240 (6th Cir. 2023) ("At this point, it is no longer enough for [a petitioner] to show that his attorneys made a decision that no reasonable lawyer would have made. He now must show that *every* fairminded juris[t] would agree that *every* reasonable lawyer would have made a different decision.") (internal quotation marks omitted).

At the competency hearing, Neyland's counsel called Dr. Sherman, who had thirty years' experience as the medical director for the Court Diagnostic and Treatment Center and had conducted thousands of competency evaluations, to testify that Neyland suffered from schizophrenia and was unable to understand the nature or gravity of the charges against him or to cooperate in his defense; Dr. Sherman was adamant during cross-examination that Neyland was not malingering. (Doc. 21-1 at 106, 111, 118-19). Dr. Sherman also articulated the

difference between a psychotic disorder and a personality disorder and explained that a person suffering from a psychotic disorder who is legally incompetent could still have an understanding of the court system and answer general questions, but his flawed judgment and reasoning would hinder his ability to assist in his own defense. (Doc. 21-1 at 107-10). Moreover, Neyland's counsel thoroughly cross-examined the State's experts, at times highlighting their relative lack of experience compared with Dr. Sherman, calling into question their conclusions that a personality disorder is not a serious mental illness for purposes of determining competence, and questioning whether a person's ability to make "choices," like the choice not to cooperate with counsel or evaluators, is actually a reliable indicator of competence. (Doc. 21-1 at 136, 150-52, 180-82, 185-87, 206). Although Dr. Sherman did not comment directly on the accuracy of the State's expert's understanding of the competency standard, his testimony laid out the correct standard and counsel's cross-examination of the State's experts demonstrated counsel were also aware of the correct standard. Thus, we find Neyland has failed to show that there was no reasonable argument counsel provided adequate representation with respect to this issue.

Additionally, Neyland argues trial counsel was ineffective for failing to move for a second competency hearing once trial began, noting a defendant must be competent throughout all phases of trial and sentencing proceedings, and that there was a reasonable probability that, had counsel done so, the trial court would have found Neyland incompetent to stand trial. (Doc. 17 at 43, Doc. 50 at 116.) According to Neyland, the court of appeals' finding that "Neyland's counsel attempted to readdress the issue of Neyland's competency, but the trial court denied his motion," was based on an unreasonable determination of the facts under § 2254(d)(2). (Doc. 50 at 118.) Neyland acknowledges that trial counsel moved for a second

competency hearing *prior to* trial, but argues counsel did not move for another evaluation or hearing at any point after trial commenced, despite the fact that it was apparent from Neyland's interactions with the trial court and his unsworn statements to the jury that there was a possibility he was incompetent. (Doc. 17 at 33-34, Doc. 50 at 118.) Consequently, Neyland argues, the merits of this claim have yet to be addressed and he is entitled to *de novo* review of the merits by this Court. (Doc. 50 at 118.)

First, contrary to Neyland's assertions, the court of appeals explicitly addressed this claim and found it without merit when it determined that trial counsel unsuccessfully attempted to "readdress the issue of Neyland's competency." *Neyland*, 2013 WL 3776602, at *6. Neyland is therefore not entitled to *de novo* review. *See Grp. v. Robinson*, 158 F. Supp. 3d 632, 650 (N.D. Ohio 2016) ("Federal habeas courts may review de novo an exhausted federal claim that was not adjudicated on the merits in state court."). As to the merits, Neyland was evaluated for competency three times prior to trial. When trial counsel moved for the trial court to reconsider its finding that Neyland was competent to stand trial following the competency hearing, during which all of the experts who evaluated Neyland testified, the trial court denied the motion. Neyland has presented no basis to believe that if trial counsel had moved for an additional competency hearing, whether before or after trial, that the trial court would have granted it. By the time of the competency hearing, the trial court already had ample opportunity to observe Neyland and interact with him, and Neyland fails to point to any significant change or new factor that would have justified granting such a motion. *See Sanders v. Plappert*, No. 16-6152, 2026 WL 593932, at *22 (6th Cir. Mar. 3, 2026) (holding the petitioner failed to establish a reasonably probability that he would have obtained a second competency hearing had trial counsel so moved where the petitioner had already been found competent after a prior

evaluation and there was no new factor or change to justify a second hearing); *id.* ("There is no right to a continual succession of competency hearings in the absence of some new factor.") (citing *Pate v. Commonwealth*, 759 S.W.2d 46, 47 (Ky. 1989).

Based on the foregoing, under the "doubly" deferential standards of *Strickland* and 2254(d), this Court finds the court of appeals acted reasonably in rejecting Neyland's ineffective assistance claims relating to his competency.

**2. mitigation evidence**

As explained above, Neyland raised a claim alleging his trial counsel were deficient in their investigation and presentation of mitigation evidence on both direct appeal and post-conviction review. Neyland identifies, with no analysis, the post-conviction appellate court's decision as the relevant decision for purposes of AEDPA deferential review. (*See* Doc. 50 at 182.) Respondent addresses both decisions in her analysis of the claim. (*See* Doc. 43 at 19-20.)

Neyland's mitigation ineffective assistance claim on direct review was broad, consisting of just two sentences in his merit brief. (Doc. 20-12 at 67 (Merit Brief).) He alleged,

> Counsel in this case failed to independently investigate Mr. Neyland's background or to conduct any mitigation investigation, let alone a full one, in the face of Mr. Neyland's clear paranoid mental condition which prevented him from recognizing the importance of or assisting in the preparation of his own defense for mitigation. Counsel's only attempt at mitigation was to recycle Dr. Sherman's testimony from the competency hearing and the request a pre-sentence report.

(*Id.*) The Ohio Supreme Court noted that "Neyland's generalized claim fail[ed] to specify any mitigating information that his counsel failed to obtain." *Neyland*, 139 Ohio St. at 399. In his post-conviction petition, Neyland argued, with supporting evidence, that counsel should have developed and presented additional mitigation evidence regarding his mental illness, his family history of mental illness, and history of abuse and neglect—the same factual arguments he now

presents to this Court. (Doc. 20-14 at 45-53 (Post-Conviction Pet.).)

Although Neyland presented a competency claim first on direct appeal with little argument, the substance of his subsequent post-conviction claim did not differ in its legal or factual basis such that it constituted a new claim. *See, e.g., Jells v. Mitchell*, 538 F.3d 478, 504 (6th Cir. 2008) (to present a claim fairly for purposes of determining exhaustion of habeas claim in state courts, "it is sufficient if the substance of the claim was presented to the state courts, such that the ultimate question would have been the same despite variations in the legal theory or factual allegations urged in its support"); *Abdur'Rahman v. Carpenter*, 805 F.3d 710, 715 (6th Cir. 2015) (citing *Schad v. Ryan*, 732 F.3d 963, 966–67 (9th Cir. 2013) (affirming denial of Rule 60(b) relief because petitioner's "new" claim of ineffective assistance of trial counsel involved the same allegation as his original ineffectiveness claim); *Woodward v. Williams*, 263 F.3d 1135, 1142 (10th Cir. 2001) (finding, for purposes of statute of limitations, amendment of habeas petition simply "clarifie[d] or amplifie[d] a claim or theory in the original" petition, and therefore was not a new claim). In both instances, Neyland focused on counsel's failure to present mitigating evidence of his mental health and family background. This Court, therefore, reviews the last state court to review the claim, which was the Ohio Supreme Court on direct review.

That court opined:

> {¶ 233} Neyland argues that his counsel were ineffective by failing to independently investigate his background or conduct any mitigation investigation. Neyland *396 asserts that his counsel's only attempt at mitigation was to "recycle Dr. Sherman's testimony from the competency hearing" and request a presentence investigation ("PSI").
>
> {¶ 234} An attorney's failure to reasonably investigate the defendant's background and present mitigating evidence to the jury at sentencing can constitute ineffective assistance of counsel. *Wiggins v. Smith*, 539 U.S. 510, 521–522, 123 S.Ct. 2527, 156 L.Ed.2d 471 (2003). "Defense counsel has a duty to investigate the

circumstances of his client's case and explore all matters relevant to the merits of the case and the penalty, including the defendant's background, education, employment record, mental and emotional stability and family relationships." *Goodwin v. Johnson*, 632 F.3d 301, 318 (6th Cir.2011). However, Neyland has the burden of demonstrating that his counsel rendered ineffective assistance by failing to conduct an adequate investigation. *State v. Hunter*, 131 Ohio St.3d 67, 2011-Ohio-6524, 960 N.E.2d 955, ¶ 104, citing *Strickland*, 466 U.S. at 687, 104 S.Ct. 2052, 80 L.Ed.2d 674.

a. Background

{¶ 235} Beginning on December 11, 2007 (more than ten months before trial), defense counsel informed the trial court that they wanted to "start preparing almost immediately" for mitigation. Counsel hired Kelly Heiby, a mitigation expert, Dr. Wayne J. Graves, a psychologist, and Beth Ann Crum, a defense investigator, to assist counsel in preparing for mitigation.

{¶ 236} During a pretrial hearing on July 28, 2008, defense counsel informed the trial court that Neyland "refused to cooperate in any preparation" for mitigation. Neyland refused to meet with either Dr. Graves or Heiby. However, defense counsel said that they would continue trying to convince Neyland to cooperate with them. During a pretrial hearing on August 5, 2008, counsel notified the trial court that Neyland still refused to cooperate in preparing for mitigation.

{¶ 237} During a pretrial hearing on August 25, 2008, defense counsel told the court that Neyland refused to sign any releases to allow the defense to obtain any of his education, employment, military, medical, or court records. Counsel asked the trial court to order that these records be released to them. The trial court granted the defense request except for Neyland's juvenile-court records.

{¶ 238} On September 19, 2008, defense counsel filed a motion requesting the court to reconsider its finding that Neyland was competent. The defense motion was based, in part, on Neyland's refusal to cooperate with Dr. Graves and Heiby in preparing for mitigation. The motion included a letter from Heiby, stating, "[Neyland] gave me no viable information to assist me in doing a proper mitigation investigation." The motion also included Dr. Graves's affidavit stating that Neyland "expressed an absolute refusal to cooperate in any type of preparation of mitigation for trial" and "refused to cooperate in any psychological testing."

{¶ 239} Following the state's presentation of trial-phase evidence,

defense counsel stated that Neyland continued to refuse to cooperate in preparing for mitigation. Consequently, his counsel requested a PSI in the event that the jury found Neyland guilty of any of the capital specifications. Defense counsel expressed uncertainty about whether Neyland would cooperate in completing the PSI. But Adrian Cimerman, lead defense counsel, told the court that he and assistant defense counsel "are in possession of other information that we could pass on to the probation department in terms of employment history, family members who might be contacted for family background, [and] school records."

{¶ 240} During mitigation, the defense presented Dr. Sherman's testimony, Neyland made two unsworn statements, and the PSI was presented for the jury's consideration.

b. Analysis

{¶ 241} Nothing in the record shows that defense counsel did not conduct an adequate investigation. Counsel obtained a mitigation specialist, a psychologist, and a defense investigator. Billing records show that Heiby spent numerous hours conducting her investigation between July 17 and October 22, 2008. The record does not show the full extent of the defense investigation into mitigation, but the court "cannot infer a defense failure to investigate from a silent record." *Were*, 118 Ohio St.3d 448, 2008-Ohio-2762, 890 N.E.2d 263, at ¶ 244.

(1) Neyland's refusal to cooperate

{¶ 242} Neyland's refusal to cooperate with defense experts in preparing for mitigation thwarted defense efforts to obtain information that could be used on his behalf during mitigation. The state argues that Neyland's ineffectiveness claim should be rejected based on the invited-error doctrine, because his refusal to cooperate with counsel in preparing mitigation caused the error that he now asserts.

{¶ 243} Under the invited-error doctrine, a party is not entitled to take advantage of an error that he himself invited or induced the trial court to make. *State ex rel. Kline v. Carroll,* 96 Ohio St.3d 404, 2002-Ohio-4849, 775 N.E.2d 517, ¶ 27. Neyland's ineffectiveness claim is not trying to take advantage of an error that he induced the trial court to make. Thus, the invited-error doctrine does not apply.

{¶ 244} Nonetheless, Neyland's lack of cooperation in preparing for mitigation is an important factor in reviewing whether counsel was

deficient. To determine whether counsel's performance was deficient, the court must measure it against an objective standard based on accepted professional norms. *See Rompilla v. Beard*, 545 U.S. 374, 380, 125 S.Ct. 2456, 162 L.Ed.2d 360 (2005).

{¶ 245} As a starting point, neither *Wiggins* nor *Strickland* addresses a situation where a defendant interferes with counsel's efforts to present mitigating evidence to a sentencing court. In *Rompilla*, the defendant refused to assist counsel in the development of a mitigation case, *id*. at 381, 125 S.Ct. 2456, but there is no indication that the defendant ever informed the court that he did not want mitigating evidence presented. The Supreme Court held that counsel was responsible for conducting a further investigation even though the defendant suggested that no mitigation was available. *Id*. at 381–389, 125 S.Ct. 2456.

{¶ 246} In *Schriro v. Landrigan*, 550 U.S. 465, 127 S.Ct. 1933, 167 L.Ed.2d 836 (2007), the defendant actively obstructed counsel's investigation and outright refused to allow counsel to present any mitigating evidence. For example, the defendant explicitly instructed his mother and ex-wife not to testify. *Id*. at 469, 127 S.Ct. 1933. Counsel tried to make a proffer of the witnesses' testimony, but the defendant repeatedly interrupted his presentation to the court to reiterate that he did not want mitigating evidence presented. *Id*. at 470, 127 S.Ct. 1933. The Supreme Court held that the defendant's refusal to cooperate in the penalty phase rendered counsel's limited investigation and presentation of mitigating evidence reasonable under the circumstances. *Id*. at 475–477, 127 S.Ct. 1933.

{¶ 247} In *Owens v. Guida*, 549 F.3d 399 (6th Cir.2008), the United States Court of Appeals for the Sixth Circuit considered whether counsel's failure to investigate a capital defendant's background was deficient when the defendant would not cooperate. In *Owens*, the defendant would not cooperate with mental-health examiners, would not allow counsel to communicate with her family, and contrary to counsel's advice, would not take the stand herself. *Id*. at 406–407. The court held that any failure to develop mitigating evidence was the result of the defendant's actions and not deficient performance by her counsel. *Id*. at 412. The court stated, “A defendant cannot be permitted to manufacture a winning [ineffective-assistance-of-counsel] claim by sabotaging her own defense, or else every defendant clever enough to thwart her own attorneys would be able to overturn her sentence on appeal.” *Id*.

{¶ 248} Other courts have held that a defendant's lack of cooperation does not eliminate counsel's duty to investigate. *See Hamilton v.*

> *Ayers*, 583 F.3d 1100, 1118 (9th Cir.2009); *Sonnier v. Quarterman*, 476 F.3d 349, 358 (5th Cir.2007). Moreover, the ABA Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases (2003) provide, "The investigation regarding penalty should be conducted regardless of any statement by the client that evidence bearing upon penalty is not to be collected or presented." *Id.,* Guideline 10.7(A)(2), at 76. See *Bobby v. Van Hook*, 558 U.S. 4, 7, 130 S.Ct. 13, 175 L.Ed.2d 255 (2009) (ABA standards useful as "guides" to what reasonableness entails to the extent that they describe professional norms that prevailed when the representation took place).
>
> {¶ 249} Neyland's refusal to cooperate appears to fall somewhere between Rompilla and Landrigan. Neyland refused to cooperate with the mitigation specialist and the defense psychologist in preparing mitigation. But Neyland never told the trial court that he did not want defense counsel to present mitigation. Neyland made two unsworn statements during the mitigation proceedings, which indicates that he did want to present some mitigation. We hold that Neyland's refusal to cooperate with the mitigation specialist and the defense psychologist did not excuse counsel from conducting a mitigation investigation.
>
> (3) Mitigating information obtained
>
> {¶ 250} Despite Neyland's lack of cooperation, the record shows that the defense was able to assemble and collect mitigating information. Trial counsel obtained a court order for Neyland's records after he refused to sign a release. Trial counsel also had ample information about Neyland's mental condition from the competency proceedings that could be used for mitigation purposes after Neyland refused to cooperate with Dr. Graves and would not undergo any further psychological testing. Indeed, Dr. Sherman testified during mitigation. The PSI also shows that a wealth of information was obtained about Neyland's family history, educational background, employment history, military service, and lack of a serious criminal record.
>
> {¶ 251} Finally, Neyland's generalized claim fails to specify any mitigating information that his counsel failed to obtain. Thus, we hold that Neyland has failed to establish that defense counsel performed inadequately in preparing for mitigation. *See Hunter,* 131 Ohio St.3d 67, 2011-Ohio-6524, 960 N.E.2d 955, at ¶ 71; *State v. Perez*, 124 Ohio St.3d 122, 2009-Ohio-6179, 920 N.E.2d 104, ¶ 226.

*Neyland*, 139 Ohio St. 3d at 395-99.

In the instant petition, Neyland reiterates his claim that trial counsel was ineffective for failing to thoroughly investigate and present various mitigation evidence during the penalty phase, including Neyland's mental health records, the abuse and neglect he experienced during his upbringing, and a family history of mental illness, poverty, and dysfunction. The only mitigation evidence presented was Dr. Sherman's testimony, which Neyland maintains was undermined by the State and by his own unsworn statements to the jury. According to Neyland, but for counsel's failure to conduct an adequate investigation, they would have uncovered and presented the aforementioned evidence to the jury, thereby lessening his culpability and potentially sparing him from a death sentence. *Wiggins v. Smith*, 539 U.S. 510, 535, 123 S. Ct. 2527, 2542, 156 L. Ed. 2d 471 (2003) ("Given both the nature and the extent of the abuse petitioner suffered, we find there to be a reasonable probability that a competent attorney, aware of this history, would have introduced it at sentencing in an admissible form."). Neyland asserts that even though trial counsel retained a mitigation specialist, that individual met with Neyland only once and attempted to contact his family only once, with no follow-up. He maintains that his or his family's failure to cooperate with the mitigation investigation is irrelevant to counsel's performance, because it was counsel's duty to track down other leads and utilize the available mental health records, and counsel provided no strategic rationale for failing to do so.

Neyland argues the court of appeals' decision to deny relief on this claim on post-conviction relief based on the cumulative nature of the mitigation evidence was an unreasonable application of clearly established federal law because evidence is not *merely* cumulative when it supports a defense that was weak at trial. Neyland argues that the court of appeals' ruling is in conflict with *Strickland's* "reasonable probability" standard because,

regardless of whether new evidence corroborates evidence that was presented at trial, there may still be a reasonable probability that the new evidence would change the outcome. He argues, for example, that where mitigation becomes a battle of experts, the presentation of additional supporting evidence could be crucial, and that in his case, evidence of his family history and mental health challenges would have humanized him to the jury and possibly spared him the death penalty.

The record reflects counsel hired a mitigation specialist, arranged for a pre-sentence investigation and report, and engaged Dr. Sherman to testify about Neyland's mental health and background. The mitigation specialist met with trial counsel and Neyland; however, Neyland refused to sign releases and would only give first names of siblings. Neyland's family also refused to cooperate. (Doc. 20-14, p. 310-11). During mitigation, Neyland's counsel argued that his lack of significant criminal history, adjustment to incarceration/lack of disciplinary infractions while incarcerated awaiting trial, employment history, military service, and mental illness or personality disorder all mitigated against a death sentence.

This Court finds that the Ohio Supreme Court's deficiency and prejudice analyses did not contravene clearly established Supreme Court precedent. *See Maxwell v. Shoop*, 2025 WL 886198, at *33 (N.D. Ohio Mar. 21, 2025) ("We cannot infer a defense failure to investigate from a silent record; the burden of demonstrating ineffective assistance is on [the petitioner]."); *Wickline v. Mitchell*, 319 F.3d 813, 820–21 (6th Cir. 2003) (holding trial counsel's mitigation investigation and presentation did not fall below an objective standard of reasonableness where "counsel investigated prior to trial, hiring a private investigator to interview persons with knowledge about the case and personally interviewing key witnesses" for the purposes of both the guilt and penalty phase, counsel discussed the mitigation strategy with the petitioner, and

the petitioner "did not want to speak with a psychiatrist or a probation officer or involve his family"). The Ohio Supreme Court correctly cited *Strickland* and engaged in a thoughtful analysis in finding that Neyland's refusal to cooperate with the mitigation specialists hired by counsel did not lessen counsel's duty to conduct an adequate mitigation investigation, but that counsel did conduct such an investigation despite Neyland's obstructionism. *See White v. Plappert*, 131 F.4th 465, 480 (6th Cir. 2025) ("When a state court quotes and cites the applicable Supreme Court precedent, its decision is not 'contrary to' that precedent."). Moreover, we agree with the Ohio Supreme Court's finding that Neyland failed to demonstrate prejudice; even assuming counsel were ineffective in their mitigation investigation and presentation, this Court finds that Neyland failed to demonstrate that a more comprehensive mitigation investigation and presentation would have overcome the aggravating circumstances presented by the State such that there was a substantial likelihood of a different result.

**3. restraints**

On post-conviction relief, Neyland argued trial counsel was ineffective for failing to object to excessive court room security measures during trial, including a leg restraint, and for failing to object when the State requested the use of a second leg restraint. Neyland now acknowledges his ineffectiveness claim as to the first leg restraint is meritless, because counsel filed a pretrial motion requesting Neyland attend trial without restraints.

As to the State's request for a second leg restraint, Neyland maintains trial counsel's performance was deficient for failing to object. However, he acknowledges that he cannot meet his burden pursuant to *Strickland* because there is no clear evidence to contradict the Ohio Supreme Court's finding that the record is unclear whether he was ever actually placed in a second restraint. Neyland nevertheless reiterates his belief that the underlying constitutional claim regarding his

restraint during trial, which was visible to the jury, is meritorious. Based on the foregoing, this Court finds Neyland waived both these claims.

### III. Eighth Ground for Relief: *Right to Confrontation*

Neyland argues his due process right to a fair trial and confrontation clause rights under the Fifth, Sixth, Eight, and Fourteenth Amendments to the U.S. Constitution were violated when Dr. Smith's prior testimony was presented during the sentencing phase without her presence. (Doc. 17, 152). Neyland maintains Dr. Smith's testimony from the competency hearing should not have been presented because she was not truly an "unavailable" witness—she was on maternity leave and the State failed to make a good faith reasonable effort to procure her presence—and he did not have a meaningful opportunity to cross-examine Dr. Smith regarding sentencing. (Doc. 17, 153, Doc. 50, 208-09).

Neyland raised this claim on direct appeal and it was rejected by the Ohio Supreme Court on the merits:

> {¶ 161} Dr. Thomas G. Sherman, a psychiatrist, testified as a defense mitigation witness. Dr. Sherman had conducted a competency evaluation of Neyland, and he testified during mitigation that "it was crystal clear to me that [Neyland] had a mental illness, and I thought he was incompetent to stand trial." Dr. Sherman diagnosed Neyland with "[o]ne * * * a delusional disorder, a persecutory type. And second * * * schizophrenia, a more severe form of that illness."
>
> {¶ 162} Dr. Sherman provided examples of Neyland's behavior that supported his findings. First, Neyland moved out of his house and into his truck because he believed that people were breaking into his house to listen to his answering machine. Second, Neyland mentioned that prophylactics were showing up all the time in his laundry. Finally, Neyland left bizarre notes in his storage unit saying, "I'm so scared" and other comments possibly related to the killings.
>
> {¶ 163} As it relates to the mitigating factors, Dr. Sherman testified

that at the time of committing these offenses, because of a mental disease or defect, Neyland lacked substantial capacity to conform his conduct to the requirements of the law.[1] Dr. Sherman concluded, “[A]ll of this indicates to me [that] he had a severe mental illness of a paranoid type, that he suspected virtually everybody of something, that probably would have not taken very much to tip him off.”

{¶ 164} The state called Dr. Barbra Bergman and Dr. Kristen Haskins as rebuttal witnesses. Both witnesses had also conducted competency evaluations of Neyland. Dr. Bergman, a psychologist, testified that Neyland was not suffering from a mental illness but had a severe personality disorder. Dr. Bergman stated that she could not determine whether Neyland lacked substantial capacity to appreciate the criminality of his conduct because Neyland would not talk to her about his criminal conduct.

{¶ 165} Dr. Haskins, a psychologist, testified that Neyland had a “mixed personality disorder.” She stated, “[H]e's capable of choosing his behaviors and actions and of making decisions. And there were no indications that those were tainted by any kind of severe mental illness.”

{¶ 166} Dr. Delaney Smith, a psychiatrist, was also a rebuttal witness, although she was not present for the hearing. The prosecutor sought to introduce Dr. Smith's former testimony at the competency hearing in lieu of calling her as a witness in the penalty phase, because she was on maternity leave. The prosecutor stated that Dr. Smith had been subpoenaed, but that the legal department at Twin Valley Behavioral Health Care, where Dr. Smith worked, notified the state that Dr. Smith was unavailable because she was on maternity leave. The prosecutor also presented a letter from a nursing supervisor at Twin Valley, dated November 3, 2008, stating that Dr. Smith was aware of the subpoena, but was currently on maternity leave and “will be unavailable until after the first of the year.”

{¶ 167} Defense counsel objected to admitting Dr. Smith's former testimony from the competency proceedings during mitigation, arguing that “the issue before the Court at that time is significantly different than the issue before the jury today.” The defense asked that Dr. Smith's testimony be excluded, on the basis that “the party against whom the testimony [is] being offered does not have the same motive to develop testimony today as we would have had back in the competency hearing * * *.”

{¶ 168} The trial court overruled the defense objection, stating:

And in looking at this * * *, hearsay is permitted even though the unavailability of this witness would probably make the transcript admissible regardless, so hearsay is not really, and I'm not sure that's the defense's objection, the competency issue, the fact that that was advanced, the testimony was advanced during the competency hearing and so has all the rest of the testimony that we've heard thus far in this proceeding and this phase of it. So I don't see how that would be a problem in terms of objections. I'm going to overrule the objection and permit the State to proceed.

{¶ 169} Thereafter, the state read to the jury the transcript of Dr. Smith's former testimony from the competency hearing. Dr. Smith stated that she observed Neyland during his 30–day inpatient stay for a competency evaluation at Twin Valley. Dr. Smith detected no signs of mental illness, but determined that Neyland had a paranoid personality disorder. Dr. Smith reviewed Dr. Sherman's report and stated that she had “more time to observe and interact with Mr. Neyland and see him in various different settings and see his interactions with different people.”

{¶ 170} The former testimony included Dr. Smith's cross-examination. Dr. Smith acknowledged that it was not her job to do a competency evaluation of Neyland, and she did not complete a written report. Dr. Smith stated that she saw signs that Neyland had a paranoid personality disorder. She also reviewed Neyland's results on the Minnesota Multiphasic Personality Inventory (“MMPI”) and stated that Neyland answered questions in such a way as to present himself in a very positive light. She also recognized that Neyland scored extremely low in the reasoning category of the MacCAT–CA, but characterized such low scores as resulting from his personality disorder. During redirect examination, Dr. Smith expressed her opinion that Neyland was competent to stand trial. On recross, Dr. Smith again stated that Neyland has a personality disorder. But she stated that Neyland can still make reasoned choices.

b. Analysis

{¶ 171} Neyland argues that the trial court erred in admitting Dr. Smith's former testimony from the competency hearing. Neyland claims that defense counsel's inability to cross-examine Dr. Smith denied him the right to confrontation.

{¶ 172} The Sixth Amendment to the United States Constitution provides, “In all criminal prosecutions, the accused shall enjoy the

right * * * to be confronted with the witnesses against him * * *."

{¶ 173} In *Crawford v. Washington,* 541 U.S. 36, 68, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004), the Supreme Court held that the admission of a testimonial hearsay statement made by a declarant who does not testify at trial violates the Sixth Amendment unless (1) the declarant is unavailable and (2) the defendant had a prior opportunity to cross-examine the declarant.

{¶ 174} While *Crawford* did not establish a precise definition of the term "testimonial," the Supreme Court did provide some guidance, holding that, at a minimum, statements are testimonial if the declarant made them at a "preliminary hearing, before a grand jury, or at a former trial; and [in] police interrogations." *Id.* at 68, 124 S.Ct. 1354. Dr. Smith's former testimony was presented during the competency hearing that was conducted during an earlier stage of Neyland's trial. Thus, Dr. Smith's testimony constituted a testimonial statement and unless it met the two requirements of *Crawford,* its admission violated Neyland's constitutional right to confrontation.

(1) *Unavailability*

{¶ 175} The trial court determined that Dr. Smith was unavailable to testify because she was on maternity leave. Neyland asserts that it is questionable whether Dr. Smith was truly unavailable and whether the state made a good-faith effort to procure her attendance.

{¶ 176} Yet defense counsel did not object to Dr. Smith's former testimony on the basis that her unavailability had not been established. Given defense counsel's failure to dispute unavailability, Neyland has waived all but plain error as to this point. *See State v. Pasqualone,* 121 Ohio St.3d 186, 2009-Ohio-315, 903 N.E.2d 270, ¶ 14 ("Confrontation Clause rights, like other constitutional rights, can be waived"); *State v. Mitchell,* 2d Dist. Montgomery No. 24797, 2012-Ohio-3722, 2012 WL 3542309, ¶ 10 (failure to object on the basis of unavailability constitutes waiver).

{¶ 177} An alleged error is plain error only if the error is " 'obvious,' " *State v. Barnes,* 94 Ohio St.3d 21, 27, 759 N.E.2d 1240 (2002), quoting *State v. Sanders,* 92 Ohio St.3d 245, 257, 750 N.E.2d 90 (2001), and "but for the error, the outcome of the trial clearly would have been otherwise," *State v. Long,* 53 Ohio St.2d 91, 372 N.E.2d 804 (1978), paragraph two of the syllabus. Notice of plain error "is to be taken with the utmost caution, under exceptional circumstances and only to prevent a manifest miscarriage of

justice." *Id*. at paragraph three of the syllabus.

{¶ 178} We hold that no plain error occurred. Dr. Smith's testimony was cumulative. Dr. Bergman and Dr. Haskins provided similar testimony that rebutted Dr. Sherman's testimony about Neyland's mental condition. Indeed, a review of Dr. Smith's testimony shows that she provided little information that was not also provided by the state's other two rebuttal witnesses. Thus, no outcome-determinative plain error occurred.

(2) *Prior Opportunity for Cross–Examination*

{¶ 179} The trial court permitted Dr. Smith's former testimony to be introduced over a defense objection that trial counsel did not have an opportunity and similar motive to cross-examine Dr. Smith at the competency hearing about Dr. Sherman's conclusion that Neyland's mental illness met the requirements as an R.C. 2929.04(B)(3) mitigating factor.

{¶ 180} *Crawford* requires a prior opportunity for the defendant to cross-examine the declarant about the testimonial statement sought to be admitted. The "prior opportunity to cross-examine" is both a "necessary" and "dispositive" requirement for the admission of testimonial statements. *Crawford,* 541 U.S. at 55, 124 S.Ct. 1354, 158 L.Ed.2d 177.

{¶ 181} Neyland argues, in effect, that *Crawford* incorporates the "similar motive" requirement set forth in Evid.R. 804(B)(1). *Crawford* did not state whether the Confrontation Clause requires a defendant to have had both an opportunity and a similar motive to cross-examine. *See Contreras,* 979 So.2d at 909. However, in *United States v. Hargrove,* 382 Fed.Appx. 765, 778 (10th Cir.2010), the United States Court of Appeals for the Tenth Circuit stated:

*Crawford* requires only that the defendant have an opportunity to cross-examine the adverse witness at the prior proceeding—it does not require that the defendant have a similar motive at the prior proceeding. The prior motive requirement comes from the Federal Rules of Evidence, not the Confrontation Clause. *See* Fed.R.Evid. 804(b)(1).

{¶ 182} However, Dr. Smith's former testimony must also meet the requirements of Evid.R. 804(B)(1) to be admissible. Thus, we must examine whether trial counsel had the opportunity and a similar motive to cross-examine Dr. Smith during the competency proceedings. "An identical motive to develop testimony is not

required by Evid.R. 804(B)(1), only a similar motive." *State v. White,* 2d Dist. Montgomery No. 20324, 2005-Ohio-212, 2005 WL 120059, ¶ 26.

{¶ 183} During mitigation, Dr. Sherman testified that he had conducted a competency evaluation and determined that Neyland had a mental illness and was incompetent to stand trial. Dr. Sherman also testified that Neyland's mental illness qualified as an R.C. 2929.04(B)(3) mitigating factor. But Dr. Smith's former testimony did not purport to rebut Dr. Sherman's findings regarding the R.C. 2929.04(B)(3) factor. Rather, Dr. Smith's rebuttal was limited to challenging Dr. Sherman's findings that Neyland was incompetent and suffered from a mental illness.

{¶ 184} During the competency hearing, Dr. Smith had also testified that she disagreed with Dr. Sherman's findings. She concluded that Neyland suffered from a personality disorder and not a mental illness and was competent to stand trial. At that time, defense counsel fully cross-examined Dr. Smith. Thus, defense counsel had "an opportunity and similar motive" to cross-examine Dr. Smith during the competency hearing as to those matters she testified to during the mitigation proceedings.

{¶ 185} However, Neyland claims that defense counsel did not have a similar motive to cross-examine Dr. Smith about Dr. Sherman's findings regarding the R.C. 2929.04(B)(3) mitigating factor. Neyland cites *State v. Vrabel,* 99 Ohio St.3d 184, 2003-Ohio-3193, 790 N.E.2d 303, ¶ 87 (Moyer, C.J., dissenting), in arguing that the standard for an insanity defense and the standard for the R.C. 2929.04(B)(3) mitigating factor are not synonymous. But in *State v. Cooey,* 46 Ohio St.3d 20, 33, 544 N.E.2d 895 (1989), the court held that a psychological report on sanity is relevant to the existence of the R.C. 2929.04(B)(3) mitigating factor, stating, "The issues involved are similar: whether a 'mental disease or defect' existed and, if so, whether and to what degree it may have impaired [the defendant's] cognition and volition." *See State v. Evans,* 63 Ohio St.3d 231, 244, 586 N.E.2d 1042 (1992) ("the results of a competency evaluation would also be relevant to mitigation").

{¶ 186} Defense counsel was motivated at the mitigation hearing by issues similar to those at the competency hearing. *See United States v. Salerno,* 505 U.S. 317, 326, 112 S.Ct. 2503, 120 L.Ed.2d 255 (1992) (Blackmun, J., concurring) ("Because 'similar motive' does not mean 'identical motive,' the similar-motive inquiry * * * is inherently a *factual* inquiry, depending in part on the similarity of the underlying issues and on the context of the [prior] questioning"

[emphasis sic] ).

> The requirement has become, not a mechanical one of identity or even of substantial identity of issues, but rather that the issues in the first proceeding, and hence the purpose for which the testimony was offered, must have been such as to produce an adequate motive for testing on cross-examination the credibility of the testimony.

McCormick, *Evidence,* Section 304, at 495 (7th Ed.2013).

{¶ 187} Dr. Smith's testimony that Neyland suffered from a personality disorder rather than a mental illness would have also been relevant in determining the existence of the R.C. 2929.03(B)(3) mitigating factor. Defense counsel would have had a similar motive in challenging this testimony during both the competency and the mitigation hearings. Thus, we conclude that the trial court did not abuse its discretion in determining that defense counsel had a prior opportunity to cross-examine Dr. Smith pursuant to Evid.R. 804(B)(1).

*State v. Neyland*, 139 Ohio St. 3d 353, 381–87, 12 N.E.3d 1112, 1143–48 (2014).

The Sixth Amendment guarantees that "[i]n all criminal prosecutions, the accused shall enjoy the right ... to be confronted with the witnesses against him." U.S. Const. amend. VI. "Where testimonial evidence is at issue, ... the Sixth Amendment demands ... unavailability and a prior opportunity for cross-examination." *Crawford v. Washington*, 541 U.S. 36, 68 (2004). "[T]here has traditionally been an exception to the confrontation requirement where a witness is unavailable and has given testimony at previous judicial proceedings against the same defendant which was subject to cross-examination by that defendant." *Barber v. Page*, 390 U.S. 719, 722, 88 S. Ct. 1318, 1320 (1968); *see also Crawford*, 541 U.S. at 57, 124 S. Ct. at 1367 ("[P]rior trial or preliminary hearing testimony is admissible only if the defendant had an adequate opportunity to cross-examine."). However, "the prosecution may not substitute former testimony for live testimony unless the government first demonstrates that the witness

remains unavailable for trial proceedings." *Hamilton v. Morgan*, 474 F.3d 854, 858 (6th Cir. 2007). "[A] witness cannot be deemed unavailable for purposes of the exception unless the government has made a good faith effort to obtain her presence at the trial proceedings." *Id*.

Neyland argues the State did not make a good faith effort to procure Dr. Smith's attendance because they served a subpoena on her workplace and, once informed she was on maternity leave, made no effort to serve a subpoena at her residence, to contact her by phone or email, or to otherwise determine her availability. (Doc. 17, 153-54). Neyland maintains the State therefore failed to meet its burden to prove Dr. Smith was unavailable due to infirmity or physical illness, as required by clearly established federal law. (Doc. 50, 208-09). However, the Ohio Supreme Court correctly noted that defense counsel's objection at trial did not challenge the reasonableness of the State's efforts in procuring Dr. Smith as a witness, only whether Neyland had an opportunity and similar motive to cross-examine Dr. Smith. Thus, the state court properly reviewed that portion of the issue for plain error only and determined Neyland failed to establish plain error. *See United States v. Koeberlein*, 161 F.3d 946, 949 (6th Cir. 1998) ("To establish plain error, a defendant must show (1) that an error occurred in the district court; (2) that the error was plain, i.e., obvious or clear; (3) that the error affected defendant's substantial rights; and (4) that this adverse impact seriously affected the fairness, integrity or public reputation of the judicial proceedings."). This is not a case where the State made *no* effort to procure the witness's presence; the State attempted to procure her presence by serving a subpoena on Dr. Smith's workplace, but discovered she was on maternity leave and therefore not currently engaging in her professional activities, which would include testifying as an expert. *Barber*, 390 U.S. at 723, 88 S. Ct. at 1321 (holding witness was not unavailable where "the State made absolutely no effort to obtain the presence of [the witness]

at trial"). Even assuming the State failed to make reasonable efforts to obtain Dr. Smith's presence, we do not believe any error undermined Neyland's rights or adversely impacted the fairness of the proceedings because, as noted by the state court, Dr. Smith's testimony was cumulative to the State's other rebuttal witnesses, who were present at trial.

Neyland further argues he did not have an opportunity to cross-examine Dr. Smith regarding the statutory mitigating factor R.C. 2929.04(B)(3): "Whether, at the time of committing the offense, the offender, because of a mental disease or defect, lacked substantial capacity to appreciate the criminality of the offender's conduct or to conform the offender's conduct to the requirements of the law." However, as noted by the Ohio Supreme Court, the law does not require the defendant to have an identical motive for cross-examination, only a "similar motive." *United States v. Salerno*, 505 U.S. 317, 322, 112 S. Ct. 2503, 2507 (1992) (confirming that former testimony of unavailable witness may only be introduced if the defendant previously had "similar motive" to examine the witness). We believe the state court's conclusion that Neyland's motive for cross-examining Dr. Smith at the competency hearing was similar to his motivate at mitigation is reasonable. In both scenarios, the issue was Neyland's mental health. Although the standard for competency is not identical to the mitigating factor articulated in R.C. 2929.04(B)(3), we agree that the issues are sufficiently overlapping as to provide Neyland a similar motive at both proceedings. Additionally, the Ohio Supreme Court explicitly cited state law holding that the results of a competency evaluation are relevant to mitigation.

Based on the foregoing, relief on this ground is denied.

### IV. Ninth Ground for Relief: *Improper Use of Restraints*

In his ninth claim, Neyland argues his due process rights were violated when he was

forced to wear restraints in front of the jury and by the presence of extra deputies in the courtroom during trial. (Doc. 17, 155-56).

Neyland raised this issue on direct appeal and the Ohio Supreme Court denied the claim on the merits, finding as follows:

> {¶ 81} In proposition of law II, Neyland argues that the trial court erred when it ordered Neyland to wear leg restraints without a valid reason.
>
> {¶ 82} No one should be tried while shackled, absent unusual circumstances. *State v. McKnight*, 107 Ohio St.3d 101, 2005-Ohio-6046, 837 N.E.2d 315, ¶ 219, *citing Illinois v. Allen,* 397 U.S. 337, 344, 90 S.Ct. 1057, 25 L.Ed.2d 353 (1970). The use of restraints tends to erode the presumption of innocence that the justice system attaches to every defendant. *State v. Franklin*, 97 Ohio St.3d 1, 2002-Ohio-5304, 776 N.E.2d 26, ¶ 79. But it is widely accepted that a prisoner may be shackled when there is a danger of violence or escape. *State v. Woodards*, 6 Ohio St.2d 14, 23, 215 N.E.2d 568 (1966). The decision to require restraints is left to the sound discretion of the trial court, which is in a position to consider the prisoner's actions both inside and outside the courtroom, as well as his demeanor while the court is in session. *Franklin* at ¶ 79.
>
> a. Rulings on leg restraints
>
> {¶ 83} On April 10, 2008, defense counsel filed a motion requesting that Neyland appear at all proceedings without restraints. On June 2, 2008, the trial court denied this motion.
>
> {¶ 84} On August 25, 2008, during a pretrial session outside the defendant's presence, the trial court discussed the potential that Neyland might become disruptive during trial based on his propensity "to insist on certain subject matters being addressed" and that "he may become out of control a little bit" if the court "rules against him on relevance." The trial court added, "I don't know what we can do other than obviously using some sort of restraint, but I guess now is the time to talk about it so that we're not all caught off guard." The court also said, "Other than that he's been pretty well-behaved."
>
> {¶ 85} In response, defense counsel said, "In fairness to Calvin it's hard to predict, he's very unpredictable, but I would anticipate he would be demonstrative, not necessarily disruptive." Defense

counsel also mentioned that he has had previous clients wear leg shackles that were hidden from the jury by an apron in front of counsel's table.

{¶ 86} During pretrial proceedings on September 24, 2008, the trial court stated that it was considering having Neyland wear either leg irons or some other leg restraint under his pants and that placing skirting around the table would ensure that the jury could not see that Neyland was restrained. The trial court also mentioned that there would be two or three deputies in the courtroom.

{¶ 87} During pretrial proceedings on October 8, 2008, the bailiff indicated that a leg restraint had been found that would fit Neyland. He stated that Neyland would walk with a "slight gate [sic]," apparently meaning that Neyland's gait would be slightly impaired. During pretrial proceedings on October 15, 2008, the trial court stated that a leg restraint would be used and that a skirt around the defense counsel's table would not be necessary.

{¶ 88} After trial began, the state filed a motion to have Neyland wear two leg restraints because he had figured out how to manipulate the single one. During a hearing on the motion, the trial court asked defense counsel if they wanted to have an evidentiary hearing. Defense counsel responded, "We'll leave it up to the sheriff's department." Defense counsel added, "My experience with leg braces, * * * the defendant has figured out how to unlock it or manipulate it or something, which I think that's not a secret how to do that. * * * Again, * * * let's not do anything at this point unless the sheriff thinks it's appropriate."

{¶ 89} The trial court then stated:

> And he is obviously a big individual. We have tried to do the most we could in terms of not restraining him certainly in a visible way, and that's our effort is to not have the jury even be aware. From what I've been able to see thus far, no one would even know. What I think I'll do is authorize it but leave it at the discretion of the sheriff's department. Does that seem fair? And if they feel it's appropriate, they can do it.

{¶ 90} Both the prosecutor and the defense counsel expressed their agreement. The trial court said, "We'll leave it at that. That will be the order of the Court." Subsequently, the trial court issued an order granting the state's motion to require Neyland to wear a second leg restraint at trial "if deemed necessary by the Wood County Sheriff."

b. Analysis

(1) *First leg restraint*

{¶ 91} Neyland claims that the trial court ordered him to wear restraints without any showing that restraints were necessary because of his disruptive behavior.

{¶ 92} The trial court granted the state's request on shackling without first conducting a hearing to consider whether evidence showed that shackling was necessary. We continue to emphasize that prior to ordering a defendant to wear restraints, the trial court should hold a hearing on the matter. *Franklin*, 97 Ohio St.3d 1, 2002-Ohio-5304, 776 N.E.2d 26, at ¶ 82.

{¶ 93} The United States Court of Appeals for the Sixth Circuit has held that when considering whether to physically restrain a defendant during trial, the court should conduct a formal hearing with sworn testimony to resolve factual disputes and preserve the appellate record. *United States v. Perry*, 401 Fed.Appx. 56, 63 (6th Cir.2010). However, the United States Supreme Court has not held that such a hearing is required. *See Deck v. Missouri*, 544 U.S. 622, 629, 125 S.Ct. 2007, 161 L.Ed.2d 953 (2005).

{¶ 94} We have also held that a hearing on the necessity for restraints is not an "absolute rule." *Franklin* at ¶ 82. In *Franklin*, we stated, "Where the facts and circumstances surrounding a defendant illustrate a *compelling need* to impose exceptional security procedures, the trial court's exercise of discretion in this regard should not be disturbed unless its actions are not supported by the evidence before it." (Emphasis added.) *Id*.

{¶ 95} While there was no formal hearing, the trial court's reasons for ordering Neyland to wear a leg restraint can be gleaned from the record. During the pretrial session on August 25, 2008, the judge voiced his concerns about Neyland's potential for disruptive courtroom behavior. Defense counsel stated that Neyland was "very unpredictable" and acknowledged that he "would be demonstrative, not necessarily disruptive."

{¶ 96} The trial court had observed Neyland's demeanor in court. The trial court had also heard two psychologists and two psychiatrists testify at the competency hearing about Neyland's bizarre thinking and paranoid behavior. The trial court was also mindful that Neyland was a large man and that sheriff's deputies

might have difficulty in handling him if he became disruptive. Neyland's driver's license stated that he stood six feet, three inches tall and weighed 250 pounds.

{¶ 97} Yet nothing shows that Neyland had been disruptive in court or had been violent or disruptive in jail. Indeed, the trial court stated that Neyland had been “pretty well-behaved.” *Compare Franklin*, 97 Ohio St.3d 1, 2002-Ohio-5304, 776 N.E.2d 26, at ¶ 80–81 (defendant demonstrated a propensity for violence and a psychologist described him as a “time bomb waiting to happen”); *Cassano*, 96 Ohio St.3d 94, 2002-Ohio-3751, 772 N.E.2d 81, at ¶ 55 (defendant had a history of violent felonies and committed a murder in prison).

{¶ 98} The trial court provided limited reasoning as to why it found a compelling need to keep Neyland shackled. Yet the trial judge was in a position to consider Neyland's actions inside and outside the courtroom and voiced his concerns about Neyland's potential for disruptive courtroom behavior. A “court need not sit by helplessly waiting for a defendant to commit a violent or disruptive act in the courtroom before being cloaked with the power to invoke extra security measures.” *Franklin* at ¶ 79. Thus, we hold that the trial court did not abuse its discretion in ordering Neyland to wear a leg restraint.

(2) *Second leg restraint*

{¶ 99} After trial began, the trial court granted the state's request for Neyland to wear a second restraint, but left it to “the discretion of the sheriff's department.” As an initial matter, the record is unclear whether Neyland was actually placed in a second leg restraint following the trial court's ruling. In any event, defense counsel failed to object and thus waived all but plain error.

{¶ 100} Neyland argues that the trial court erred by leaving the final decision on wearing a second restraint to the sheriff's discretion. “The trial court must exercise its own discretion and not leave the issue up to security personnel.” *State v. Adams*, 103 Ohio St.3d 508, 2004-Ohio-5845, 817 N.E.2d 29, ¶ 104; *see also United States v. Miller,* 531 F.3d 340, 345–346 (6th Cir.2008).

{¶ 101} Accordingly, the trial court erred by leaving the final decision on wearing a second leg restraint to the sheriff's discretion.

{¶ 102} Even assuming that Neyland wore a second restraint for the remainder of the trial, we hold that there was no plain error. The leg

restraints were under Neyland's pants and not visible to the jury. But Neyland argues that when he went to the podium to make an unsworn statement during the mitigation phase of the trial, his constrained movements must have been visible to the jury. However, nothing in the record indicates that the jury observed Neyland walking with constrained movements before he made his unsworn statement. Neyland bears the burden on plain-error review, and he has not met that burden. Thus, this claim is rejected. *See Miller*, 531 F.3d at 347.

(3) *Defense arguments*

{¶ 103} Neyland argues that the trial court failed to consider lesser alternatives, such as the employment of extra deputies, before ordering that he wear leg restraints. Some Ohio courts of appeals have held that a trial court has "a duty to determine whether there is a 'less prejudicial but adequate means of providing security' " before ordering restraints. *State v. McCree,* 5th Dist. Richland No. 10CA133, 2011-Ohio-4114, 2011 WL 3652755, ¶ 14, quoting *Lakin v. Stine*, 431 F.3d 959, 964 (6th Cir.2005); *State v. Davis*, 2d Dist. Clark No. 2011 CA 15, 2012-Ohio-1225, 2012 WL 996909, ¶ 15; *State v. Mitchell*, 6th Dist. Williams No. WM–05–004, 2006-Ohio-5117, 2006 WL 2790333, ¶ 29.

{¶ 104} The trial court did discuss the use of deputies to provide courtroom security. The trial court also discussed the option of using a stun belt. The bailiff stated that two uniformed deputies would be with the defendant at all times. But the presence of additional deputies was not discussed as a lesser alternative to the use of leg restraints.

{¶ 105} The trial court should have considered whether there were lesser alternatives to the use of leg restraints to provide adequate courtroom security. Nevertheless, the trial court used restraints that were not visible to the jury rather than shackles or other visible types of restraints. Even though the record is unclear, it appears that the trial court considered the presence of deputies and the use of leg restraints as the least form of restraint necessary to ensure courtroom security. Under these circumstances, we reject this claim.

{¶ 106} Finally, Neyland argues that the leg restraints inhibited his interaction with defense counsel and thus interfered with his Sixth Amendment right to counsel. However, the defense never asserted that restraints interfered with the attorney-client relationship and thus waived all but plain error.

{¶ 107} No plain error occurred. Nothing in the record indicates that Neyland's leg restraints inhibited his communication with counsel with respect to his defense. Both of Neyland's hands were free throughout the trial. Neyland also does not claim that the restraints impeded his ability to follow the proceedings and take an active interest in the presentation of his case. Indeed, when asking to represent himself, Neyland said that he had taken pages and pages of notes that he wanted counsel to use during cross-examination. The trial court responded, "I noticed that they [defense counsel] were paying attention to you when you offered points." *See State v. Chester*, 10th Dist. Franklin No. 08AP–1, 2008-Ohio-6679, 2008 WL 5265860, ¶ 14.

(4) *Harmless error beyond a reasonable doubt*

{¶ 108} Even assuming that the trial court abused its discretion in ordering Neyland shackled, we find that such error was harmless. Nothing in the record shows that the jury observed Neyland in leg restraints, and he was not prejudiced.

{¶ 109} Moreover, even if the jurors observed Neyland in shackles, any error was harmless beyond a reasonable doubt.

> [W]here a court, without adequate justification, orders the defendant to wear *shackles that will be seen by the jury*, the defendant need not demonstrate actual prejudice to make out a due process violation. The State must prove "beyond a reasonable doubt that the [shackling] error complained of did not contribute to the verdict obtained."

(Emphasis added.) *Deck*, 544 U.S. at 635, 125 S.Ct. 2007, 161 L.Ed.2d 953, quoting *Chapman v. California*, 386 U.S. 18, 24, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967).

{¶ 110} The state can meet this burden because overwhelming evidence of Neyland's guilt was presented at trial. Evidence showed that Neyland was scheduled to meet with Lazar and Smith about the termination of his employment as a truck driver with Liberty Transportation. After arriving at Liberty, Neyland shot Lazar several times in the back and then walked upstairs to Smith's office and shot him once in the head. Neyland's murder of Smith can be heard on a 9–1–1 tape that was introduced at trial. A handgun was found in Neyland's truck after the police arrested him. Forensic testing matched this handgun with bullets and shell casings found at the murder scene and with a bullet recovered from the autopsy of

> Thomas Lazar. Gunshot residue was found on Neyland's hands. Investigators also found pieces of paper in Neyland's storage unit on which three pennies were arranged in a triangular pattern that matched the triangular gunshot pattern on Lazar's back. The paper contained the words, "OOOO, I'm so scared. Three Round Shot Group." There was also the statement, "You think I'm playing[.] You're gonna come up missing!!!" Thus, there is little chance that leg restraints, even if observable, affected the verdict or the sentence in this case.

*Neyland*, 139 Ohio St. 3d at 363-72.

The right to a fair trial is a "fundamental liberty secured by the Fourteenth Amendment." *Estelle v. Williams*, 425 U.S. 501, 503 (1976). And "[t]he presumption of innocence, although not articulated in the Constitution, is a basic component of a fair trial under our system of criminal justice." *Id*. "'[O]ne accused of a crime is entitled to have his guilt or innocence determined solely on the basis of the evidence introduced at trial, and not on grounds of official suspicion, indictment, continued custody, or other circumstances not adduced as proof at trial.'" *Holbrook v. Flynn*, 475 U.S. 560, 567 (1986) (quoting *Taylor v. Kentucky,* 436 U.S. 478, 485 (1978)). Certain practices pose such a threat to the presumption of innocence and attendant "fairness of the fact-finding process" that they require "close judicial scrutiny." *Williams*, 425 U.S. at 503-04.

One aspect of trial that courts have examined carefully is the physical appearance of criminal defendants when brought before a jury, as they are "generally entitled to the physical indicia of innocence" at trial. *Kennedy v. Cardwell*, 487 F.2d 101, 104 (6th Cir. 1973). Shackling a defendant during trial is an "inherently prejudicial practice that . . . should be permitted only where justified by an essential state interest specific to each trial." *Flynn*, 475 U.S. at 568-69; *see also Kennedy*, 487 F.2d at 111 (noting that "shackles should only be used as a last resort" and "only upon a clear showing of necessity") (emphasis original)). "Not only

is it possible that the sight of shackles and gags might have a significant effect on the jury's feelings about the defendant, but the use of this technique is itself something of an affront to the very dignity and decorum of judicial proceedings that the judge is seeking to uphold." *Illinois v. Allen*, 397 U.S. 337, 344 (1970). Yet, in certain situations, "binding and gagging might possibly be the fairest and most reasonable way to handle" a disruptive and obstreperous defendant or to prevent a defendant's escape. *Id.*; *Kennedy*, 487 F.2d at 111-12.

In *Deck v. Missouri*, the U.S. Supreme Court held that, "given their prejudicial effect, due process does not permit the use of visible restraints if the trial court has not taken account of the circumstances of the particular case." 544 U.S. 622, 632, 125 S. Ct. 2007, 2014. *Deck* addressed the use of visible shackles during the *penalty* phase of a death penalty trial in particular, ultimately holding courts could not "routinely place defendants in shackles or other physical restraints visible to the jury during the penalty phase of a capital proceeding," noting such restrictions "almost inevitably affect[ed] adversely the jury's perception of the character of the defendant" and thereby "undermine[ed] the jury's ability to weight accurately all relevant considerations . . . when it determines whether a defendant deserves death." *Id.* at 633, 125 S.Ct. at 2014. Though the Court acknowledged there were situations in which a trial judge, in his or her discretion, may allow the shackling of a defendant for security purposes during sentencing, the Court held that in this case, where the shackles were visible to the jury and there was no on-the-record discussion by the trial court specifying any special justification for the shackles, their use was constitutionally impermissible. *Id.* at 634-35, 125 S.Ct. at 2015.

In the instant petition, Neyland acknowledges that the leg restraints were placed underneath his pants, but maintains they were detectable to the jury, particularly when he walked to the podium to make his unsworn statements to the jury during sentencing; therefore,

he argues, the Ohio Supreme Court's finding that the jury did not observe the restraints was unreasonable. (Doc. 17, 155; Doc. 50, 153). According to Neyland, restraints are prejudicial *per se* and should only be used in highly unusual circumstances, after a hearing during which the State has made a "clear showing of necessity" and the trial court has considered less restrictive means. He maintains the Ohio Supreme Court's ruling on this issue violates clearly established law because there was no justification for shackling him under the circumstances here. (Doc. 50, 159-62). In support of this contention, Neyland notes the trial court expressed concern about possible disruption but also called Neyland "well behaved," there was nothing in the transcript to indicate he was engaged in violent or disruptive behavior, the presence of multiple deputies in the courtroom was not discussed as an alternative to leg restraints, and the trial court improperly left the decision regarding shackling to the discretion of the Sheriff's Department. (Doc. 50, 159-62).

Further, Neyland argues the Ohio Supreme Court's application of an "overwhelming evidence of guilt" rationale to find that any error by the trial court regarding restraints was harmless is contrary to clearly established law because Neyland suffered prejudice from the use of restraints during the *penalty* phase; that prejudice, therefore, could not be cured by any amount of evidence because the restraints added to the jury's perception that he was a danger to the community and put a thumb on "death's side of the scale" pursuant to *Deck v. Missouri*, 544 U.S. 622, 125 S. Ct. 2007 (2005).

This Court finds the Ohio Supreme Court's disposition of this claim was not contrary to or an unreasonable application of clearly established law. The state court cited the applicable law regarding this issue and ultimately determined that even if the trial court erred by failing to consider less restrictive means and/or by leaving the decision about the necessity of a second

leg restraint to law enforcement, any error was harmless. We agree. The trial court was in the best position to assess courtroom security needs and the court engaged in an on-the-record discussion about Neyland's large size, his unpredictability, and his tendency to become worked up about the proceedings. Moreover, contrary to Neyland's assertions, nothing in the record indicates that Neyland's leg restraint had to be unlocked prior to his walking to the podium to give an unsworn statement to the jury during sentencing. At best, the record reflects that the restraint may have affected Neyland's gait, but with the restraint having been placed underneath his pantleg, it would be purely speculation to conclude the jury attributed any abnormalities in his gait to a restraint they could not see. Where Neyland has presented no evidence that the jury was aware of the use of restraint, as the jury in *Deck* was, he cannot show he suffered prejudice. *See Mendoza v. Berghuis*, 544 F.3d 650, 654-55 (6th Cir. 2008) (holding the state courts' rejection of the petitioner's shackling claim was not contrary to or an unreasonable application of clearly established law where the restraints were not visible to the jury in the courtroom and the only time any jurors saw the petitioner shackled was in a hallway during transport); *Brown v. Davenport*, 596 U.S. 118, 143-44, 142 S. Ct. 1510, 1529-30 (2022) (holding the state court of appeals' rejection of the petitioner's shackling claim was not contrary to or an unreasonable application of clearly established law where jurors testified post-trial the security measures taken had no influence on their verdict and the State presented overwhelming evidence of the petitioner's guilt at trial).

Based on the foregoing, relief on this ground is denied.

### V. Eleventh Ground for Relief: *Biased Jury / Pretrial Publicity*

Neyland argues counsel was ineffective for failing to move for and a change of venue based on excessive pretrial publicity. (Doc. 17, 159). He asserts that ultimately eleven of the

sixty-one prospective jurors who acknowledged having heard about the case were seated on the jury and, although they testified they could be impartial, the nature of the media coverage was so inflammatory that prejudice must be presumed. (Doc. 17, 160-61). Neyland argues it was apparent during voir dire that the jury was exposed to extensive media coverage of the case, including stories in multiple local newspapers and television news coverage, and therefore the state court's finding that jurors were not exposed to significant pretrial publicity was an unreasonable determination of the facts. (Doc. 50, 170). He notes the coverage included many prejudicial details and inflammatory language, such as referring to his possession of an "arsenal" of weapons, his "behavioral problems," and references to a "heart-wrenching" 911 call made by one of the victims prior to his death. (Doc. 50, 171-72). According to Neyland, in a county where the total population was only 125,488 residents, such publicity would have influenced the community. (Doc. 50, 174).

Neyland raised this claim on post-conviction review and the court of appeals issued an opinion on the merits affirming the trial court's denial. (cite cases). The court of appeals held:

> {¶ 38} In the case sub judice, the trial court extensively questioned the jurors during voir dire in order to ensure that they were not improperly influenced by the pretrial publicity. Rather than revealing any actual bias on the part of the jurors, the record reflects that the empaneled jurors were either unaware of the pretrial publicity or specifically informed the court that they were capable of disregarding it in arriving at their decisions. Absent a showing of juror bias, Neyland would have been unsuccessful in his request for a change of venue. Indeed, the Ohio Supreme Court has previously held that trial counsel's failure to request a change of venue was not tantamount to ineffective assistance of counsel where the voir dire was adequate. *State v. Davis,* 116 Ohio St.3d 404, 2008–Ohio–2, 880 N.E.2d 31, ¶ 49. Thus, we cannot conclude that Neyland's counsel was ineffective when he failed to request a change in venue.

*State v. Neyland*, 2013-Ohio-3065.

> When pretrial publicity is at issue, "primary reliance on the

> judgment of the trial court makes [especially] good sense" because the judge "sits in the locale where the publicity is said to have had its effect" and may base her evaluation on her "own perception of the depth and extent of news stories that might influence a juror."

*Skilling v. United States*, 561 U.S. 358, 386, 130 S. Ct. 2896, 2918 (2010) (citing *Mu'Min,* 500 U.S., at 427, 111 S.Ct. 1899). "Reviewing courts are properly resistant to second-guessing the trial judge's estimation of a juror's impartiality, for that judge's appraisal is ordinarily influenced by a host of factors impossible to capture fully in the record—among them, the prospective juror's inflection, sincerity, demeanor, candor, body language, and apprehension of duty." *Id.*

"Presumptive prejudice from pretrial publicity occurs where an inflammatory, circus-like atmosphere pervades both the courthouse and the surrounding community." *Foley v. Parker*, 488 F.3d 377, 387 (6th Cir. 2007). "Prejudice from pretrial publicity is rarely presumed." *Id.*

> Where pretrial publicity cannot be presumed prejudicial, the trial court must then determine whether it rises to the level of actual prejudice. The primary tool for discerning actual prejudice is a searching voir dire of prospective jurors. The court must review the media coverage and the substance of the jurors' statements at voir dire to determine whether a community-wide sentiment exists against the defendant. Negative media coverage by itself is insufficient to establish actual prejudice, and the existence of a juror's preconceived notion as to the guilt or innocence of the defendant, without more, is not sufficient to rebut the presumption of impartiality. . . . The prospective juror must be able to lay aside his or her impressions or opinions and render a verdict based upon the evidence presented in court. The relevant question is "did [the] juror swear that he could set aside any opinion he might hold and decide the case on the evidence, and should the juror's protestation of impartiality have been believed."

*Id.*

This Court finds the court of appeals' holding as to this claim was not an unreasonable application of the law or an unreasonable determination of the facts. The court cited the correct

law and the record supports the court's finding that the trial court engaged in a thorough questioning of potential jurors regarding their prior awareness of the case and ability to be unbiased, reiterating to potential jurors the presumption of innocence throughout. (Doc. 20-4, 56-57, 66-67, 82-83, 90, 109-10, 118-19, 124-25). Although this case was reported in the media, as many murder cases routinely are, there is nothing to indicate the coverage or interest in the case was so extensive as to create a "circus-like atmosphere"; thus, this is not one of the rare cases where prejudice from pretrial publicity should be presumed. Additionally, Neyland has failed to demonstrate the coverage rose to the level of actual prejudice. *See Foley*, 488 F.3d at 387 ("Negative media coverage by itself is insufficient to establish actual prejudice, and the existence of a juror's preconceived notion as to the guilt or innocence of the defendant, without more, is not sufficient to rebut the presumption of impartiality."). Every prospective juror who was ultimately seated and who had prior knowledge of the case attested that they could set aside that knowledge and base their conclusion solely on the evidence presented, and Neyland has presented no evidence why the jurors' answers should not be believed. *See Mu'Min*, 500 U.S. 415 at 416 (only where damaging pretrial publicity has permeated the community can prejudice be presumed such that a juror's claim that he can be impartial should not be believed); *Williams v. Bagley*, 380 F.3d 932, 945 (6th Cir. 2004) ("Generally, a defendant's right to an impartial jury is secured if a juror attests that he can set aside any information he has obtained and render a verdict based on the evidence presented in court.").

Based on the foregoing, relief on this ground is denied.

### VI. Twelfth Ground for Relief: *Ineffective Assistance of Appellate Counsel*

Neyland argues his due process right to effective assistance of counsel in his first appeal of right was violated by appellate counsel's ineffectiveness in failing to raise meritorious issues

on direct appeal. (Doc. 17, 161-62).

A criminal defendant is entitled to effective assistance of counsel in his or her first appeal as a matter of right. *Evitts v. Lucey*, 469 U.S. 387, 396 (1985). The two-part test enunciated in *Strickland v. Washington*, 466 U.S. 668 (1984), applies to claims of ineffective assistance of appellate counsel. *Smith v. Robbins*, 528 U.S. 259, 285 (2000); *Evitts v. Lucey*, 469 U.S. 387 (1985). Appellants have no constitutional right, however, to have every non-frivolous issue raised on appeal, *Jones v. Barnes*, 463 U.S. 745, 750-54 (1983), and tactical choices regarding issues to raise on appeal are properly left to the sound professional judgment of counsel. *United States v. Perry*, 908 F.2d 56, 59 (6th Cir. 1990). "[O]nly when issues are clearly stronger than those presented, will the presumption of effective assistance of [appellate] counsel be overcome." *Joshua v. DeWitt*, 341 F.3d 430, 441 (6th Cir. 2003) (internal quotation marks and citations omitted). In *Maples v. Coyle*, the Sixth Circuit articulated the following considerations in determining whether appellate counsel "performed reasonably competently":

> (1) Were the omitted issues "significant and obvious"?
> (2) Was there arguably contrary authority on the omitted issues?
> (3) Were the omitted issues clearly stronger than those presented?
> (4) Were the omitted issues objected to at trial?
> (5) Were the trial court's rulings subject to deference on appeal?
> (6) Did appellate counsel testify in a collateral proceeding as to his appeal strategy and, if so, were the justifications reasonable?
> (7) What was appellate counsel's level of experience and expertise?
> (8) Did the petitioner and appellate counsel meet and go over possible issues?
> (9) Is there evidence that counsel reviewed all the facts?
> (10) Were the omitted issues dealt with in other assignments of error?

> (11) Was the decision to omit an issue an unreasonable one which only an incompetent attorney would adopt?

171 F.3d 408, 427–28 (6th Cir. 1999).

Claims of ineffective assistance of appellate counsel, like ineffectiveness claims regarding trial counsel, are analyzed pursuant to *Strickland*. Neyland must therefore demonstrate that appellate counsel's performance was deficient, and that the deficient performance so prejudiced the appeal that the appellate proceedings were unfair and the result unreliable. *Strickland*, 466 U.S. at 687.

Neyland argues his appellate counsel on his direct appeal was ineffective for failing to raise meritorious claims, namely, an ineffective assistance of trial counsel claim based on trial counsel's failure to move for a competency hearing after trial commenced, and a *Pate* "procedural incompetency" claim. (Doc. 17, 162-64). Neyland raised these issues in his application to reopen his direct appeal (*Murnahan* application). In his first and second propositions of law, he argued appellate counsel was ineffective for failing to raise the following claims: (1) "A capital defendant is denied the right to the effective assistance of trial counsel when trial counsel prejudicially fails to have his client's competency revisited during his capital trial and sentencing."; and (2) "When the trial court is confronted with indicia that the defendant is incompetent to stand trial, the trial court's failure to order a competency evaluation and conduct a hearing violates the defendant's procedural due process rights." The Ohio Supreme Court summarily denied Neyland's *Murnahan* application.

As to the first claim, Neyland argues he was unable to assist counsel during trial and mitigation and he was diagnosed with a mental illness; therefore trial counsel should have moved for re-evaluation after the start of trial because a defendant must be competent

throughout all of the proceedings. According to Neyland, his strange behavior after the commencement of trial, including his incoherent statements made to the trial court and to the jury, was stronger evidence of his incompetence than what was presented at the pre-trial competency hearing. For the reasons discussed above under the Sixth Ground, we find this claim is without merit. Trial counsel was not ineffective for failing to revisit the issue of competency; therefore, appellate counsel could not have been ineffective for failing to raise this issue on direct appeal.

As to the second claim, Neyland distinguishes between a defendant's right to not be tried while incompetent and a defendant's right to a competency hearing. Neyland characterizes a *Pate* claim as a due process right to a competency hearing, separate from the right not to be tried while incompetent, which he characterizes as a *Drope* claim. He argues that a defendant raising a *Pate* claim is not required to establish he was incompetent by a preponderance of the evidence; rather, when there is "substantial evidence" of a defendant's incompetence, it is incumbent upon the trial judge to order a competency hearing *sua sponte*. Neyland maintains that in the context of a *Pate* claim, the state bears the burden of proving beyond a reasonable doubt that the result of the proceeding would *not* have been different but for the trial court's failure to order a required competency hearing. Accordingly, Neyland argues that a *Pate* claim would have been easier to prove and a more successful claim for appellate counsel to raise on direct appeal. He maintains his inability to assist counsel and his bizarre communications with the trial court should have put the court on notice that a competency hearing was required.

First, it is not clear that the distinction Neyland makes between a "*Pate*" claim and a "*Drope*" claim is a distinction that is recognized by the courts that have addressed

incompetence in this context; typically courts analyze the legal standards for incompetency set forth in *Drope* and *Pate* as one and the same. *See State v. Lawson*, 165 Ohio St. 3d 445, 454, 179 N.E.3d 1216, 1227 (2021) (citing *Drope* and *Pate* and stating, "Therefore, "[t]he right to a hearing on the issue of competency rises to the level of a constitutional guarantee where the record contains 'sufficient indicia of incompetence' such that an inquiry into the defendant's competency is necessary to ensure the defendant's right to a fair trial."). Moreover, for the same reasons discussed above under the Sixth Ground, there is no reason to think the trial court, who by the time of the competency hearing had already interacted with Neyland and been informed by trial counsel of his uncooperativeness, should have *sua sponte* required another competency hearing after the commencement of trial. Thus, Neyland has failed to show that this issue is materially different from the competency issues that were raised on direct appeal, or that this issue, if raised, would have been meritorious on appeal. *See DeWitt*, 341 F.3d at 441.

Based on the foregoing, relief on this ground is denied.

## VII. Thirteenth Ground for Relief: *Jury Selection*

Neyland argues that his due process right to a fair trial was infringed upon when death-scrupled but otherwise qualified jurors were removed from the venire. (Doc. 17, 166). He raised this issue on direct appeal and the Ohio Supreme Court addressed it on the merits as follows:

> {¶ 130} Neyland argues that the trial court erred in excusing four prospective jurors. He argues that under *Witherspoon v. Illinois*, 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968), and R.C. 2945.25(C), it is improper to excuse a prospective juror for cause in the death-qualification process unless that juror unequivocally states that he would not recommend death under any circumstances.
>
> {¶ 131} However, the constitutional standard for determining when a prospective juror may be excluded for cause based upon his or her views on capital punishment is whether the juror's views would

prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and oath. *Wainwright v. Witt*, 469 U.S. 412, 424, 105 S.Ct. 844, 83 L.Ed.2d 841 (1985); *State v. Rogers*, 17 Ohio St.3d 174, 478 N.E.2d 984 (1985), paragraph three of the syllabus. This court has held that if a juror satisfies the *Witt* criterion, he may be excluded for cause under the catch-all provision of R.C. 2945.25(O) even though he does not satisfy the more specific R.C. 2945.25(C). *State v. Williams*, 99 Ohio St.3d 493, 2003-Ohio-4396, 794 N.E.2d 27, ¶ 40. Thus, we evaluate Neyland's claim under the *Witt* standard.

{¶ 132} First, Neyland argues that the trial court abused its discretion in excusing prospective juror No. 17, because this juror stated that he could follow the court's instructions. During voir dire, juror No. 17 stated that he could follow the court's instructions "in most cases." When asked to explain, juror No. 17 stated that "there is a thing called juror nullification that I might have to consider given the certain circumstances, which I think would be rare." The trial court then asked, "You understand that if you did do that, you would be violating your oath as a juror?" Juror No. 17 replied, "Well, I think there is a higher oath than this." Over defense objection, the trial court excused this juror for cause, because "he just couldn't unequivocally indicate he would follow the Court's instruction."

{¶ 133} A trial court's resolution of a challenge for cause will be upheld on appeal unless it is unsupported by substantial testimony. *Williams* at ¶ 45. Juror No. 17 refused to promise to follow the trial court's instructions and reserved the right to consider engaging in juror nullification in some circumstances. Thus, the trial court did not abuse its discretion in excusing this juror for cause.

{¶ 134} Second, Neyland argues that the trial court abused its discretion in excusing prospective juror No. 24 for cause, because that juror stated that she could vote to impose the death penalty, even though she expressed reluctance to provide a blanket "yes" that would cover all contingencies. Juror No. 24 was opposed to the death penalty. She provided contradictory answers as to whether she would follow the instructions on the death penalty. Juror No. 24 told the trial court, "I could follow [the instructions]; but I don't know if my view would change or not. I can't say at this time." She also told the prosecutor, "I honestly can't say," when asked whether she would follow such instructions. Juror No. 24 told defense counsel, "Yeah, I guess I would consider that." Over defense objection, juror No. 24 was excused for cause.

{¶ 135} This juror's final statement to defense counsel, viewed in isolation, does not suggest that she would be substantially impaired in performing her duties as a juror. "However, where a prospective juror gives contradictory answers on voir dire, the trial judge need not accept the last answer elicited by counsel as the prospective juror's definitive word. * * * Rather, 'it is for the trial court to determine which answer reflects the juror's true state of mind.'" *State v. Group*, 98 Ohio St.3d 248, 2002-Ohio-7247, 781 N.E.2d 980, ¶ 66, quoting *State v. Jones*, 91 Ohio St.3d 335, 339, 744 N.E.2d 1163 (2001). Juror No. 24 equivocated on whether she would follow the trial court's instructions. Thus, substantial evidence supported excluding this juror. We hold that the trial judge did not abuse his discretion in doing so. *See State v. Bethel*, 110 Ohio St.3d 416, 2006-Ohio-4853, 854 N.E.2d 150, ¶ 123.

{¶ 136} Third, Neyland argues that the trial court abused its discretion in excusing prospective juror No. 55, because this juror provided "strong answers" indicating that she could follow the law. Juror No. 55 stated that she "would have a hard time doing it," but she would follow the instructions on the death penalty, "[i]f legally I have to do it." There was also the following exchange:

> The Court: So there are some times when you could get by your personal beliefs and impose the death penalty?
>
> Juror 55: Possibly.
>
> The Court: You're still hedging on me here.
>
> Juror 55: I know I am. I cannot say 100 percent, yes, I could do it or, no, I cannot, first of all because I've never truly had to make that decision on somebody's life. And we all think about it. But when it truly comes down to me having to make that decision in that instance when I had to answer that, I still go, I'm not a hundred percent convinced either way.

{¶ 137} The trial court, over defense objection, excused juror No. 55 for cause, stating:

> She was not unequivocal about anything. And if that's an understatement, I apologize. I'm going to find that her beliefs do impair her ability to serve as a juror. Even though she did seem to voice some desire to please the Court, she also seemed to indicate

> that her personal beliefs were such that she just couldn't do it. So that's a close call, I have to admit * * *.

{¶ 138} The record supports the trial court's decision to excuse juror No. 55. She provided equivocal responses on her ability to follow the trial court's instructions on the death penalty. Moreover, on her juror questionnaire, juror No. 55 responded "No" when asked whether she could "consider fairly" the court's instructions on the death penalty.

{¶ 139} Neyland argues that juror No. 55 should not have been excused, because the trial court acknowledged that his decision was a "close call." But the trial court's determination that juror No. 55 was impaired is entitled to deference. Where, as here, a juror gives conflicting answers, it is for the trial court to determine which answer reflects the juror's true state of mind. *Jones*, 91 Ohio St.3d at 339, 744 N.E.2d 1163.

{¶ 140} Finally, Neyland argues that the trial court abused its discretion in excusing prospective juror No. 111 for cause, because this juror expressed his willingness to follow the law. Juror No. 111 stated that his religious beliefs would make it difficult to impose the death penalty: "I believe that * * * God has that say of whether to take life. And again, only as a last resort and if I'm commanded to by you people. But I certainly wouldn't want to make that decision by any means if I didn't have to, you know." Juror No. 111 also acknowledged that his religious beliefs "would be a factor" in weighing the aggravating circumstances and the mitigating factors. But juror No. 111 also stated that he would "follow the law." Over defense objection, juror No. 111 was excused for cause.

{¶ 141} "A prospective juror's conscientious or religious opposition to the death penalty in and of itself is not grounds for a challenge for cause." *State v. Treesh*, 90 Ohio St.3d 460, 468, 739 N.E.2d 749 (2001). But juror No. 111's answers demonstrate that his strong religious views might impair his ability to perform his duties as a juror. Indeed, he indicated that he would recommend death "only * * * if I'm commanded to by you people," which would never happen.

{¶ 142} Moreover, the trial court had also reviewed juror No. 111's questionnaire. On the questionnaire, the prospective jurors were asked, "If instructed by the Court to consider fairly the imposition of a sentence of death, would you be able to follow the Instruction?" Juror No. 111 responded, "If this court or my country asked me to and I had no other choice I guese [sic] I would have to, I really

> believe it is up to god weather [sic] we live or die, I believe it is God desicision [sic]."
>
> {¶ 143} Here again, the trial court's determination that juror No. 111's religious views "would substantially impair the performance of his duties" is entitled to deference. *See Bethel*, 110 Ohio St.3d 416, 2006-Ohio-4853, 854 N.E.2d 150, at ¶ 126. We hold that the trial court did not abuse its discretion in excusing this juror for cause. Proposition XI is overruled.

*Neyland*, 139 Ohio St. 3d at 375-78.

In the instant petition, Neyland repeats his argument that four prospective jurors were improperly struck for cause, despite stating they were able to follow the law. (Doc. 17, 167). He maintains his right to an impartial jury was violated because the exclusion of death-scrupled jurors resulted in only neutral or pro-death jurors, which was not representative of the community and caused him prejudice because these jurors were more likely to sentence him to death. (Doc. 50, 214-15). Neyland argues the jurors at issue, despite expressing some hesitancy regarding the imposition of the death penalty based on religious or ethical beliefs, all ultimately confirmed that they could follow the trial court's instructions and therefore should not have been removed. (Doc. 50, 218-26).

Respondent contends this claim does not implicate any rights under the federal constitution and is consequently not cognizable on federal habeas review. (Doc. 43, 41-42). Respondent explains that where the capital jury that was ultimately seated was unbiased, it is not a violation of the federal constitution even if a potential juror was wrongfully excused for cause. *Id.* Thus, because Neyland does not allege that the seated jurors were biased and only that four prospective jurors should not have been excused for cause, this claim should be dismissed for non-cognizability. (Doc. 43, 42).

The United States Constitution guarantees a criminal defendant the right to a fair trial

by a panel of impartial jurors. *Wainwright v. Witt,* 469 U.S. 412, 418 (1985). The proper standard for determining when a prospective juror may be excluded for cause due to their beliefs on the death penalty is "whether the juror's views would prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath." *Id.* at 424 (internal quotation marks omitted); *see also Adams v. Texas*, 448 U.S. 38, 45, 100 S. Ct. 2521, 2526 (1980) (reiterating the general proposition that "a juror may not be challenged for cause based on his views about capital punishment unless those views would prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath"). The U.S. Supreme Court in *Wainwright* explained that this standard "does not require that a juror's bias be proved with unmistakable clarity," and "determinations of juror bias cannot be reduced to question-and-answer sessions which obtain results in the manner of a catechism." *Id.* However, the Court clarified, "there will be situations where the trial judge is left with the definite impression that a prospective juror would be unable to faithfully and impartially apply the law" and therefore "deference must be paid to the trial judge who sees and hears the juror." *Id.* at 425-26. "A jury that includes a juror who will automatically vote for the death penalty in every case [or will in no case vote for the death penalty] violates a defendant's right to an impartial jury." *Haight v. Jordan*, 59 F.4th 817, 833 (6th Cir. 2023) (internal quotation marks omitted); s*ee also Dennis v. Mitchell*, 354 F.3d 511, 523 (6th Cir. 2003) (finding the state court's opinion was not contrary to clearly established federal law where death-scrupled jurors were excused for cause after stating they would be "unable to sign a death verdict").

"Any claim that the jury was not impartial . . . must focus not on [the juror dismissed for cause], but on the jurors who ultimately sat." *Ross v. Oklahoma*, 487 U.S. 81, 86, 108 S.

Ct. 2273, 2277 (1988). In *Ross*, the U.S. Supreme Court determined that the petitioner failed to establish the jury was not impartial where he challenged the trial court's failure to remove a prospective juror for cause, but made no claim that any of the jurors who were ultimately seated were not impartial; the Court noted the Constitution presumes that a jury selected from a cross-section of the community is impartial so long as they can carry out their sworn duty. *Id.*

Initially, we question whether Neyland has adequately presented a claim proper for consideration on federal habeas review where he fails to explicitly allege that the seated jury was not impartial. *See Ross*, 487 U.S. at 86. Nevertheless, assuming Neyland's claims regarding the individual jurors dismissed for cause are proper for this Court's review, we do not believe the state court's disposition was contrary to or an unreasonable application of the law. The Ohio Supreme Court discussed each contested prospective juror in turn and properly found none of them unequivocally and consistently stated they would be able to set their beliefs aside and follow the trial court's instructions. Additionally, the court gave appropriate deference to the findings of the trial court, which was in a better position to assess the demeanor and qualifications of prospective jurors. *See Wainwright* at 425-26 (deference must be paid to the trial judge who sees and hears the juror); *see also Uttecht v. Brown*, 551 U.S. 1, 22, 127 S. Ct. 2218, 2231 (2007) (holding "federal courts considering habeas petitions . . . owe deference to the trial court, which is in a superior position to determine the demeanor and qualifications of a potential juror").

Based on the foregoing, relief is denied as to this claim.

### VIII. Fourteenth Ground for Relief: *Right to Self-Representation*

Neyland argues he unequivocally asserted his right to self-representation on two occasions, once at a pretrial conference and again during trial, and both times, the trial court

failed to address his request. (Doc. 17, 169). Neyland raised this issue on direct appeal and the Ohio Supreme Court ultimately rejected it on the merits:

> **a. Assertions and request for self-representation**
>
> {¶ 63} During a pretrial hearing on December 11, 2007, Neyland told the trial court:
>
>> I might be able, I *might have to defend myself* because I am not getting cooperation that I need from the public defender's office.
>>
>> And my credibility right now, I have 800 pages of prosecution here. I have no, I have nothing for discovery [from] the public defender's office. I have 800 pages from October from the prosecution's office, and I read the 800 pages. There is a credibility problem with every witness in here.
>
> (Emphasis added.)
>
> {¶ 64} In response, the trial court encouraged Neyland to work with his attorneys. The judge stated, "I realize that everyone in your circumstance is nervous about their representation; but in view of the reports that I have received, I would strongly encourage you to not * * * consider that." The trial court's reference to "reports" appears to have been Dr. Sherman's competency evaluation that the parties had been discussing during this hearing. Neyland responded, "My Sixth Amendments Rights have been violated." But Neyland said nothing more about representing himself.
>
> {¶ 65} During a pretrial hearing on February 12, 2008, the trial court expressed concern about the possibility that Neyland would request self-representation. The judge stated, "I'm hoping that he won't raise this * * *. But if at some point he expresses a clear and unequivocal request, then the Court is going to have to rule on it and address it." Adrian Cimerman, lead defense counsel, stated that Neyland had "never seriously, if at all, raised the desire to represent himself." J. Scott Hicks, assistant defense counsel, also stated, "He has never expressed to me any desire to represent himself."
>
> {¶ 66} During a pretrial hearing on August 25, 2008, the trial court asked defense counsel if Neyland was insisting that counsel withdraw and that he represent himself. Cimerman replied that Neyland was not.

{¶ 67} On October 30, 2008, following the introduction of all the trial-phase evidence, the trial judge stated that the deputies had informed him that Neyland wanted to discuss representing himself. The trial court stated, "I definitely am not going to let him represent himself pro se at this time because we're done basically other than closing arguments." Nevertheless, the trial court allowed Neyland to make his request.

{¶ 68} Neyland addressed the trial court and made the following remarks about a pro se motion and his request for self-representation:

> Thank you, Your Honor. The first question I need to ask you is I understand that the addendum to Motion 44 was not filed in a timely manner. There is some information from the witnesses that was testified to on the witness stand that is included in the addendum, and I would like to only address that during a presentation. *I would like to mount my own defense from the defense table and counsel with counsel's assistance*. I am not requesting to be a witness. I'm not a witness. I am introducing myself to the jury because they do not have any background information, personal background information, family background information, and I have no defense witnesses.

(Emphasis added.)

{¶ 69} Neyland then discussed his concerns about the defense. Neyland claimed that there were discrepancies in witness statements that "I would like to read" and mentioned his desire to read court cases into the record that involved him and his previous employers. Neyland also discussed his unhappiness with counsel because they failed to use his notes during cross-examination.

{¶ 70} In response, the trial judge told Neyland that he had noticed that his counsel were paying attention to him when he offered points. The trial court stated, "I'm sure they determined that they just weren't proper issues because you don't understand what is a proper issue before the Court. So, again, I'm going to deny your request to represent yourself." There was no further discussion about self-representation.

b. Analysis

{¶ 71} "The Sixth Amendment * * * guarantees that a defendant in a state criminal trial has an independent constitutional right of self-representation and that he may proceed to defend himself without counsel when he voluntarily, and knowingly and intelligently elects to do so." *State v. Gibson*, 45 Ohio St.2d 366, 345 N.E.2d 399 (1976), paragraph one of the syllabus, citing *Faretta v. California*, 422 U.S. 806, 95 S.Ct. 2525, 45 L.Ed.2d 562 (1975). If a trial court denies the right to self-representation when the right has been properly invoked, the denial is per se reversible error. *State v. Reed*, 74 Ohio St.3d 534, 535, 660 N.E.2d 456 (1996), citing *McKaskle v. Wiggins*, 465 U.S. 168, 177, 104 S.Ct. 944, 79 L.Ed.2d 122 (1984), fn. 8.

{¶ 72} The assertion of the right to self-representation must be clear and unequivocal. *State v. Dean*, 127 Ohio St.3d 140, 2010-Ohio-5070, 937 N.E.2d 97, ¶ 68; *State v. Cassano*, 96 Ohio St.3d 94, 2002-Ohio-3751, 772 N.E.2d 81, ¶ 38. A request for self-representation may be denied when circumstances indicate that the request is made for purposes of delay or manipulation of the trial process. See *United States v. Frazier–El*, 204 F.3d 553, 560 (4th Cir.2000).

{¶ 73} First, Neyland argues that the trial court erred in failing to grant his request for self-representation on December 11, 2007. On that occasion, Neyland told the trial court that he "might have to defend himself" at the same time that he was voicing his frustration about getting discovery from the public defender's office. Other courts have held that a request for self-representation is not unequivocal if it is a " 'momentary caprice or the result of thinking out loud,' " *Jackson v. Ylst*, 921 F.2d 882, 888 (9th Cir.1990), quoting *Adams v. Carroll*, 875 F.2d 1441, 1445 (9th Cir.1989), or the result of frustration, *Reese v. Nix*, 942 F.2d 1276, 1281 (8th Cir.1991) (defendant merely expressed frustration and did not clearly invoke his right of self-representation). Similarly, we conclude that Neyland was expressing his frustration and not clearly invoking his right to self-representation.

{¶ 74} Defense counsel confirmed that Neyland was not invoking his right to self-representation. Counsel told the trial court during a pretrial hearing on February 12, 2008, that Neyland had "never seriously, if at all, raised the desire to represent himself." Thus, we reject Neyland's claim that his request for self-representation on December 11, 2007, was improperly denied.

{¶ 75} Second, Neyland argues that the trial court erred in failing to

grant his request for self-representation after the state's case-in-chief was completed. Neyland informed the court at that time that "I would like to mount my own defense."

{¶ 76} A trial court may deny a defendant's request for self-representation if it is untimely made. In *Cassano*, 96 Ohio St.3d 94, 2002-Ohio-3751, 772 N.E.2d 81, at ¶ 40, the court held that a defendant's request to represent himself made three days before trial was untimely. Other courts have also found that a request for self-representation can be denied when the request is untimely. *See, e.g., United States v. Young*, 287 F.3d 1352, 1354 (11th Cir.2002) ("a defendant's request to proceed pro se is untimely if not made before the jury is empaneled"); *Wood v. Quarterman*, 491 F.3d 196, 202 (5th Cir.2007) ("Wood did not move to proceed *pro se* until after the jury had already returned a guilty verdict against him, immediately before the sentencing phase of his [capital-murder] trial, and the trial court therefore had the discretion to deny the motion" [emphasis sic]); *United States v. Smith*, 413 F.3d 1253, 1281 (10th Cir.2005) (request made six days before trial untimely).

{¶ 77} Neyland's request for self-representation was untimely because he did not make it until just before the beginning of the trial-phase closing arguments. Thus, we hold that the trial court did not err in denying Neyland's late request for self-representation.

{¶ 78} But Neyland argues that the trial court sidestepped the issue and never addressed his request to waive counsel. Upon learning of Neyland's intent to request self-representation, the trial court informed the parties that he was going to deny this request because it was untimely. Nevertheless, the trial court allowed Neyland to make his request for self-representation and voice any other concerns that he had about the proceedings. After Neyland finished, the trial court said, "You've raised these issues, and the Court is denying your request at this time." Thus, the record shows that the trial court did consider Neyland's request for self-representation and denied it for being untimely.

{¶ 79} Neyland also argues that the trial court erred by failing to consider whether he was competent to represent himself. *See Indiana v. Edwards*, 554 U.S. 164, 177–178, 128 S.Ct. 2379, 171 L.Ed.2d 345 (2008). However, the trial court did not need to determine Neyland's competency to represent himself, because Neyland's underlying request was untimely.

{¶ 80} Based on the foregoing, we reject proposition XIV.

*Neyland*, 139 Ohio St. 3d at 363-67.

The Sixth Amendment explicitly guarantees every criminal defendant the right to counsel to assist with his defense. U.S. Const. amend. VI. But in *Faretta v. California*, 422 U.S. 806 (1975), the Supreme Court also recognized that a criminal defendant has "a constitutional right to proceed *without* counsel when he voluntarily and intelligently elects to do so." *Id*. at 807 (emphasis added); *see also Godinez v. Moran*, 509 U.S. 389, 400-02 (1993) (applying *Faretta* in a capital case). This right to self-representation, the Court explained, stems from "a nearly universal conviction, on the part of our people as well as our courts, that forcing a lawyer upon an unwilling defendant is contrary to his basic right to defend himself if he truly wants to do so." *Faretta,* 422 U.S. at 817.

Nevertheless, "the right to self-representation is not absolute." *Martinez v. Ct. of Appeal of Cal., Fourth App. Dist.*, 528 U.S. 152, 161 (2000). Because the dangers and disadvantages of self-representation during trial are so great, the Court has explained, there is a "strong presumption against" waiver of the right to counsel. *Patterson v. Illinois*, 487 U.S. 285, 307 (1988). "[I]t is clear that it is representation by counsel that is the standard, not the exception." *Martinez*, 528 U.S. at 161. "Even at the trial level, . . . the government's interest in ensuring the integrity and efficiency of the trial at times outweighs the defendant's interest in acting as his own lawyer." *Id*. at 162 (holding that *Faretta* does not require that a criminal defendant be allowed to represent himself on direct appeal).

The defendant, therefore, must "knowingly and intelligently" elect to conduct his own defense. *Faretta*, 422 U.S. at 835 (quoting *Johnson v. Zerbst,* 304 U.S. 458, 464-65 (1938)). Courts must conduct a "searching or formal inquiry" to ensure that a defendant's waiver of the right to counsel is valid. *Patterson*, 487 U.S. at 299. "Although a defendant need not himself have

the skill and experience of a lawyer in order competently and intelligently to choose self-representation, he should be made aware of the dangers and disadvantages of self-representation, so that the record will establish that 'he knows what he is doing and his choice is made with eyes open.'" *Faretta*, 422 U.S. at 835 (quoting *Adams v. United States ex rel. McCann*, 317 U.S. 269, 279 (1943)). Whether a defendant has made an intelligent waiver of counsel "depend[s], in each case, upon the particular facts and circumstances surrounding that case, including the background, experience, and conduct of the accused." *Zerbst*, 304 U.S. at 464.

The defendant's request to proceed without counsel also must be "clear and unequivocal." *See, e.g., Raulerson v. Wainwright*, 469 U.S. 966, 969-70 (1984) (Marshall, J., dissenting from an order denying certiorari) ("[S]ince a defendant must act affirmatively to relinquish the right to counsel, it follows that the right of self-representation must affirmatively be asserted as well."); *United States v. Cromer*, 389 F.3d 662, 682 (6th Cir. 2004) ("*Faretta* procedures are only required when a defendant has clearly and unequivocally asserted his right to proceed pro se . . . ."). In *Faretta*, the Court observed that the defendant had "clearly and unequivocally declared to the trial judge that he wanted to represent himself and did not want counsel." *Faretta*, 422 U.S. at 835.

Neyland maintains that both his requests were clear and unequivocal. (Doc. 50, 236-39). During the December 11, 2007 pretrial hearing, he addressed the trial court directly, saying he was not mentally ill and "might" need to represent himself because trial counsel was not giving him certain information. Neyland acknowledges that his initial use of the word "might" made his request seem qualified, but maintains that when considered in the context of his complaints about counsel and his statement that his Sixth Amendment rights were being infringed, it should have been clear to the trial court that he wanted to represent himself. However, rather than address Neyland's remarks, the trial court advised him to stop talking,

for the sake of convenience. There were additional intermittent discussions of Neyland's issues with counsel at subsequent proceedings, but Neyland argues that he clearly asserted the right a second time on October 30, 2008 during the culpability phase of trial and, although the trial court acknowledged Neyland's right to represent himself in the upcoming penalty phase of trial, the court failed to revisit the issue and conduct a proper *Faretta* inquiry. Neyland argues the tardiness of his request to represent himself during the culpability phase could not resolve the issue of his right to self-representation in the penalty phase and the trial court should have held a hearing in between the two phases to warn Neyland of the dangers of proceeding pro se and ensure he knowingly and intelligently waived his right to counsel. (Doc. 50, 240-41). According to Neyland, he did not fall into the category of defendants, like in *Indiana v. Edwards*, who are competent to stand trial though mentally ill, but not sufficiently competent to represent themselves at trial, because Neyland was determined to be suffering from a personality disorder rather than a mental illness.

We find the Ohio Supreme Court's rejection of this claim is not contrary to or an unreasonable application of clearly established federal law. As to Neyland's first alleged request to proceed pro se, the record supports the state court's finding that the request was not "unequivocal." *See Raulerson*, 469 U.S. at 969-70 ("[S]ince a defendant must act affirmatively to relinquish the right to counsel, it follows that the right of self-representation must affirmatively be asserted as well.") (Marshall, J., dissenting); *Cromer*, 389 F.3d at 682 (6th Cir. 2004) ("*Faretta* procedures are only required when a defendant has clearly and unequivocally asserted his right to proceed pro se . . . ."). Rather than clearly assert his right to self-representation, Neyland stated he "might" have to represent himself, because he was unhappy with communication from counsel. Further conversation between Neyland, the trial court, and counsel confirmed this was not a sincere

or affirmative assertion of his right.

As to the trial court's denial of Neyland's second request, again we find the Ohio Supreme Court's holding is not contrary to or an unreasonable application of the law or facts. Neyland's request to proceed pro se was specific to "mounting his own defense" and this request took place near the end of the culpability phase of trial. Thus, the trial court reasonably denied this request as untimely. Neyland never re-raised the issue of self-representation prior to the penalty phase, and the phrasing of his request indicated his desire was to present his own defense, rather than mitigation. Moreover, it was reasonable for the trial court to consider that Neyland may fall into the category of defendants who are sufficiently competent to stand trial, but not capable of self-representation. The Sixth Circuit explained in *United States v. Stafford*, 782 F.3d 786, 791 (6th Cir. 2015) that "[w]hen determining whether a mentally ill defendant falls in a gray area" between the competence required to stand trial and the "somewhat higher standard that measures mental fitness for self representation," the trial court's decision should be given deference. (internal quotations omitted). The court reasoned that trial courts "will often prove best able to make more fine-tuned mental capacity decisions, tailored to the individualized circumstances of a particular defendant." *Id.* The trial court was in a position to observe Neyland and determine, based on his obstructionism and sometimes-nonsensical remarks, that allowing him to represent himself would undermine the integrity of the proceedings. *See Martinez*, 528 U.S. at 161-62 ("Even at the trial level, . . . the government's interest in ensuring the integrity and efficiency of the trial at times outweighs the defendant's interest in acting as his own lawyer.").

Based on the foregoing, relief is denied as to this claim.

## IX. Fifteenth Ground for Relief: *Trial-Court Error / Evidentiary Rulings*

Neyland argues the admission of photos of an "arsenal" of weapons in his hotel room and

storage unit was unduly prejudicial and improper because none of the items pictured were related to or involved in the crimes. (Doc. 17, 169-70). Neyland raised this claim on direct appeal and the Ohio Supreme Court addressed it on the merits as follows:

> {¶ 153} The state presented photographs of weapons and ammunition that the police seized during their search of Neyland's motel room and storage units. The state also presented a cooler bag containing a stun gun, two knives, handcuffs, and 9 mm ammunition. These weapons and ammunition were not linked to the murders themselves. But the state argued that such evidence was relevant to prove Neyland's prior calculation and design, which is an element of the aggravated-murder charges. The trial court, over defense objection, permitted police officers to testify about these weapons and ammunition and also admitted their photographs.
>
> (1) *Neyland's storage unit*
>
> {¶ 154} Perrysburg Detective Monica Gottfried testified about the weapons and ammunition found in one of Neyland's storage units and used photographs to show them to the jury. Four of these photographs displayed two rifles with silencers and two cases of ammunition. A separate photograph displayed all the weapons and ammunition that the police found in the storage unit, including at least six rifles.
>
> (2) *Neyland's motel room*
>
> {¶ 155} Perrysburg Detective James Gross testified about the weapons and ammunition found in Neyland's motel room. He said that "it appeared to be an arsenal." Gross found weapons on the floor next to the bed. He used a photograph to show the weapons and ammunition after they had been placed on the bed. This photograph displayed two rifles, a handgun, several weapons magazines, and boxes of ammunition. Gross also testified that a cooler bag found in the room contained a camouflaged lock-blade knife, a folding-blade Leatherman-style tool knife, a stun gun, a pair of handcuffs, and two magazines loaded with 9 mm ammunition.
>
> b. Analysis
>
> {¶ 156} In *State v. Trimble,* 122 Ohio St.3d 297, 2009-Ohio-2961, 911 N.E.2d 242, the state presented evidence about firearms and ammunition that were seized from the defendant but not used in the murders. The trial court, over defense objection, permitted

testimony that 19 firearms not used in the murders were found in the defendant's basement. *Id*. at ¶ 102–103. The state argued that the firearms in the basement were relevant in proving that Trimble murdered the victim with prior calculation and design as charged in one of the aggravated-murder counts. *Id*. at ¶ 105. This court stated: "We reject this argument because the weapon used to kill [the victim] was unmistakably identified and admitted into evidence. The other firearms were not used in [the victim's] murder and thus had no relevance to prove that Trimble murdered her with prior calculation and design." *Id*. at ¶ 106.

{¶ 157} As in *Trimble,* the 9 mm handgun used in killing Lazar and Smith was identified and admitted into evidence. The other weapons and ammunition found in Neyland's motel room and storage unit had no connection with the murders. Thus, these other weapons and ammunition had no relevance in proving Neyland's prior calculation and design as charged in the aggravated-murder offenses. We hold that the trial court erred in admitting this other evidence.

c. Harmless error

{¶ 158} We must now determine whether the erroneous admission of the weapons and ammunition constituted harmless error. "Nonconstitutional error is harmless if there is substantial other evidence to support the guilty verdict." *State v. Webb,* 70 Ohio St.3d 325, 335, 638 N.E.2d 1023 (1994). In *Trimble,* we employed such an analysis in finding that the error in admitting the firearms was harmless. In that case, we found that overwhelming evidence established Trimble's guilt. *Id*. at ¶ 111. We also concluded that the jury did not impose the death penalty based on the fact that Trimble owned many firearms. *Id*. In reaching that conclusion, we emphasized that the firearms found in the basement were not readmitted during the penalty phase. *Id*.

{¶ 159} As discussed in proposition II, overwhelming evidence was introduced that established Neyland's guilt. Moreover, the evidence of Neyland's other weapons and ammunition was less prejudicial than the presentation of such evidence in *Trimble*. In *Trimble,* the state displayed the weapons and ammunition upon two long tables in the courtroom during the testimony of one of the police officers. *Id*. at ¶ 114. The trial court also allowed the firearms to be in the jury room during the trial-phase deliberations. *Id*. at ¶ 115. In contrast, the prosecutor in the present case introduced mostly photographs of the firearms and ammunition, and the photographs were not readmitted during the penalty phase. Thus, we conclude that the jury did not impose the death penalty because of the other weapons and

ammunition. Proposition XV is overruled.

*Neyland*, 139 Ohio St. 3d at 379–81.

Generally, "alleged errors in evidentiary rulings by state courts are not cognizable in federal habeas review." *Moreland v. Bradshaw*, 699 F.3d 908, 923 (6th Cir. 2012). Federal habeas courts presume that state courts correctly interpret state evidentiary law in their evidentiary rulings. *Small v. Brigano*, No. 04-3328, 2005 WL 1432898, at *5 (6th Cir. June 17, 2005). And they "do not pass upon 'errors in the application of state law, especially rulings regarding the admission or exclusion of evidence.'" *Coleman v. Mitchell*, 244 F.3d 533, 542 (6th Cir. 2001) (quoting *Cooper v. Sowders*, 837 F.2d 284, 286 (6th Cir. 1988)).

Nevertheless, state-court evidentiary rulings may "rise to the level of due process violations [if] they 'offend[] some principle of justice so rooted in the traditions and conscience of our people as to be ranked as fundamental.'" *Seymour v. Walker*, 224 F.3d 542, 552 (6th Cir. 2000) (quoting *Montana v. Egelhoff*, 518 U.S. 37, 43 (1996)). A state-court evidentiary ruling, therefore, will be reviewed by a federal habeas court only if it were so fundamentally unfair as to violate the petitioner's due process rights. *Coleman*, 244 F.3d at 542. But they must be "so egregious that [they] result[]in a denial of fundamental fairness." *Bugh v. Mitchell*, 329 F.3d 496, 512 (6th Cir. 2003).

Neyland argues his trial was rendered fundamentally unfair by the admission of the photographs at issue and testimony about the photographs because they were irrelevant to the crimes and served only to lead the jury to believe he had a general propensity for violence. (Doc. 50, 175). He maintains he presented this claim as a federal constitutional claim on direct appeal, but the Ohio Supreme Court adjudicated the claim only for non-constitutional error, so he is entitled to de novo review by this Court. (Doc. 50, 177). Looking to Neyland's merit brief on

direct appeal, he primarily relied on state law in asserting the trial court erred in admitting the evidence at issue. (Doc. 20-12, 93-94). However, he does cite his due process rights to a fair trial and the Sixth and Fourteenth Amendments to the U.S. Constitution. Nevertheless, we find Neyland has failed to assert a claim that rises to the level of a "denial of fundamental fairness."

"[W]hen a state court decides a constitutional issue by form order or without extended discussion, the habeas court must conduct an independent review of the record and applicable law. . . . Ultimately, however, the inquiry remains the AEDPA standard of whether the state court result is contrary to or unreasonably applies clearly established federal law." *Maldonado v. Wilson*, 416 F.3d 470, 476 (6th Cir. 2005) (internal citation omitted). "T]he Supreme Court has defined very narrowly the category of infractions that violates fundamental fairness." *Bey v. Bagley*, 500 F.3d 514, 522 (6th Cir. 2007) (internal quotations omitted). Neyland fails to point to any clearly established federal law holding that admission of photographs of this nature render a trial fundamentally unfair. In *Bey v. Bagley*, the petitioner argued that certain "other acts" evidence admitted at trial was so prejudicial as to render his trial fundamentally unfair. The Sixth Circuit rejected this claim, holding, "Bey has offered nothing more than his disagreement with the Ohio Supreme Court's ruling that the 'other acts' evidence was properly admitted. Bey's personal disagreement is not cognizable on federal habeas review, inasmuch as it involves no constitutional dimension." *Id.* at 523.

Based on the foregoing, relief on this claim is denied.

### X. Sixteenth Ground for Relief: *Serious Mental Illness*

"The Eighth Amendment, this Court has held, prohibits the execution of a prisoner whose mental illness prevents him from 'rational[ly] understanding' why the State seeks to impose that punishment." *Madison v. Alabama*, 586 U.S. 265, 267, 139 S. Ct. 718, 722 (2019); *see*

*also Ford v. Wainwright*, 477 U.S. 399, 406, 106 S. Ct. 2595, 2600 (1986) ("The bar against executing a prisoner who has lost his sanity bears impressive historical credentials; the practice consistently has been branded "savage and inhuman." (citing 4 W. Blackstone, Commentaries *24-*25)). "*Ford* claims are designed to determine whether a prisoner is competent to be executed at the time the execution is imminent." *Thompson v. Bell*, 580 F.3d 423, 449 (6th Cir. 2009) (J. Suhrheinrich, concurring in part and dissenting in part).

In *Panetti v. Quarterman*, the U.S. Supreme Court concluded, "Congress did not intend the provisions of AEDPA addressing 'second or successive' petitions to govern a filing in the unusual posture presented here: a § 2254 application raising a *Ford*-based incompetency claim filed as soon as that claim is ripe." 551 U.S. 930, 946, 127 S. Ct. 2842, 2854 (2007). The Court, in explaining why it determined a merits analysis of the petitioner's then-ripe *Ford* claim was appropriate, despite that claim having been previously raised and rejected when unripe, stated, "Instructing prisoners to file premature claims, particularly when many of these claims will not be colorable even at a later date, does not conserve judicial resources" and "AEDPA's concern for finality . . . is not implicated, for under none of the possible approaches would federal courts be able to resolve a prisoner's *Ford* claim before execution is imminent." *Id*. at 946, 127 S. Ct. at 2854. The Court "confirmed that claims of incompetency to be executed remain unripe at early stages of the proceedings." *Id*. at 947, 127 S. Ct. at 2855; *see also Scott v. Mitchell*, 250 F.3d 1011, 1013 (6th Cir. 2001) ("Accordingly, Scott's imminent execution and his claim to a declining mental state lead us to conclude . . . that while this claim might not have been ripe six years ago, it is certainly ripe now."); *State v. Brooks*, 2011-Ohio-5877, ¶ 4 ("A *Ford* claim under R.C. 2949.28 is not ripe until an execution date has been set for a defendant since competency to be executed cannot be determined until execution is

imminent.").

Based on the above-cited law, this Court finds that Neyland's *Ford* claim is not justiciable at this time. Neyland does not have an execution date set; therefore, his execution is not imminent and his claim is unripe. Under *Panetti*, Neyland would not be barred from potentially raising this claim in the future, once his execution becomes imminent. We therefore decline to address the merits of this claim. *See Daniels v. United States*, 532 U.S. 374, 381, 121 S. Ct. 1578, 1583 (2001) ("Procedural barriers, such as statutes of limitations and rules concerning procedural default and exhaustion of remedies, operate to limit access to review on the merits of a constitutional claim.").

**XI. Seventeenth Ground for Relief: *Constitutionality of Death Penalty***

Neyland argues for his seventeenth ground for relief that Ohio's death-penalty scheme violates the Constitution, including the Fourteenth Amendment's guarantee of equal protection and the Eighth Amendment's protection against cruel and unusual punishment, because it allows the death penalty to be imposed in an arbitrary and discriminatory manner. (Doc. 17 at 173-174) In support of this claim, Neyland cites studies showing race and gender disparities in the imposition of the death penalty and others showing the use of the death penalty does not act as a deterrent to homicide. Neyland further argues Ohio's death penalty scheme is unconstitutionally vague and the absence of specific and detailed guidance regarding the weighing of aggravating and mitigating factors leads to juror confusion. He asserts Ohio law precludes a "mercy" option for jurors when aggravating circumstances outweigh mitigating circumstances or there is no mitigation, thereby unconstitutionally limiting the jury's role as the sentencing body.

Neyland raised this claim on direct appeal to the Ohio Supreme Court, which rejected it

summarily on the merits.[11] *Neyland*, 139 Ohio St. 3d at 401 (¶ 260). This claim, therefore, is ripe for federal habeas review.

This Court finds the Ohio Supreme Court's decision was neither contrary to, nor an unreasonable application of Supreme Court precedent. The Supreme Court has "time and again reaffirmed that capital punishment is not *per se* unconstitutional." *Glossip v. Gross*, 576 U.S. 863, 881 (2015); *see also Gregg v. Georgia*, 428 U.S. 153, 177 (1976). Moreover, the Sixth Circuit repeatedly has upheld the constitutionality of Ohio's death-penalty scheme and rejected many of the same claims Neyland asserts here. *See Beuke v. Houk*, 537 F.3d 618, 652-53 (6th Cir. 2008) ("Beuke next challenges the constitutionality of Ohio's death penalty scheme. His arguments are entirely meritless and have been rejected by this court on numerous occasions. We therefore will afford them minimal attention."); *Cooey v. Strickland*, 604 F.3d 939, 944 (6th Cir. 2010); *Cooey v. Coyle,* 289 F.3d 882, 928 (6th Cir. 2002); *Buell v. Mitchell*, 274 F.3d 337, 367-76 (6th Cir. 2001); *Coleman v. Mitchell*, 268 F.3d 417, 453 (6th Cir. 2001); *Byrd v. Collins*, 209 F.3d 486, 539 (6th Cir. 2000) *Jamison v. Collins*, 100 F. Supp. 2d 647, 759-67 (S.D. Ohio 2000).

In *Coleman*, the Sixth Circuit addressed concerns over racial disparities in the application of the death penalty as follows: "[T]hough the racial imbalance is, to say the least, extremely troubling, we find that the prosecutorial discretion under the Ohio death penalty scheme, and the disconcerting racial imbalances accompanying such discretion, nevertheless fall, under current Supreme Court law, within the 'constitutionally permissible range of discretion in imposing the death penalty.'" *Coleman*, 268 F.3d at 442 (quoting *McCleskey v. Kemp*, 481 U.S. 279, 107 S.Ct. 1756 (1987)).

---

[11] Justice O'Neill, in his dissenting opinion, wrote that "the death penalty is both cruel and unusual and cannot be morally justified by retribution or deterrence" and that its "unconstitutionality and inhumanity . . . are even clearer when it is imposed on the mentally ill, such as Calvin Neyland." *Neyland*, 139 Ohio St. 3d at 401 (¶ 310) (J. O'Neill, dissenting).

The Sixth Circuit has repeatedly rejected the argument that Ohio's death-penalty scheme violates the Constitution because it allows the death penalty to be imposed in an arbitrary and discriminatory manner. (Doc. No. 32 at 138-40.) *See, e.g., Buell,* 274 F.3d at 367; *Byrd*, 209 F.3d at 539. It explained in *Buell*:

> We note that the Ohio death penalty statute includes a number of capital sentencing procedures that the United States Supreme Court held in *Gregg v. Georgia*, 428 U.S. 153, 188–95, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976), specifically to reduce the likelihood of arbitrary and capricious imposition of the death penalty. These procedures include: (1) consideration of a pre-sentence report by the sentencing authority; (2) jury sentencing where the jury is adequately informed and given meaningful standards to guide its use of the information; (3) a bifurcated guilt phase/sentencing phase trial; (4) weighing of aggravating circumstances and mitigating factors; (5) a sentencing decision based on specific findings; and (6) meaningful appellate review. In *Gregg*, the Court stated that the concerns expressed in *Furman* could be met by "a carefully drafted statute that ensures that the sentencing authority is given adequate information and guidance." *Gregg*, 428 U.S. at 195, 96 S.Ct. 2909. By complying with this requirement, the Ohio death penalty statute significantly reduces the likelihood of arbitrary and capricious imposition of the death penalty and does not run afoul of the Constitution.

*Buell*, 274 F.3d at 367.

Based on the foregoing, relief on this claim is denied.

**XII. Neyland's Motion for Discovery**

Neyland has filed a motion for discovery. (Doc. 53.). He seeks to conduct discovery on his first, second, and third grounds for relief, all pertaining to his competency. His first ground for relief alleges he was tried while incompetent. His second and third grounds for relief allege his trial counsel were ineffective for failing to adequately impeach Dr. Haskins and Dr. Smith, who testified on behalf of the State that Neyland was competent. Specifically, Neyland moves for leave to depose Drs. Haskins and Smith. Neyland argues he should be permitted to take discovery because the state courts unreasonably adjudicated his claims, as argued in his habeas petition and

traverse, and deposing Drs. Haskins and Smith is likely to lead to evidence relevant to his claims.

Respondent opposes the motion. (Doc. 54.)

**A. Discovery in Federal Habeas Cases**

A federal habeas petitioner, "unlike the usual civil litigant, is not entitled to discovery as a matter of ordinary course." *Bracy v. Gramley*, 520 U.S. 899, 904 (1997). Discovery in habeas cases is governed by Rule 6 of the Rules Governing Section 2254 Cases in the United States District Courts ("Habeas Rules"), which permits petitioners to initiate discovery available under the federal civil rules "if, and to the extent that, the judge in the exercise of his discretion and for good cause shown grants leave to do so, but not otherwise." Habeas Rule 6(a). "Good cause" for discovery under Rule 6 exists only "'where specific allegations before the court show reason to believe that the petitioner may, if the facts are fully developed, be able to demonstrate that he is . . . entitled to relief . . . .'" *Bracy*, 520 U.S. at 908–09 (quoting *Harris v. Nelson*, 394 U.S. 286, 300 (1969)).

The burden is on the petitioner to demonstrate the materiality of the information requested. *See Williams v. Bagley*, 380 F.3d 932, 974 (6th Cir. 2004). Habeas Rule 6 does not "sanction fishing expeditions based on a petitioner's conclusory allegations," but requires "specific allegations of fact." *Id.* (internal quotation marks and citations omitted). When a habeas petitioner "offers nothing more than vague musings on how [the desired discovery] might . . . unfold[,]" a district court may correctly determine that he or she has "fail[ed] to satisfy the 'good cause' standard required to obtain habeas corpus discovery." *Stojetz v. Ishee*, 892 F.3d 175, 207 (6th Cir. 2018).

The Supreme Court further circumscribed the availability of discovery in federal habeas proceedings in *Cullen v. Pinholster*, 563 U.S. 170 (2011). In that case, the Court held that "review under § 2254(d)(1) is limited to the record that was before the state court that adjudicated the claim

on the merits." *Pinholster*, 563 U.S. at 181.[12] Noting that § 2254(d)(1) review "focuses on what a state court knew and did," the Court reasoned that "[i]t would be strange to ask federal courts to analyze whether a state court's adjudication resulted in a decision that unreasonably applied federal law to facts not before the state court." *Id*. at 182. "'Federal courts sitting in habeas are not an alternative forum for trying facts and issues which a prisoner made insufficient effort to pursue in state proceedings.'" *Id*. at 186 (quoting *(Michael) Williams v. Taylor*, 529 U.S. 420, 427-29 (2000)).

Under *Pinholster*, therefore, "district courts are precluded from conducting evidentiary hearings to supplement existing state court records when a state court has issued a decision on the merits with respect to the claim at issue." *Ballinger v. Prelesnik*, 709 F.3d 558, 561 (6th Cir. 2013); *see also Bourne v. Curtin*, 666 F.3d 411, 415 (6th Cir. 2012) (finding petitioner was not entitled to an evidentiary hearing because the state courts had adjudicated his claim on the merits and, under *Pinholster*, petitioner was "stuck with 'the record that was before the state court'"). The Sixth Circuit also consistently has held that *Pinholster* bars consideration of new evidence developed in federal habeas proceedings relating to claims adjudicated on the merits in state courts. *See, e.g., Loza v. Mitchell*, 766 466, 494 (6th Cir. 2014) ("Loza's selective prosecution claim was adjudicated on the merits in state court, and, therefore, *Pinholster* requires us to consider only the evidence that was before the state court when reviewing Loza's claim."); *Sheppard v. Bagley*, 657 F.3d 338, 344 (6th Cir. 2011) (refusing to consider evidence adduced at federal evidentiary hearing in light of *Pinholster*).

Similarly, the Sixth Circuit has held that a district court properly denied a habeas

[12] Review under § 2254(d)(2) is limited to evidence presented in the state-court proceedings by its express terms. *See* 28 U.S.C. § 2254(d)(2).

petitioner's motion for discovery in part because the claim to which it applied "was adjudicated on the merits in state court, [and the court's] review [was] limited to the record that was before the state court." *Guysinger v. Buchanan*, 2020 WL 5405892, at *2 (6th Cir. July 16, 2020). Indeed, the clear trend among district courts in this circuit is to apply *Pinholster* to limit discovery in habeas proceedings and deny petitioners' requests for discovery of evidence that *Pinholster* would bar from their review. *See, e.g., Broom v. Bobby*, 2018 WL 1621083, at *3-5 (N.D. Ohio Apr. 4, 2018); *Lang v. Bobby*, 2014 U.S. Dist. LEXIS 150916, at *8 (N.D. Ohio Oct. 23, 2014); *Davis v. Bobby*, 2017 WL 2544083, at *4 (S.D. Ohio June 13, 2017) (collecting cases). As one district court observed: "It would defy logic to preclude a petitioner from developing factual information in an evidentiary hearing [under *Pinholster*], but allow her to introduce the same factual information via discovery and expansion of the record." *Caudill v. Conover*, 871 F. Supp. 2d 639, 646 (E.D. Ky. 2012).

Federal habeas courts may consider new evidence when deciding whether there is cause and prejudice or actual innocence to excuse a procedurally defaulted claim. *House v. Bell*, 547 U.S. 518, 537-38 (2006). But habeas courts have denied discovery requests related to procedurally defaulted claims where the petitioner did not show that the discovery could produce evidence excusing the default. *See Williams v. Bagley*, 380 F.3d 932, 975-76 (6th Cir. 2004) (holding district court properly denied a habeas petitioner's discovery requests relating to procedurally defaulted ineffective-assistance claims because the petitioner had not shown that the requested discovery could "resolve any factual disputes that could entitle him to relief"); *Owens v. Guida*, 2002 WL 1398544, at *2 (W.D. Tenn. Jan. 9, 2002) ("Petitioner has not shown that she is entitled to conduct discovery because the information sought would not have established cause and prejudice for the asserted procedural default of her ineffective assistance of counsel claim.").

**B. Analysis**

The Court finds Neyland has failed to demonstrate his entitlement to discovery. First, discovery related to grounds one, two, and three is precluded under *Pinholster*, because, as explained above, Neyland raised those claims in state court, where they were adjudicated on the merits. Second, discovery is not warranted on any of the claims at issue because this Court has also concluded these claims are meritless. Third, Neyland has not shown good cause for his request for discovery related to grounds one, two, or three because, as this Court's prior discussion of the merits indicates, his allegations do not show that, even if the facts were fully developed, he may be able to demonstrate that he is entitled to relief. *See Bracy*, 520 U.S. at 908–09. Neyland's motion for discovery, therefore, is denied.

## CERTIFICATE OF APPEALABILITY ANALYSIS

The Court must now determine whether to grant a Certificate of Appealability ("COA") for any of Neyland's grounds for relief. The Sixth Circuit has held that neither a blanket grant nor a blanket denial of a COA is an appropriate means by which to conclude a capital habeas case as it "undermine[s] the gate keeping function of certificates of appealability, which ideally should separate the constitutional claims that merit the close attention of counsel and this court from those claims that have little or no viability." *Porterfield v. Bell*, 258 F.3d 484, 487 (6th Cir. 2001); *see also Murphy v. Ohio*, 263 F.3d 466 (6th Cir. 2001) (remanding motion for certificate of appealability for district court's analysis of claims).

Habeas courts are guided in their consideration of whether to grant a COA by 28 U.S.C. § 2253, which provides in relevant part:

> (c)(1) Unless a circuit justice or judge issues a certificate of appealability, an appeal may not be taken to the court of appeals from –

> (A) the final order in a habeas corpus proceeding in which the detention complained of arises out of process issued by a State court . . .
>
> (2) A certificate of appealability may issue under paragraph (12) only if the applicant has made a substantial showing of the denial of a constitutional right.

28 U.S.C. § 2253. This language is identical to the requirements set forth in the pre-AEDPA statutes, requiring the habeas petitioner to obtain a Certificate of Probable Cause. The sole difference between the pre- and post-AEDPA statutes is that the petitioner must now demonstrate he was denied a *constitutional*, rather than federal, right. *Slack v. McDaniel*, 529 U.S. 473, 483-04 (2000) (interpreting the significance of the revision between the pre- and post-AEDPA versions of that statute).

Furthermore, if a habeas claim is not procedurally defaulted, then the court need only determine whether reasonable jurists would find the district court's decision "debatable or wrong." *Id*. at 484. A more complicated analysis is required, however, when assessing whether to grant a COA for a claim the district court has determined is procedurally defaulted. In those instances, a COA should only issue if "jurists of reason would find it debatable whether the petition states a valid claim of the denial of a constitutional right and that jurists of reason would find it debatable whether the district court was correct in its procedural ruling." *Id*.

After taking the above standards into consideration, the Court declines to issue a COA on Neyland's claims, which the Court found were either not proper for this Court's review or meritless. As discussed above, Neyland has failed to demonstrate the state court proceedings resulted in a decision that was contrary to or involved an unreasonable application of clearly established federal law, or resulted in a decision based on an unreasonable determination of the facts pursuant to § 2254, which we reiterate represents a "formidable barrier to federal habeas

relief for prisoners whose claims have been adjudicated in state court." *Titlow*, 571 U.S. at 19. Accordingly, no jurist of reason would debate the Court's conclusions on these claims.

## CONCLUSION

For the foregoing reasons, this Court denies Neyland's Petition for Writ of Habeas Corpus. The Court certifies that, pursuant to 28 U.S.C. § 1915(a)(3), an appeal from this decision could not be taken in good faith with regard to Claims I through XVII, and that there is no basis upon which to issue a certificate of appealability. 28 U.S.C. § 2253(c); Fed. R. App. P. 22(b).

IT IS SO ORDERED.

Dated: September 22, 2026

*\/s/ John R. Adams*
JOHN R. ADAMS
UNITED STATES DISTRICT JUDGE